**Case No. 23-1165**

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

LuzMaria Arroyo,

Plaintiff-Appellant,

v.

Volvo Group North America, LLC,

Defendant-Appellee.

---

Appeal from a Judgment of the District Court for the
Northern District of Illinois, Eastern Division
Case No. 12 C 06859
Honorable Robert M. Dow, Jr., Judge Presiding

**BRIEF AND SHORT APPENDIX OF
LUZMARIA ARROYO, PLAINTIFF-APPELLANT**

John P. DeRose & Associates
615 N. York Road
Hinsdale, IL 60521
(630) 920-1111 office
(630) 920-1170 fax
john@johnderoselaw.com
caitlyn@johnderoselaw.com

**Oral Argument Requested**

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT (Revised)**

**Appellate Court No:** 23-1165

**Short Caption:** LuzMaria Arroyo v. Volvo Group North America, LLC

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing, or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the parties mean brief.

**Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> **[X] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED. Additional names of law firms that represented LuzMaria Arroyo**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):  LuzMaria Arroyo, Plaintiff-Appellant

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court: John P. DeRose & Associates, Ed Fox & Associates, and Donna M. Adler Law, LLC

(3)     If the party or amicus is a corporation:
i) identify all the parent corporations, if any; and
　　　N/A
ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
　　　N/A

---

Attorney's Signature: /S/ John P. DeRose　　　　　　　　　Date: 06/26/23
Attorney's Printed Name: John P. DeRose

Please indicate if you are Counsel of Record for the above listed parties, pursuant to Circuit Court Rule 3(d).　[X] Yes [ ] No.
Address: John P. DeRose & Associates, 615 N. York Road., Hinsdale, IL 60521
Phone: (630) 920-1111 Fax: (630) 920-1170 Email Address: john@johnderoselaw.com

# TABLE OF CONTENTS

Page No.

Circuit Rule 26.1 Disclosure Statement …………………………………………….…….i

Table of Contents ………………………………………………………………..........ii

Table of Authorities ……………………………………………………………………..xii

Jurisdictional Statement.…………………………………………………………………..1

Statement of the Issues Presented for Review……………………………………………2

Statement of the Case…………………………………………………………………..3

I. CLEAR INSTRUCTIONS FROM THE SEVENTH CIRCUIT ON REMAND…....................5

   A. All Emails Must Be Considered by the Jury
   To Show Volvo's Anti-Military Animus under USERRA………………………………....5

   B. The ADA Discrimination Claim Should Be Considered by The Jury……………….…..6

   C. Unsatisfied with the Result on Appeal,
   Volvo Unsuccessfully Moves for *En Banc* Reconsideration……………………………..6

II. DISCUSSING THE RULES FOR THE TRIAL OF *ARROYO I*………………………………7

   A. The Parties Analyze the Seventh Circuit Directions………..……………………………7

   B. Volvo Continues to Take Issue
   With the Seventh Circuit Opinion and Directions………………………………………..8

   C. Stipulations Between the Parties Regarding the ADA and PTSD
   Read to the Jury in *Arroyo I*………………………………………………………...8

   D. Consideration of the ADA Claim, the Meditation Room, and Parking Restrictions
   to Show Volvo Frustration and Animosity in *Arroyo I*…………………………………..9

   E. Volvo Revisits the Seventh Circuit Directions during *Arroyo I*…………………………...10

III. EVIDENCE ADDUCED IN *ARROYO I*………………………………………………11

   A. Emails, Trial Testimony, And Acknowledgments
   Presented for Jury Consideration in *Arroyo I*…………………………………………11

IV. ASSURANCES IN *ARROYO I* FROM THE TRIAL COURT THAT THE
   SEVENTH CIRCUIT DIRECTIONS ARE BEING FOLLOWED………………………..20

A. The Court is Being Fair to Both Sides during *Arroyo I*…………………………………20

B. Seventh Circuit's New Look at Evidence Announced During *Arroyo I*………………...21

   1.  Trial Judge Is Satisfied *Arroyo I* Was Tried Correctly
      Even under Newly Announced Law……………..……………………………………...21

C. Following the Directions and Instructions from the Seventh Circuit
   *Arroyo I* Results in a Jury Verdict for Arroyo and against Volvo………………………22

V. POSTTRIAL PRACTICE AFTER *ARROYO I*……………………………………………...22

A. Jury Verdict in *Arroyo I* Set Aside and
   New Trial Ordered on USERRA Claim Only……………………………………………24

VI. SUMMARY OF THE ARGUMENT……………………………………………………25

VII. ARGUMENT…………………………………………………………………………27

A. The Grant of a New Trial Not Immediately Appealable………………………………..27

B. Arroyo's Attempt to Correct Trial Court's Announced Shortcomings
   in *Arroyo I* before Commencement of *Arroyo II* are Rejected.…………………………27

   1. The Testimony of Arroyo's Treaters regarding Arroyo's PTSD……………………27

   2. The Stipulations of Facts Already Agreed upon in *Arroyo I*
     And Their Elimination Causing a Completely Different Trial in *Arroyo II*………...28

   3. The Testimony of an Expert Economist Regarding Arroyo's Damages……………28

   4. The Testimony of Comparators Regarding Arroyo's Damages……………………29

C. Arroyo Files Motions for Judge Dow to Reconsider His Rulings……………………29

D. Plaintiff's Memorandum of Law
   Recapping Seventh Circuit Precedent on Retrial……………………………………30

   1. Pursuant to Her Jury Demand, Arroyo Is Entitled to Jury Consideration
     on All Damages and To Present Her Expert's Analysis of Those Damages………30

   2. The Jury in *Arroyo v. Volvo* Should Determine Statutory Damages
     Based on the Frequency, Persistence, and Intentional Noncompliance…………...30

   3. The Jury Verdict in *Arroyo I* Should Not Have Been Set Aside
     Because It Is Within Permissible Ratios…………………………………………...31

4. The Jury Verdict in *Arroyo I* Should Have Been Afforded Great Deference
   Because Facts in the Case Are Simple and Not in Dispute…………………………31

   a. The Jury Verdict Resulting in a 1 to 3 Ratio
      between Compensatory and Punitive Damages
      Was Proportionate and Reasonable in *Arroyo I*………………………………32

   b. Divided Supreme Court Justices Express Their Beliefs
      that The Judiciary Unwisely Ventured into and/or Is Ill-Equipped
      To Reassess Punitive Damages Imposed by a Jury…………….………………32

   c. Although the Federal Judge Has Discretion to Revisit
      and Even Overturn a Verdict for Excessiveness,
      the Responsibility of the Jury to Assess Damages Must Be Respected………34

5. Volvo and Its Counsel Failed to Properly Assert Any Complaints
   about How the Jury Would Calculate Damages in *Arroyo I* …………………....34

   a. The *Arroyo I* Verdict Was Not against the Weight of the Evidence………….35

   b. Seventh Circuit's Directions on Remand Not Scrupulously Followed
      And Both the USERRA and ADA Claims Should Have Been
      Submitted for Retrial in *Arroyo II*……………………………………….........36

   c. On Remand, directions from the Seventh Circuit
      Were Not Scrupulously Followed in in *Arroyo II*
      As They Had Been Carefully Followed in *Arroyo I*…………………………37

E. Trial Judge Issues Additional Rulings Limiting Evidence
   that will be allowed in *Arroyo II*……………………………………………………...38

F. The Effect of the Trial Judge's Limiting Emails in *Arroyo II*………………..……….38

G. Emails, Testimony, and Acknowledgments Precluded, Excluded,
   or Disguised and Recharacterized from Jury Consideration in *Arroyo II*………..……40

   1. *Arroyo II* is Tried on the USERRA Claim Only
      and Results in a Verdict for Volvo………………………………………………..…40

   2. Motion Practice after *Arroyo II*…………………….………………………………....40

      a. On March 2, 2022, Plaintiff's Rule 59 Motion for New Trial
         or To Alter or Amend Judgment was filed...……………….....……………….….40

      b. On March 10, 2022, because Judge Dow indicated that he had never seen

a jury verdict on any other USERRA case except jury verdict in the above-captioned case, Plaintiff's counsel was given leave to research across the country regarding other USERRA jury verdicts……………………………40

c. On March 11, 2022, Plaintiff's counsel filed a Report to the Court of other jury verdicts under USERRA……………………………………………40

d. On December 27, 2022, Judge Dow denied Plaintiff's Rule 59 Motion for New Trial or to Alter or Amend Judgment…………………….…..41

3. So Much Evidence was Sanitized and Scrubbed Away in *Arroyo II*……………42

4. In *Arroyo II*, So Many Emails were Eliminated……………………………..…42

5. The Original Jury Verdict in *Arroyo I* Must Be Reinstated………………..…...42

VIII. CONCLUSION……………………………………………………………………43

CIRCUIT RULE 30(d) STATEMENT………………………………………………..44

CERTIFICATE OF COMPLIANCE…………………………………………………..44

CERTIFICATE OF SERVICE…………………………………………………………45

# TABLE OF AUTHORITIES

**Cases Cited**                                                           **Page(s)**

*Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir.2015)……………………...…7, 23, and 24

*Arroyo v. Volvo Group North America, LLC,* 805 F.3d 278, (7th Cir. 2015).........3, 4, 5, 6, and 42

*BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)………………………………………………………………………32

*Central States, Southeast And Southwest Areas Pension Fund v. Koder,* 969 F.2d 451, 455 (1992)…………………………………………………………………..28

*Christian Legal Society Chapter of the University of California, Hastings College of Law, a.k.a. Hastings Christian Fellowship v. Martinez*, 1561 U.S. 661, 676, 130 S.Ct. 2971, 177 L.Ed.2d 838 (2010)………………………………………………………………………28

*Clarett v. Roberts*, 657 F.3d 664,674 (7th Cir. 2011)…………………………………………35

*Creek v. Village of Westhaven*, 144 F.3d 441, 445 (7th Cir.1998)……………………...…36

*Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 436-8, 116 S.Ct. 2211, 135 L.Ed.2d 659  (1996)………………………………………………………………………34

*J.K.J. v. Polk County*, 960 F.3d 367, 378 (7th Cir. 2020)………………………………...36

*Jorge Baez-Sanchez v. William P. Barr*, 947 F.3d 1033, 1035-6 (7th Cir. 2020)………………37

*Juneau Square Corp. v. First Wisconsin National Bank of Milwaukee,* 624 F. 798, 806 (7th Cir. 1980)…………………………………………………………………41

*Kapelanski v. Johnson*, 390 F.3d 525, (7th Cir. 2004)………………………………………..31

*Kobs v. Arrow Service Bureau, Inc.*, 134 F.3d 893, 896 (7th Cir. 1998)………………………..30

*Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 485, (7th Cir.2003)…………………………34

*Latino v. Kaiser*, 58 F.3d 310, 314 (7th Cir. 1995)………………………………….........27, 43

*Louis Vuitton S.A. v. Pun Yang Lee*, 875 F.2d 584, 587-8 (1989)………………………………28

*Maher v. City of Chi.*, 463 F.Supp.2d  837, 844 (N.D.Ill.2006)…………………………………23

*Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672 (7th Cir.2003)……………………………31

*Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 106 F.3d 1388, 1396-9 (7th Cir. 1997)……………………………………………………………………………30

*Middleton v. City of Chicago*, 578 F.3d 655, 659 (7th Cir.2009)……………………………..23

*Neely v. Martin K. Eby Construction Company, Inc.*, 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967)……………………………………………..........29, 41

*Ortiz v. Warner Enterprises,* 834 F.3d 760 (7th Cir.2016). ……………………..…………….21

*Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 500 (7th Cir. 2000)……………....23, 34

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)………………………………………………………...31, 32

*Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012)………………………………………….31

**Statutes-Regulations Cited**                                       **Page(s)**

28 U.S.C. A. §§ 1331…………………………………………………………………...1

28 U.S.C. A. §1343…………………………………………………………………...1

28 U.S.C. § 1367……………………………………………………………………...1

28 U.S.C. A. §1391(b)……………………………………………………………....1

29 U.S.C. § 791 *et. seq*..…………………………………………………...1 and 3

29 U.S.C. A. § 794……………………………………………………………………...1

29 U.S.C.A. § 794(a)(1) ………………………………………………………1

38 U.S.C.A. § 4301 *et seq*..………………………………………...…….…..1and 3

42 U.S.C. § 2000e et seq……………………………………………………..……...3

42 U.S.C.A. § 12101 *et seq*..………………………………………………...…...1and 3

**Jurisdictional Statement**

This cause of action was brought pursuant to 29 U.S.C. § 794; and the jurisdiction of this court is invoked pursuant to 29 U.S.C. § 794(a)(1). Venue lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §§ 1331, 1343, and 1391(b) because the events giving rise to this claim occurred in this Judicial District and Plaintiff and Defendant reside in this District. Supplemental jurisdiction is requested over state law claims pursuant to 28 U.S.C. § 1367.

This is an action seeking redress for violations of rights and protections guaranteed to the Plaintiff under the Americans with Disabilities Act (ADA) of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq. ("ADA") and under the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 et seq. ("USERRA"). (Doc.#51).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Did the retrial of this case follow the instructions of the Seventh Circuit?

What caused the vast discrepancy between the jury verdicts of *Arroyo I* and *Arroyo II*?

Was critical evidence withheld from jury consideration in *Arroyo II*?

Was the jury in *Arroyo II* told a sanitized story unfair to Arroyo?

Should the jury in *Arroyo II* have been able to rule on damages in the USERRA claim?

Should the jury in *Arroyo II* have been allowed to consider the ADA claim?

Should Dr. Lynn, Brian Fask, LCSW, and Dr. Smith been allowed to testify in *Arroyo II*?

Should evidence of Arroyo's PTSD and treatment been presented to the jury in *Arroyo II*?

Should the trial court have offered a remittitur before ordering a new trial?

Should the trial and jury verdict in *Arroyo I* which followed the directions from the Seventh Circuit be reinstated?

Was too much information kept from the jury in *Arroyo II* showing the frustration of Volvo management and supervisors as Arroyo followed her military orders?

## STATEMENT OF THE CASE

A statement of this case has been recited many times, in the original motion for summary judgment, in the appeal to the Seventh Circuit Court of Appeals[1], in the several pretrial and posttrial motions before and after the trials of *Arroyo I* and *Arroyo II*.  Judge Kanne provided the most succinct statement of the case upon remand of the case for trial:

> LuzMaria Arroyo is an Army Reservist and veteran who suffers from post-traumatic stress disorder ("PTSD"). She worked for Volvo Group North America, LLC, d/b/a Volvo Parts North America ("Volvo") from June 2005 until she was fired in November 2011. Volvo says it fired her for violations of its attendance policy, but Arroyo claims the real reason was discrimination on the basis of her military service and her disability.
>
> Arroyo sued Volvo in federal district court for discrimination, retaliation, and failure to provide reasonable accommodations in violation the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 et seq. ("USERRA"), the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Arroyo also brought a state-law claim for intentional infliction of emotional distress. The district court granted Volvo's motion for summary judgment on all counts and awarded Volvo, as the prevailing party, its reasonable costs. We now reverse the district court's order with respect to Arroyo's discrimination claims under USERRA and the ADA because Arroyo has raised genuine, material factual issues that should be resolved at trial.[2]

---

[1] *Arroyo v. Volvo Group North America, LLC*, 805 F.3d 278, (7th Cir. 2015).

At oral argument, Judge Kanne expressed concern about the statement that Volvo had hired and employed Arroyo as its one and only active Army Reservist throughout the entire company and invited Volvo to send written communication to the Seventh Circuit if that understanding was incorrect. No such communication was ever forthcoming from Volvo.

Also at oral argument, Judge Williams expressed concern because it appeared from the record that the regulation prohibiting parking at the rear of the Volvo plant was a rule promulgated just for Arroyo.

[2] *Arroyo v. Volvo Group North America, LLC*, 805 F.3d 278, 280-281 (7th Cir. 2015).

After the Seventh Circuit remanded the case for trial, the matter was tried before a jury on August 23, 2016 wherein the jury returned a verdict in favor of Arroyo on both claims, awarding $2.6 million in compensatory damages and $5.2 million in punitive damages on her ADA claim and finding Volvo liable for willful violations under USERRA.[3] Judge Dow determined that the jury would not rule on USERRA damages. (Doc.#: 162). On September 30, 2019, disregarding the jury's determination that Volvo's adverse employment action was actually based on discrimination and anti-military animus, Judge Dow granted Volvo's motion for judgment as a matter of law on Arroyo's ADA claim, holding that no reasonable juror could find that Arroyo was a qualified individual under the ADA at the time of her termination. (Doc.#: 227, at 26-27). Lacking any proof for such contention whatsoever, Judge Dow determined the jury's finding in *Arroyo I* was rooted in passion and prejudice.

No longer following the mandate from the Seventh Circuit Court of Appeals and its clear directions and instructions, Judge Dow granted Volvo a new trial on Arroyo's USERRA claim only. The case proceeded to a second jury trial wherein much of the emails, information and evidence[4] found to be relevant by the Seventh Circuit Court of Appeals was barred from being presented to the jury. Following the second trial, the jury returned a verdict for defendant.

---

[3] "USERRA is intended to ensure that these service members are not disadvantaged in their civilian careers because of their service; are promptly reemployed in their civilian jobs upon their return from duty; and are not discriminated against in employment because of their military status or obligations." See the Presidential Memorandum, July 19, 2012, 77 F. R. 43699.

[4] Among many things, Arroyo's PTSD diagnosis and subsequent treatment was barred from jury consideration in *Arroyo II*. Her therapy at the Veterans Administration was referred to as "Tuesday meetings" and the "meditation room" was "meeting room." Rumors circulating concerning Arroyo's whereabouts when dealing with PTSD was barred. As was Schroeder's statement on the date of her termination about Arroyo involving ESGR.

# I. CLEAR DIRECTIONS FROM THE SEVENTH CIRCUIT ON REMAND

## A. All Emails Must Be Considered by the Jury
## To Show Volvo's Anti-Military Animus under USERRA

The Seventh Circuit noted that Arroyo's claim under USERRA and the email exchanges

among Volvo management and supervisors[5] must be considered by the jury[6]:

> Taking all the evidence as a whole, a reasonable jury could infer
> that Volvo was motivated, at least in part, by anti-military
> animus toward Arroyo. [7] There is evidence that from the
> beginning of her employment, her supervisors disliked the
> burden her frequent military leave placed on the company. They
> repeatedly discussed disciplining her and denied her rights, such
> as travel time, to which she was entitled. Some of the emails
> come close to a direct admission of management's frustration.
> For example, Schroeder discussed his "dilemma" of
> "disciplin[ing] a person for taking too much time off for military
> reserve duty." He later reportedly told Arroyo that
> accommodating her orders placed an undue hardship on Volvo;
> Jarvis repeated the same sentiment. Temko complained about
> Arroyo's lack of communication while she was deployed in Iraq.
> A jury could understandably detect in these communications
> animus toward Arroyo's military service.[8]

> [W]e think a jury could reasonably conclude that there was such a
> link here. The emails expressing management's frustration often
> transitioned directly to a discussion about disciplining Arroyo
> under the local attendance policy for her tardiness and absences. In

---

[5] The Seventh Circuit indicated that all the emails over the years revealed Volvo's frustration that she was a burden as she answered the orders of the United States Army. None of these emails were known to Ms. Arroyo until discovery in this case. There were as many as four volumes (i.e., 4-inch, three ring binders) of the secret emails among Volvo management expressing their frustration with Arroyo's military service). Only one three ring binder, three-quarters full of those emails was allowed into evidence and seen by the jury on retrial.

[6] Still, at retrial more than two thirds of the emails were kept from jury review and consideration. The emails showed Schroeder wanted every supervisor to have a witness when talking to Arroyo, and yet Schroeder refused to allow Arroyo her own witness to be available when he met with her. Some emails had no connection to PTSD or disability but could be connected to the non-verbal discrimination and hostility about which Arroyo has been pointing and complaining throughout all of 2010 and 2011.

[7] The emails showed Schroeder wanted every supervisor to have a witness when talking to Arroyo, and yet Schroeder refused to allow Arroyo her own witness or proofer to be available when he met with her. The better to gaslight and control the narrative. Some emails had no connection to PTSD or disability but could be connected to the non-verbal discrimination and hostility about which Arroyo has been pointing and complaining throughout all of 2010 and 2011.

[8] The emails mocking Arroyo when she was in the ER shows Volvo management and supervisors were not taking her seriously or her diagnosis- they even contemplated discipline for her during that time, which shows their true motive and intent. (e.g., Pl.'s Exs, 95, 118A, 118B, 119, 123, 124, 125, 128, 138, 141, and 142).

5

the end, she was not disciplined directly for her military leave. But she was disciplined for other instances of tardiness, often of a relatively minor nature—one or only a few minutes late. A jury could infer from the evidence that Arroyo's punishment for such infractions was actually motivated by her supervisors' long-standing frustration about her frequent absences.[9]

## B. The ADA Discrimination Claim Should Be Considered by The Jury

The Seventh Circuit also directed that Arroyo's claim under the Americans with Disabilities Act should be tried before a jury[10]:

> There is also enough to support a finding of "but for" causation. Management's expressions of frustration about Arroyo's military absences goes back to the beginning of her employment in 2005, but it was not until she returned from her second deployment in the fall of 2010 that Volvo began implementing the series of disciplinary steps that led to her termination. That timing coincides with the onset and diagnosis of Arroyo's PTSD. This kind of suspicious timing can support an inference of discrimination. (Citation omitted).[11]

Importantly, the Seventh Circuit also noted:

> After returning from her second deployment, Arroyo received treatment for symptoms of PTSD and was formally diagnosed in January 2011. She checked herself into the emergency room on December 23, 2010; the next day she emailed Schroeder to tell him what was happening and that the doctor ordered her not to work through the 30th. In an internal email, Schroeder considered disciplining her, but she later provided a doctor's note and discharge paperwork excusing the absences.[12]

## C. Unsatisfied with the Result, Volvo Unsuccessfully Moves for *En Banc* Reconsideration

Volvo's motion for *En Banc* reconsideration was denied by the Seventh Circuit.

---

[9]  *Arroyo v. Volvo Group North America, LLC*, 805 F.3d 278, 285-286 (7th Cir. 2015).
[10] Barring all evidence in *Arroyo II* concerning Arroyo's PTSD diagnosis or treatment in the emergency room and Volvo's subsequent attempts to discipline her at that time directly challenges the Seventh Circuit's opinion that it may support an inference of discrimination.
[11] *Arroyo v. Volvo Group North America, LLC,* 805 F.3d 278, 287(7th Cir. 2015).
[12] *Arroyo v. Volvo Group North America, LLC,* 805 F.3d 278, 283 (7th Cir. 2015).

## II. DISCUSSING THE RULES FOR THE TRIAL OF *ARROYO I*

### A. The Parties Analyze the Seventh Circuit Directions

On the first day of *Arroyo I*, as the trial judge was explaining how the trial would

proceed, the following discussion occurred:

> MR. McMAHON:      You know, as you know, the Seventh Circuit
> really went through the record --
>
> THE COURT:   I do know that.
>
> MR. McMAHON:      -- and teased out the emails that it
> believed supported USERRA and the ADA.
> But on the USERRA, I think it's noteworthy they cite the *Adams*
> case from the Seventh Circuit when they talk about how the
> *animus* has to be linked as a motivating factor to the adverse
> employment action.
>
> So they're not just saying, "Well, here's an email and there's
> animus. And we're going to collect all of the emails with some
> animus and throw them into a pot
> and say, 'Okay. There's the link.'"
>
> What they went on to say was, "Again, you think a jury could
> reasonably conclude there was such a link here. The emails
> expressing management's frustration often transitioned directly to
> the discussion of disciplining Arroyo under the local attendance
> policy for her tardiness and absences."
>
> So what they were pointing out was it's not just that they randomly
> picked some emails that were some animus and said, "Yeah these
> look bad. We think there's animus in there," according to the
> Seventh Circuit. And because they were discussing what she was
> ultimately disciplined under, we think there's a requisite link
> there.[13]
>
> MR. McMAHON: And my point of, quote, reporting this,
> was not to, again, argue again, so the Seventh Circuit is – or I want
> your Honor to revisit the Seventh Circuit's rulings on old emails.
> What I'm getting at is the prism they're talking about the old emails
> with, which is kind of our point of submitting that supplemental
> brief on the direct standard – or the direct method.

---

[13] *Arroyo I* Trial Transcript, August 15, 2016, 23:12 to 24: 10.

7

The direct method is actually a pretty dang narrow
standard. It's pretty difficult. So it's not just this, oh,
there's animus and we have an adverse employment action, and if
you have both, then you can use both.[14]

### B. Volvo Continues to Take Issue
### With the Seventh Circuit Opinion and Directions

As *Arroyo I* progresses, Volvo continues to express its dissatisfaction with the ruling

from the Seventh Circuit Court of Appeals upon remand:

> MR. McMAHON: Interestingly enough, your Honor, I will
> say for the record, the Seventh Circuit panel cited to *Teruggi*.
> Again, I don't want to spend time rearguing things here --
>
> THE COURT: Yes.
>
> MR. McMAHON: -- but we do want to preserve that for appeal.
> And I understand your Honor to have essentially
> overruled that objection, such that these emails are going to be
> admissible[15]
>
> MR. McMAHON: …I guess, your Honor, our position would be,
> just for the record, that, you know, the Seventh Circuit panel did go
> through the evidence, and obviously we know this case email
> intensive, as Your Honor noted.[16]
>
> MR. McMAHON: I think what is noteworthy is they divided up the
> animus, if you will. We have military animus on the one hand, ADA
> animus on the other hand. And, actually, noted that in their view
> there was less animus towards the ADA than there was towards
> USERRA. And, notably, what they noted with respect to the ADA
> was pretty minimal. [17]

### C. Stipulations Between the Parties Regarding the ADA and PTSD
### Read to the Jury in *Arroyo I*

The parties stipulated between themselves in *Arroyo I* regarding the ADA and Arroyo's PTSD[18]:

---

[14] *Arroyo I* Trial Transcript, August 15, 2016, 25: 19 to 26: 4.
[15] *Arroyo I* Trial Transcript, August 16, 2016, 52:3 to 16.
[16] *Arroyo I* Trial Transcript, August 16, 2016, 55:23 to 56: 2.
[17] *Arroyo I* Trial Transcript, August 16, 2016, 56:4 to 9.
[18] This stipulation was not presented to the jury in *Arroyo II* as no evidence regarding Arroyo's PTSD diagnosis was allowed in the second trial at all.

(1) Plaintiff was treated for Post-Traumatic Stress Disorder ("PTSD") in December 2010 and formally diagnosed in January 2011.

(2) Plaintiff's PTSD was due to and caused by her military service.

(3) PTSD is a mental disorder that can develop after a person is exposed to a traumatic event, such as warfare.

(4) The symptoms of PTSD may include disturbing thoughts, feelings or dreams related to the events, mental or physical distress to trauma-related cues, attempt to avoid trauma related cues, alterations in how a person thinks and feels, and increased arousal.

(5) The term "posttraumatic stress disorder" came into use in the 1970s in large part due to the diagnoses of US military veterans of the Vietnam War. It was officially recognized by the American Psychiatric Association in 1980 in the edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-III).

(6) PTSD is a disability under the ADA. (Doc.#:128).

### D. Consideration of the ADA Claim, the Meditation Room, and Parking Restrictions to Show Volvo Frustration and Animosity in *Arroyo I*

As testimony and evidence was being introduced, the following discussion occurred between the trial court and counsel:

> MR. McMAHON: I'm just going to say the objection is really on relevance grounds. In other words, even if the Seventh Circuit opinion, the panel has affirmed your Honor's analysis on the ADA indirect claim in which you explain in that section of your opinion that the process in which she was leaving the meditation room late was not meeting her expectations.
>
> Accordingly, we have a whole kind of section of this trial, the parking in the back, the time in which she left the bell late, it's all undisputed. In other words, she's not meeting her expectations through that. So by presenting this evidence, we are revisiting that issue.
>
> THE COURT: Okay. Now let me ask this. So accepting that as the Seventh Circuit's opinion, what would the relevance of this whole episode over the parking in the back be? What does that go to?

MR. DeROSE: Judge, what it goes to is showing the animosity towards LuzMaria Arroyo because she has PTSD and the failure to cooperate and find ways to meet that as required by USERRA and the ADA. Just because they say you got the room, they found a hundred ways to frustrate her use of the room, and that's only one of them.

THE COURT: Okay. Here is what I would say on that. I do think that it's relevant to animosity, but all that I have heard today reinforces where I was this morning, which is that at the end of this case, I am going to tell the jury both what is in and what is not in this case, and what is not in this case is a failure to accommodate. So in that sense, you won't be able to argue that, and the jury will know that.[19]

### E. Volvo Revisits the Seventh Circuit Directions during *Arroyo I*

On August 18, 2016, before any testimony is taken, the following exchange occurred between the Trial Judge and Volvo's counsel:

… MR. McMAHON: Thank you very much, your Honor. Again, I don't intend to beat a dead horse with this objection I'm raising. But we have taken a look, and we continue to take a look, as your Honor does, at the Seventh Circuit panel's opinion in this case. So far I would say that the discussion regarding certain things like the accommodation -- or about the accommodations, specifically the meditation room, I think have been appropriately addressed by way of background, by way of kind of circumstance, if you will, in terms of some of the events that are also at issue in the discrimination claims.

… MR. McMAHON: What accommodation requests were granted. What may have been either denied or delayed. And, additionally, I think there's at least the potential today to get into a discussion about Ms. Arroyo's internal harassment complaint against Mr. Schroeder.

The reason why we're kind of bringing those up today, specifically, is in looking back at the panel's opinion, it's our position that the panel was not focused as broadly as Volvo's attitude towards Arroyo. But it's her attitude towards Arroyo with reference to her absences. And I think that is the piece they're really teasing out in

---

[19] *Arroyo I* Trial Transcript, August 16, 2016, 242:7 to 243:10.

their citation. Specific pieces of evidence that they identify on the ADA side of things.

So what was noteworthy to us, and we're taking a second look at this, they opine on Page 16 that in their view there's actually less evidence towards PTSD than there is towards the military service.

THE COURT: Mm-hmm. And there's a lot less period of time there could have been because there was no knowledge of PTSD until 2011.

MR. McMAHON: Right. And it didn't develop until later. That's correct.

THE COURT: Right.

…
MR. McMAHON: That was also in reference to leave. If we look at the context of that email, interestingly enough that particular email was dealing with military leave. I'm not so sure why they cited it for PTSD animus, but it is what it is on that front. But I guess the point of it is that it appears it is attitude toward the applicants. In other words, it's not just attitude kind of in a vacuum. So for that reason we want to clarify on the record that we do object to testimony about a harassment complaint against Schroeder. We don't think that is within the scope of what the Seventh Circuit said is relevant. And we don't believe that Ms. Arroyo should be able to testify to accommodations that she did not receive from Volvo. That completely obliterates the distinction between the discrimination and the failure to accommodate claims. And the Seventh Circuit made very clear that they are two different frameworks, two different kind of ways to approach it.[20]

### III. EVIDENCE ADDUCED IN *ARROYO I*

#### A. Emails, Trial Testimony, And Acknowledgments
#### Presented for Jury Consideration in *Arroyo I*

1. Keith Schroeder acknowledges that he knew two years before Arroyo's termination

that she had two months after a tour of duty that was in excess of 91 days, that she had two

---

[20] *Arroyo I* Trial Transcript, August 16, 2016, 471:5 to 474:10.

months to return to work at Volvo. Schroeder asked for and received permission from VP Scholl to offer Arroyo a severance package.[21]

2. Schroeder created a Local Attendance Policy for the Joliet plant that was different than the attendance policy used by Volvo companywide.[22]

3. Maureen Somersett acknowledges, "No other Volvo employee was ever terminated for being 1 to 3 minutes late."[23]

4. Bruce Olin acknowledges that if Schroeder applied his local attendance policy and terminated Arroyo for being one minute late, "I can see some outsiders having a different view".[24]

5. There was an unwritten two-minute grace period for many years prior to Schroeder's Local Attendance Policy. [25]

6. Sherrie Jankowski mockingly advises and warns Schroeder, "Arroyo is getting to be a pain about of this law.  Enjoy the reading. It is only 24 pages."[26]

7. Schroeder: "Arroyo was giving me more information about the rights of soldiers than HR gave me."[27]

8. Arroyo reports to Schroeder: "Between the stress of work and the stress of reliving the events of my deployment through writing my story, I've been having panic attacks. I have been waking up and feeling scared, not able to get more than four hours of sleep a day."[28]

---

[21] *Arroyo I* Trial Transcript, August 18, 2016, 566:20-25.
[22] *Arroyo I* Trial Transcript, August 18, 2016, 580: 3-10.
[23] *Arroyo I* Trial Transcript, August 18, 2016, 583: 18-21.
[24] *Arroyo I* Trial Transcript, August 18, 2016, 585:4-10.
[25] *Arroyo I* Trial Transcript, August 18, 2016, 587:22 to 588:8.
[26] *Arroyo I* Trial Transcript, August 18, 2016, 590:17 to 591:25.
[27] *Arroyo I* Trial Transcript, August 18, 2016, 592:13-15.
[28] *Arroyo I* Trial Transcript, August 18, 2016, 594: 19 to 595:3.

9. USERRA requires that if Arroyo has an injury that is either caused or aggravated while she is serving our country, Volvo as her employer must cooperate and give her all the rehabilitation possible.[29]

10. Schroeder was prepared to give Arroyo discipline for an attendance policy violation when she came back on January 3rd, even though she told him she self-admitted to the hospital.[30]

11. Schroeder orders Arroyo to submit to an Independent Medical Evaluation performed by a doctor chosen by Volvo confirming that Arroyo was suffering from PTSD.[31]

12. After Schroeder met with Arroyo about parking in the rear of the plant, she wrote to him: "I felt threatened. I felt cornered in the room by you and Mr. Dunne and Ms. Somersett."[32]

13. Four days before his meeting with Arroyo, Schroeder met with all the supervisors and told them it was poor safety practice to park behind the plant. And he expected them to follow his advice, but it was not an order.[33]

14. Schroeder sent a confidential email to all his management team only which was labeled: "Do not print. Read and Delete."[34]

15. Schroeder only wanted his supervisors to see the email because there were numerous people parking back there and it had long been a safety issue for him so he writes, "Ms. Arroyo is likely well aware of this, and to avoid a charge of retaliation, I must first review this with legal. We cannot afford a circumstance where it is perceived that I am retaliating, I must first review this with legal. We cannot afford a circumstance where it is perceived that I am singling

---

[29] *Arroyo I* Trial Transcript, August 18, 2016, 597:1-10.
[30] *Arroyo I* Trial Transcript, August 18, 2016, 597:1-24.
[31] *Arroyo I* Trial Transcript, August 18, 2016, 605:4-16.
[32] *Arroyo I* Trial Transcript, August 18, 2016, 610:1-11.
[33] *Arroyo I* Trial Transcript, August 18, 2016, 618: 21 to 620:5.
[34] *Arroyo I* Trial Transcript, August 18, 2016, 622:13-25.

out Ms. Arroyo when others in this facility have, on occasion, been allowed to park back there."[35]

16. Schroeder tells Arroyo on November 1, 2011, "I am going to prohibit parking back there" [36]

17. Arroyo asked Schroeder, "Is this a policy or rule just for me or did you make it for the whole company and publish it?"[37]

18. November 1, 2011 notice of no parking is published.[38]

19. On November 3, 2011, Schroeder writes to the Volvo Vice President and Regina Williams about the fact that Arroyo is observed by management parking in the south truck docking area and going around and exiting the assigned meditation room at 4:30.[39]

20. Schroeder is preparing a Corrective Action Plan for Arroyo when she comes back to work even though he had not yet posted notice of no parking in the rear of the building. Interestingly, no discipline was even considered for supervisor David Miller for parking in the back next to Arroyo. [40]

21. Schroeder reminds the Volvo Vice President and Regina Williams in writing on November 3, 2011, progressive discipline at Volvo includes the steps one, two, three, and four, the final termination and advises that he plans to give Arroyo the second CAP for parking in the rear of the building next time she shows up for work.[41]

---

[35] *Arroyo I* Trial Transcript, August 18, 2016, 623:22 to 626:8.
[36] *Arroyo I* Trial Transcript, August 18, 2016, 628: 2-5.
[37] *Arroyo I* Trial Transcript, August 18, 2016, 628:8-12.
[38] *Arroyo I* Trial Transcript, August 18, 2016, 63:9 and she is to 631:7.
[39] *Arroyo I* Trial Transcript, August 18, 2016, 632:17 t0 630:20.
[40] *Arroyo I* Trial Transcript, August 18, 2016, 634:1 to 634: 25.
[41] *Arroyo I* Trial Transcript, August 18, 2016, 635:1-8.

22. Progressive discipline requirements at Volvo were not followed as Schroeder gave Arroyo the termination notice November 8, 2011 when she next came the work.[42]

23. Once again, Schroeder agrees that the sole reason for terminating Arroyo was violation of the local attendance policy which was longer than the six month rolling period used for all other Volvo employees who were not active army reservists.[43]

24. Arroyo checked-in at 3:48 to use the meditation room, but her recorded punch-in time was edited by management personnel to reflect that she was 1 minute late at 4:30.[44]

25. Arroyo's supervisor added a punch to avoid paying overtime when Arroyo arrived early to use the meditation room.[45]

26. On the 2nd, 3rd and 4th of November Arroyo arrived early at the Volvo plant to use the meditation room.[46]

27. Volvo knew Arroyo had PTSD therapy at the VA on Tuesdays and she needed time to travel from the VA to the Volvo plant.[47]

28. Volvo only had to pay Arroyo for the time she was actually at work and not the time when Arroyo went to therapy following military orders.[48]

29. Before Arroyo punched in on Tuesdays, Volvo did not have to pay her, and she always got a work done once Arroyo punched in.[49]

---

[42] *Arroyo I* Trial Transcript, August 18, 2016, 635:9-14.
[43] *Arroyo I* Trial Transcript, August 18, 2016, 635:1 to 636:7.
[44] *Arroyo I* Trial Transcript, August 18, 2016, 635:25 to 636:20.
[45] *Arroyo I* Trial Transcript, August 18, 2016, 638:8 to 639:3.
[46] *Arroyo I* Trial Transcript, August 18, 2016, 639:20 to 640:2.
[47] *Arroyo I* Trial Transcript, August 18, 2016, 640:3-18.
[48] *Arroyo I* Trial Transcript, August 18, 2016, 640:19-24.
[49] *Arroyo I* Trial Transcript, August 18, 2016, 641:1-14.

30. On November 2nd, 3rd, and 4th, 2011, management was reporting to Schroeder that after using the meditation room, Arroyo would drive to the front of the plant, and walk in one minute late.[50]

31. Judge Dow directs plaintiff's counsel in asking questions acceptable to Volvo's counsel as he will remind the jury that, again, there is no failure to accommodate claim. The two claims are the statutory claims that the jury was told about at the beginning of the case.[51]

32. Management had discretion to forgive tardies that were even more than one hour late if the employee had a good excuse like a car break down or traffic problems or employees who missed the whole day because of inclement weather.[52]

33. There is a verbal warning waiting for Arroyo dated November 3rd that is not signed by Schroeder or Arroyo.[53]

34. Schroeder wrote to VP Sholl and Regina Williams that he was prepared to communicate a Corrective Action Plan (CAP) to Arroyo as of November 3, 2011 Arroyo had been off work on November 5 and 6, 2011 because she had Earned Time off and the CAP had not been communicated to her. Schroeder planned to communicate the CAP to Arroyo when she returned to work on November 7 or 8, 2011.[54]

35. Schroeder testified that he was just trying to give information to the big boss in North Carolina and did not want to leave the impression that Arroyo was a problem employee. But by November 4, 2011, Arroyo's last day of work, Schroeder decided that he should no longer use

[50] *Arroyo I* Trial Transcript, August 18, 2016, 642:13 to 643:6.
[51] *Arroyo I* Trial Transcript, August 18, 2016, 648:12 to 649:12.
[52] *Arroyo I* Trial Transcript, August 18, 2016, 650:3 to 651:4..
[53] *Arroyo I* Trial Transcript, August 18, 2016, 652: 2 to 653:4.
[54] *Arroyo I* Trial Transcript, August 18, 2016, 653:17 to 654: 22.

his discretion and decided to terminate Arroyo for violation of the Local Attendance Policy even though she had checked in early.[55]

36. Schroeder could not name any other employee during his 15 years of managing the company who had ever been terminated before for being 1 to 3 minutes late except Army Reservist Arroyo.[56]

37. According to the spreadsheet that Michael Temko had been keeping, Volvo had been counting 912 days Arroyo was not at work pursuant to military orders against the five years she would be entitled to if she voluntarily left Volvo's employment for military service. But the recording of the 912 days that Arroyo followed military orders had nothing to do with the five years voluntary service an employee could be away from Volvo. And Bruce Olin's email was wrong when he indicated that Volvo had to let Arroyo go to active-duty pursuant to military orders for five years after which they could terminate her.[57]

38. Dennis Sholl gave Schroeder permission to terminate Arroyo after telling Schroeder Arroyo had registered a written complaint against him for harassment, contending Schroeder had discriminated against her because she had a disability.[58]

39. Schroeder emails Regina Williams on November 8, 2011 "Arroyo termination communication" to tell her what his intent was to do when Arroyo showed up for work.[59]

40. Schroeder and Williams were talking for a couple of weeks already and they were making the plan of terminating Arroyo because she might not talk to Schroeder without legal counsel present.[60]

---

[55] *Arroyo I* Trial Transcript, August 18, 2016, 655:3-25.
[56] *Arroyo I* Trial Transcript, August 18, 2016, 656:24 to 657:17.
[57] *Arroyo I* Trial Transcript, August 18, 2016, 661:25 to 663:1.
[58] *Arroyo I* Trial Transcript, August 18, 2016, 663:20 to 664:10.
[59] *Arroyo I* Trial Transcript, August 19, 2016, 669: 24 to 671:8.
[60] *Arroyo I* Trial Transcript, August 19, 2016, 672:4-21.

41. Arroyo said she would only talk to Schroeder about discipline or orders to do work as a picker packer. Schroeder agreed that it was Arroyo's choice whether she would talk to him about anything else.[61]

42. Schroeder wants to know from Regina Williams what he should do if Arroyo refuses to meet with him although she has never done that before.[62]

43. Schroeder knew that VP Sholl promised Arroyo that Patrick Dunn and Maureen Somerset would be present every time Arroyo met with Schroeder.[63]

44. Vice President Sholl made that promise to Arroyo on November 1, 2011 because of the strained relationship between Arroyo and Schroeder.[64]

45. Schroeder knew that Arroyo filed a complaint about him and he told VP Sholl Arroyo was causing a morale problem for his supervisors and the whole shift.[65]

46. Although it is Schroeder's decision as director of the facility to terminate someone, he got Vice President Sholl, legal, HR, Patrick Dunn and Maureen Somerset involved when he was going to terminate Arroyo for being one to three minutes late.[66]

47. Schroeder emailed, "We cannot afford to have a scene if Arroyo would not talk to me or would attempt to go to work."[67]

48. Schroeder was asking permission to discipline Arroyo as early as 2005 but none of his emails led to discipline of her as he was getting responses from Bruce Olin, "Sorry it's not what you want to hear. Sorry there's nothing you can do about it."[68]

---

[61] *Arroyo I* Trial Transcript, August 19, 2016, 673:7-22.
[62] *Arroyo I* Trial Transcript, August 19, 2016, 674:3-14.
[63] *Arroyo I* Trial Transcript, August 19, 2016, 674:15-24.
[64] *Arroyo I* Trial Transcript, August 19, 2016, 675:20-25.
[65] *Arroyo I* Trial Transcript, August 19, 2016, 675:23 to 676;10.
[66] *Arroyo I* Trial Transcript, August 19, 2016, 678:5  to 679:3.
[67] *Arroyo I* Trial Transcript, August 19, 2016, 680:2 to 23.
[68] *Arroyo I* Trial Transcript, August 19, 2016, 758:13 to 759:9.

49. Schroeder never asked Bruce Olin why he was apologizing because he was saying what Schroeder did not want to hear about Volvo policy putting Arroyo at termination while the law required that they excuse those absences all the time.[69]

50. Arroyo was not required to keep in touch with Schroeder when she was away from Volvo and fulfilling her obligation by following military orders.[70]

51. Michael Temko emails in 2007 wanting to know what Volvo's rights and Arroyo's obligations were with respect to keeping them advised about when she was coming back to work, but the law said they had no choice and had to bring her back.[71]

52. Arroyo nominated Schroeder, Temko and Dunn for the award as cooperative employers in 2010 not knowing of all the emails that they had been writing since 2005.[72]

53. Contrary to what he writes when he terminates her, Schroeder agreed at trial that Arroyo's bringing Col. Gorski in to explain Volvo's obligations and Arroyo's rights was the best thing that ever happened and was welcome.[73]

54. Back in 2011 Schroeder emails VP Scholl, Bruce Olin, and Regina Williams that every time he tried to work something out with Arroyo she brought in Col. Gorski and that made her case more difficult and frustrated Schroeder.[74]

55. By April 2011, six months before her termination, Schroeder is already writing to Regina Williams that Arroyo was a problem employee.[75]

---

[69] *Arroyo I* Trial Transcript, August 19, 2016, 759:10-16.
[70] *Arroyo I* Trial Transcript, August 19, 2016, 760:5-16.
[71] *Arroyo I* Trial Transcript, August 19, 2016, 761:13 to 762:4.
[72] *Arroyo I* Trial Transcript, August 19, 2016, 762:7-23.
[73] *Arroyo I* Trial Transcript, August 19, 2016, 762:24 to 763:8.
[74] *Arroyo I* Trial Transcript, August 19, 2016, 764:19 to 765:12.
[75] *Arroyo I* Trial Transcript, August 19, 2016, 766: 22 to 767:6.

56. On November 8, 2011, about five hours before he terminated Arroyo, Schroeder wrote to VP Scholl and HR Williams that he was frustrated when Arroyo as Volvo's only active Army Reservist brought ESGR and Col. Gorski into the case.[76]

57. In November 2010, Arroyo was given her last excused absence, while after she was diagnosed with PTSD and was ordered to attend group therapy at the VA and she only asked for a meditation room before starting work.[77]

## IV. ASSURANCES IN *ARROYO I* FROM THE TRIAL COURT THAT THE SEVENTH CIRCUIT DIRECTIONS ARE BEING FOLLOWED

### A. The Court Is Being Fair to Both Sides During *Arroyo I*

Judge Dow said on the record during *Arroyo I* that he was trying to do things exactly the way the Seventh Circuit Court of Appeals ordered them to be done and be fair to both sides:

> …
> On the other hand, the retaliation claim is dismissed and affirmed. And the failure to accommodate claim is dismissed and affirmed. And to the extent that there's going to be a focus on aspects of this case -- whether it's testimonial or exhibit that would focus -- that would be supportive of those claims with very little probative value on the rest -- on the other claims, then I will exclude it. Because I don't think it's -- it's not fair to make the defendant defend claims that are no longer in the case.
>
> But it's equally not fair to not let the plaintiff put on evidence that would support animus related to military service or PTSD, and, obviously, they are going to have to link that to an adverse employment decision, too. So I'm just trying to draw these lines, and all I'm telling you is these are my parameters for doing so.
> …
> But if you guys stick with the next two witnesses, the same path you've been on with the first three witnesses, I think we're going to be good. Because I think everybody is adjusting to what I'm trying to do with this case. I am trying to be 100 percent fair to both sides.[78]

---

[76] *Arroyo I* Trial Transcript, August 19, 2016, 770:25 to 773:6.
[77] *Arroyo I* Trial Transcript, August 19, 2016, and 780:15 to 781:3.
[78] *Arroyo I* Trial Transcript, August 18, 2016, 474:14 to 477:9.

**B. Seventh Circuit's New Look at Evidence Announced During *Arroyo I***

**1. Trial Judge Is Satisfied *Arroyo I* Was Tried Correctly
Even under the Newly Announced Law**

On August 23, 2016, just before closing arguments in *Arroyo I*, Judge Dow introduced

the parties to the new procedure just announced by the Seventh Circuit Court of Appeals that all

evidence was relevant and for the jury to consider:

> THE COURT: Good morning, everybody.
> So the Seventh Circuit issued this case yesterday, which I think
> probably everybody has seen by now, this *Ortiz* case. Okay. Well,
> I think it's a big deal for the law, but I don't think it's a big deal for
> our case.
>
> So we all are familiar with the indirect and direct methods of proof
> for proving an employment discrimination case.
>
> And the Seventh Circuit law -- and this is an opinion by Judge
> Easterbrook, Judge Posner, Judge Hamilton on the panel. This
> takes everybody through a lengthy exegesis on the complexity of
> this law and the different directions in which district judges and
> Seventh Circuit panels have handled this issue of direct versus
> indirect.
>
> In this case, I recall going through both the direct and the indirect,
> and I recall the Seventh Circuit opinion saying right on one, wrong
> on the other. What Judge Easterbrook holds in this opinion is that
> there's no – there is to be no longer a consideration of two prongs.
> This is just a single standard for employment discrimination. It's a
> very simple standard and looking at these two methods of proof is
> just a complicating thing that's unnecessary, and, I think in his
> mind, should have been sorted out a long time ago, and he sorts it
> out. And the number of cases cited in here is astronomical. And
> I'm sure it's only just -- he could have found 100 more if he wanted
> to explain this complexity here. And then he talks about
> convincing mosaic a lot as well, and his point there is that that's
> not a standard. It's really a description. It's a metaphor.
>
> The reason I don't think it's a big issue for the way this case has
> been tried is that I haven't admitted any evidence in this case based
> on it being direct or indirect. It's all -- as Judge Easterbrook says in
> this opinion, evidence is evidence. And that's the way I have
> admitted evidence in this case. I have not excluded anything

because it is indirect or direct. We have let it all in, and we let you
guys argue whatever you want.[79]

Thereafter, the parties discussed with the *Arroyo I* jury all the aspects of evidence.

### C. Following the Directions and Instructions from the Seventh Circuit *Arroyo I* Results in a Jury Verdict for Arroyo and against Volvo

After the case followed the Seventh Circuit's instructions on remand as closely as

possible, on August 23, 2016, the jury returned a verdict in favor of Arroyo on both claims,

awarding $2.6 million in compensatory damages and $5.2 million in punitive damages on her

ADA claim and finding Volvo liable under the USERRA.[80] Judge Dow determined that the jury

would not rule on USERRA damages. (Doc.#: 162).

### V. POSTTRIAL PRACTICE AFTER *ARROYO I*

On July 13, 2017, Judge Dow entered an order awarding Arroyo $141,388.53 in back

pay, $84,131.92 in front pay, $41,348.61 in other employment-related compensation, $8,546.10

in prejudgment interest, and $275,415.16 in liquidated damages. Pursuant to 42 U.S.C. §

1981a(b)(3), the Court reduced the Jury's $2.6 million compensatory damages award to $300,000

and vacated the Jury's $5.2 million punitive damages award. All other forms of equitable relief

were denied. Final judgment was entered in favor of Plaintiff. (Doc.#: 177).

After trial, Volvo moved the Court to alter judgment, and, alternatively, for a new trial as

a matter of law on both claims and judgment notwithstanding the verdict. (Doc.#: 184). And on

February 28, 2018, Arroyo moved the Court to alter judgment concerning damages *nunc pro*

*tunc* to August 10, 2017. (Doc.#: 190).

---

[79] *Arroyo I* Trial Transcript, August 23, 2016, 1143:6 to 1144:17.
[80] "USERRA is intended to ensure that these service members are not disadvantaged in their civilian careers because of their service; are promptly reemployed in their civilian jobs upon their return from duty; and are not discriminated against in employment because of their military status or obligations." See the Presidential Memorandum, July 19, 2012, 77 F. R. 43699.

Arroyo reminded the trial court in her posttrial motion of the stipulations entered into the case by the parties and recounted the instructions that were given to the jury. The agreement between the parties that damages and liability would be separately determined was discussed, and the clear understandings entered between the parties before and during trial were recited.

In *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 500 (7th Cir. 2000), Judge Easterbrook wrote:

> [Plaintiff's] lawyer and the [ ] judge obviously had not focused on § 1981a(b)(3). [Defendant's] lawyer sat quietly as the jury instructions and verdict forms were approved and did nothing to avert the problem…. **When lawyers fail to draw the court's attention to a preventable problem, they must bear the consequences of forfeiture. … Having stood silent when it was possible to frame questions so that the jury could reveal which of the damages had been awarded under § 1981a, [defendant] has forfeited any benefit of § 1981a(b)(3)(B)**. (Emphasis in bold not in original).

No such problem was ever discussed or brought to the attention of the Trial Court.

In *Middleton v. City of Chicago*, 578 F.3d 655, 659 (7th Cir.2009), Judge Kanne noted "USERRA Created a New Cause of Action":

> **Among other improvements, if an employer engaged in willful discrimination, USERRA permitted a plaintiff to seek liquidated damages**, a form of relief unavailable under the VR RA. See USERRA sec. 2, § 4324(c)(1)(A)(iii). With that new provision, **Congress converted what had been an equitable claim into a legal one, which brought along the corresponding right to a jury trial**. See *Maher v. City of Chi.*, 463 F.Supp.2d 837, 844 (N.D.Ill.2006) (holding that **liquidated damages under USERRA are punitive and therefore subject to trial by jury**)…. (Emphasis in bold not in original).

The trial court's attention was also drawn to *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir.2015), in which guidance in determining whether a damages award is excessive:

In deciding whether a damages award is excessive, three factors guide analysis: "whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." (Internal citation omitted).

In reversing and remanding the case "with instructions to reinstate the jury's verdict" of compensatory damages of $2.4 million to one arrestee and $1 million to another arrestee, for past and future physical, mental, and emotional pain and suffering, the *Adams* court noted:

[I]n comparing past decisions to the jury award at issue, "an exact analogy is not necessary." Rather, "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." To require that a jury's damages award be no bigger than previous awards in similar cases would make every such award ripe for remittitur. There must be room for a jury's award to exceed the relevant range of cases when the facts warrant. (Internal citations omitted). *Id.*, at 545.

### A. Jury Verdict in *Arroyo I* Set Aside and New Trial Ordered on USERRA Claim Only

On September 30, 2019, Judge Dow granted Volvo's motion for judgment as a matter of law on Arroyo's ADA claim, holding that no reasonable juror could find that Arroyo was a qualified individual under the ADA at the time of her termination. (Doc.#: 227, at 26-27)

On September 30, 2019, no longer following the mandate from the Seventh Circuit Court of Appeals and its clear directions and instructions, Judge Dow granted Volvo a new trial on Arroyo's USERRA claim only. Completely dismissing the *Arroyo I* jury's finding that the evidence linked the adverse employment decision and animus related to military service and her PTSD diagnosis, the Court dismissed the ADA claim finding that she was not a qualified individual under the ADA. The Court found that Arroyo had not introduced any evidence to support an award of compensatory damages under the ADA even though she had produced

evidence that she was treated for Post Traumatic Stress Disorder at the Veterans Administration and had received Psychological Counseling from a Licensed Clinical Social Worker. Judge Dow further found that the testimony by Arroyo and witness Michael Temko regarding her loss of income and fringe benefits and her damages as a result of her termination from Volvo had been insufficient. (Doc.#: 227).

## VI. SUMMARY OF THE ARGUMENT

The Seventh Circuit considered all the emails, depositions, affidavits, and admissions of record that evince Volvo's frustration toward Arroyo as the company loses control over her attendance as she follows her military orders. The Seventh Circuit concluded that the jury should see all this evidence and determine if Volvo demonstrates hostility toward Arroyo as she seeks outside intervention from ESGR to exercise rights and to secure benefits under USERRA and ADA. The Seventh Circuit concluded that it is for the jury to determine if the comments embedded in the emails exchanged among Volvo personnel over the several years of Arroyo's deployments are linked to the adverse employment actions.

The Seventh Circuit concluded that the jury should be shown the emails indicating that upon return from her latest deployment in 2010 and while under treatment at the VA for PTSD, Volvo personnel express their ridicule and planned discipline of Arroyo as she utilizes her rights under the ADA and USERRA. Supervisor Sherrie Jankowski emails Schroeder that the rumor around the plant is that Arroyo is on vacation in Hawaii when in fact, Arroyo has emailed Schroeder that she self-admitted to the hospital emergency room. Despite knowing that Arroyo is being treated at the hospital, Schroeder contemplates discipline. Frustrating her use of the meditation room she was provided, Volvo supervisors complain in emails that Arroyo is walking through the plant to the meditation room without wearing safety shoes and discuss discipline.

There are emails between Schroeder and supervisors discussing the plan to prohibit parking in the rear of the plant and their concern Arroyo would claim such a rule is discriminatory against her. As she realizes she is being discriminated against, there is an email exchange between Arroyo and Schroeder which later involves VP Sholl where she questions whether the parking prohibition was promulgated just for her.

Once Arroyo files her Charge of Discrimination with EEOC, Keith Schroeder promulgates rules negating accommodations already granted and selectively enforces policies against only Arroyo. Volvo terminates her for allegedly being 1 to 3 minutes late in walking to her workstation although she has punched into work 30 minutes or more early to meditate before starting work as agreed. On the date of Arroyo's termination, Schroeder writes emails to VP Sholl and HR Representative Regina Williams complaining that Arroyo involved Col. Gorski, was never satisfied with how Volvo handled its USERRA obligations, and was very hard with whom to work.

All of these emails that were allowed to be presented to the jury in *Arroyo I* led the jury to determine that the adverse employment action was linked to the animus for her military obligations and PTSD diagnosis. However, so much of this evidence was precluded from jury consideration in *Arroyo II* leading to a considerably different result.

# VII. ARGUMENT

## A. The Grant of a New Trial Not Immediately Appealable

Although requested to do so by both parties, the Trial Judge never did offer a remittitur. Instead, the grant of the new trial required that the parties prepare for *Arroyo II*. See *Latino v. Kaiser*, 58 F.3d 310, 314 (7th Cir. 1995) (An order granting a new trial is not a final order and is therefore generally not immediately appealable until after the new trial and entry of final judgment. If appellate court determines that the award of a new trial was inappropriate, the original verdict may be reinstated).

## B. Arroyo's Attempt to Correct Trial Court's Announced Shortcomings in *Arroyo I* before Commencement of *Arroyo II* are Rejected

### 1. The Testimony of Arroyo's Treaters regarding Arroyo's PTSD

On February 20, 2020, after Judge Dow dismissed Arroyo's ADA claim following *Arroyo I*, Arroyo offered at *Arroyo II* the redacted videotaped depositions taken during discovery of David Lynn, MD, the Board-Certified Psychiatrist who treated and prescribed psychotropic medication for Arroyo at the Veterans Administration Hospital and Brian Fask, the Licensed Clinical Social Work who treated and counseled her on a biweekly basis for her Post-traumatic Stress Disorder. (Doc.#245). Because there was no evidence presented at *Arroyo II* regarding Arroyo's PTSD diagnosis or treatment, there were large gaps in the evidence. Volvo mocking Arroyo and discussing their plans to discipline her were barred from jury consideration. Such evidence is critical in showing that the adverse employment actions were directly linked to disability discrimination.

## 2. The Stipulations of Facts Already Agreed upon in *Arroyo I* And Their Elimination Causing a Completely Different Trial in *Arroyo II*

The stipulation of facts at the commencement of *Arroyo I* bound the parties and the Court. Once agreed upon at the District Court level, issues involving the stipulations made are waived on appeal. See *Central States, Southeast And Southwest Areas Pension Fund v. Koder*, 969 F.2d 451, 455 (1992). The stipulations completely dispensed with the need to offer any proof or expert testimony on the effect of PTSD on a soldier after returning from war. See *Christian Legal Society Chapter of the University of California, Hastings College of Law, a.k.a. Hastings Christian Fellowship v. Martinez*, 1561 U.S. 661, 676, 130 S.Ct. 2971, 177 L.Ed.2d 838 (2010). See also *Louis Vuitton S.A. v. Pun Yang Lee*, 875 F.2d 584, 587-8 (1989).

Judge Dow raved during *Arroyo I* concerning how much time the stipulations were going to save the litigants and the jury. By his rulings prior to *Arroyo II*, Judge Dow not only completely disregarded the directions and instructions from the Seventh Circuit Court of Appeals, but he also totally eliminated any consideration by the jury of the ADA and PTSD, and their effects on Arroyo as she went about her job responsibilities for Volvo. Even worse, as demonstrated by the emails, Volvo management and supervisors used Arroyo's PTSD to discipline and mock her right up to the moment of her termination, recklessly disregarding her rights and their obligations under both the ADA and USERRA.

## 3. The Testimony of an Expert Economist Regarding Arroyo's Damages

On February 20, 2020, because Judge Dow found that Arroyo had not introduced any evidence to support an award of compensatory damages under the ADA at *Arroyo I* and

disregarded the testimony concerning her loss of income and benefits[81], Plaintiff made a motion to present the testimony of Economist Stan V. Smith, PhD at the retrial of the cause.

### 4. The Testimony of Comparators Regarding Arroyo's Damages

Arroyo also sought to present comparators identified in discovery[82] who had been hired by Volvo in the same week as Plaintiff and were still so employed there. Marsheela Bouie, Brad Olson and David Tilghman as witnesses situated locally to show the difference in their salaries and incomes compared to Arroyo's salary and income after all these years. (Docs.##: 247, 248, 249, and 251).

See *Neely v. Martin K. Eby Construction Company, Inc.*, 386 U.S. 317, 327,87 S.Ct. 1072, 18 L.Ed.2d 75 (1967)("[T]here remain important considerations which may entitle [Plaintiff] to a new trial. The erroneous exclusion of evidence which would have strengthened [her] case is an important possibility. Another is that the trial court itself caused the insufficiency in plaintiff-appellee's case by erroneously placing too high a burden of proof on [her] at trial").

### C. Arroyo Files Motions for Judge Dow to Reconsider His Rulings

On November 27, 2000 and again on June 15, 2021, Plaintiff filed a motion to reconsider her request for miscellaneous relief concerning issues to be tried and witnesses to be called at the second trial of the cause. (Docs.##: 276 and 297).

On August 26, 2021, Judge Robert M. Dow, Jr. denied both of Plaintiff's motions to reconsider. (Doc.#: 300).

---

[81] Temko had testified before the jury in *Arroyo I* that the pay structure and benefits package offered by Volvo was so lucrative and appealing to others in the community that the company would receive as many as 1000 applications for each position offered. See *Arroyo I* Trial Transcript, August 17, 2016, 277:1 to 279:14 and 286:18 to 287:23.

[82] The comparators were also named as Plaintiffs Proposed Witnesses in the Final Pretrial Orders in both *Arroyo I* and *Arroyo II.*

### D. Plaintiff's Memorandum of Law
### Recapping Seventh Circuit Precedent on Retrial

#### 1. Pursuant to Her Jury Demand, Arroyo Is Entitled to Jury Consideration on All Damages and To Present Her Expert's Analysis of Those Damages

On January 2, 2022, Plaintiff's Memorandum of Law recapping Seventh Circuit

precedent on retrial, cited *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 106 F.3d

1388, 1396-9 (7th Cir. 1997) for a panel that included Judge Coffey and Judge Manion, Judge

Eschbach wrote:

> [Plaintiff] does not waive the right to have jury decide damages. Nothing in the record showed that [plaintiff] had abandoned the right to the first jury verdict. *Id.*, at 1396.

> [Plaintiff] could transfer reinstatement of first jury award until second somewhat comparable award was made and plaintiff could continue to press for damages and issues decided in its favor at first trial. *Id.*, at 1397.

> The ascertainment and assessment of damages is a question of fact for the jury; although the amount may not be speculative, it need not be proved with mathematical certainty. The jury must bring in a verdict within the range of the valuation testimony presented. *Id.*, at 1398

> The court underestimates the jury's abilities. [The parties' experts] were the subject of lengthy cross-examination. The jury had the information it needed to decide whether [the expert's] analysis was flawed…. The jury must bring in a verdict within the range of the valuation testimony presented. *Id.*, at 1399.

#### 2. The Jury in *Arroyo v. Volvo* Should Determine Statutory Damages Based on the Frequency, Persistence, and Intentional Noncompliance

In *Kobs v. Arrow Service Bureau, Inc.*, 134 F.3d 893, 896 (7th Cir. 1998), before a panel

that included Judge Wood and Judge Coffey, Judge Cummings wrote:

> We find...trial by jury in determining statutory additional damages and remand to the district court to impanel a jury for the purpose of determining the amount of statutory damages, if any, due to the

plaintiffs. In instructing the jury on the issue of damages, the district court should inform the jury as to the maximum recovery allowable under law and as to the factors... which include "the frequency and persistence of noncompliance..., the nature of such noncompliance, and the extent to which such noncompliance was intentional." *Id.*, at 898-9.

### 3. The Jury Verdict in *Arroyo I* Should Not Have Been Set Aside Because It Is Within Permissible Ratios

In *Kapelanski v. Johnson*, 390 F.3d 525, (7th Cir. 2004), before a panel that included

Judge Easterbrook and Judge Manion, Judge William and wrote:

We will not set aside a jury verdict if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of evidence to the jury. *Id.*, at 530.

Further, the punitive damage award of $331,250 represents a ratio of 3.3 to 1 which is easily permissible. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (noting that "[s]ingle digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1."). See also *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672 (7th Cir.2003) (sustaining a punitive damages award with a ratio to compensatory damages of 37.2 to 1). Here, not only is our ratio a single digit, but a low one at that. We therefore find the punitive damage award to be sound both under federal and state law. *Id.*, at 534.

### 4. The Jury Verdict in *Arroyo I* Should Have Been Afforded Great Deference Because Facts in the Case Are Simple and Not in Dispute

In *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012), before a panel that included

Judge Flaum and Judge Williams, Judge Tinder wrote:

The district court, however, cannot grant a new trial just because it believes the jury got it wrong. [S]ince the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict. Even when evidence is contradictory, [i]t's the jury's job—not the district court's job or the job of a panel of appellate

judges—to figure out who's telling the truth. (Internal citations and quotation marks omitted).

### a. The Jury Verdict Resulting in a 1 to 3 Ratio between Compensatory and Punitive Damages Was Proportionate and Reasonable in *Arroyo I*

In *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408, 438, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), the Supreme Court noted "an award that exceeds a single digit ratio between punitive and compensatory damages may comport with [due] process where a particularly egregious act as resulted in only a small amount of economic damages". Of course, without any help in arguments from counsel or instructions from the court, the jury in *Arroyo I* returned a verdict of $2,600,000 in compensatory damages and $5,200,000 in punitive damages[83], a ratio that has been found to comport with due process by the Supreme Court.

### b. Divided Supreme Court Justices Express Their Beliefs that The Judiciary Unwisely Ventured into and/or Is Ill-Equipped To Reassess Punitive Damages Imposed by a Jury

In *BMW of North Ameri ca, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), Justices of the Supreme Court rendered very long and strongly conflicting opinions concerning their views on Judiciary review of punitive damages assessed by a jury. The majority opinion was written by Justice Stevens:

> The Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a " 'grossly excessive' " punishment on a tortfeasor. *Id.*, at 562.

> Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition. (Internal citations omitted.) *Id.*, at 568.

> Degree of Reprehensibility
> Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. As the Court stated nearly 150 years ago,

---

[83] See Doc.#: 162.

exemplary damages imposed on a defendant should reflect "the enormity of his offense." *Id.*, at 575.

In his concurring opinion, joined by Justice O'Connor and Justice Souter, Justice Breyer

wrote:

> Legal standards need not be precise in order to satisfy this constitutional concern. But they must offer some kind of constraint upon a jury or court's discretion, and thus protection against purely arbitrary behavior. (Internal citation omitted.) *Id.*, at 598.

In his dissenting opinion, Justice Scalia, joined by Justice Thomas wrote:

> Today we see the latest manifestation of this Court's recent and increasingly insistent "concern about punitive damages that 'run wild.'" Since the Constitution does not make that concern any of our business, the Court's activities in this area are an unjustified incursion into the province of state governments. (Internal citation omitted).
>
> In earlier cases that were the prelude to this decision, I set forth my view that a state trial procedure that commits the decision whether to impose punitive damages, and the amount, to the discretion of the jury, subject to some judicial review for "reasonableness," furnishes a defendant with all the process that is "due."
> I do not regard the Fourteenth Amendment's Due Process Clause as a secret repository of substantive guarantees against*599 "unfairness"—neither the unfairness of an excessive civil compensatory award, nor the unfairness of an "unreasonable" punitive award. What the Fourteenth Amendment's procedural guarantee assures is an opportunity to contest the reasonableness of a damages judgment in state court; but there is no federal guarantee a damages award actually be reasonable. (Internal citations omitted.) *Id.*, at 598.
> …
> The relationship between judicial application of the new "guideposts" and jury findings poses a real problem for the Court, since as a matter of logic there is no more justification for ignoring the jury's determination as to how reprehensible petitioner's conduct was (i.e., how much it deserves to be punished), than there is for ignoring its determination that it was reprehensible at all (i.e., that the wrong was willful and punitive damages are therefore recoverable). *Id.*, at 606.

In his dissenting opinion, joined by Chief Justice Rehnquist, Justice Ginsburg wrote:

The Court, I am convinced, unnecessarily and unwisely ventures into territory traditionally within the States' domain, and does so in the face of reform measures recently adopted or currently under consideration in legislative arenas. *Id.*, at 607.

…Tellingly, the Court repeats that it brings to the task no "mathematical formula," ante, at 1602, no "categorical approach," *ibid.*, no "bright line," ante, at 1604. It has only a vague concept of substantive due process, a "raised eyebrow" test, see *ante*, at 1603, as its ultimate guide. *Id.*, at 612.

### c. Although the Federal Judge Has Discretion to Revisit and Even Overturn a Verdict for Excessiveness, the Responsibility of the Jury to Assess Damages Must Be Respected

The Supreme Court has long acknowledged the duty and responsibility of the trial judge to exercise discretion and overturn a jury verdict that is excessive, against due process, or when the verdict winner refuses to agree to a remittitur. See *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 436-8, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). See also *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 485, (7th Cir.2003)("A court should not substitute a jury's damages verdict with its own figure merely because a case with similar facts has not yet arisen, or because a plaintiff in a similar case was perhaps not able to plead his facts to the jury as well.")

### 5. Volvo and Its Counsel Failed to Properly Assert Any Complaints about How the Jury Would Calculate Damages in *Arroyo I*

When exercising discretion in reviewing the size of the verdict, the Court must be mindful that it is the jury's responsibility to assess damages and avoid thinking "the jurors got it wrong" when they disagree with the Court. In *Pals v. Schepel Buick and GMC Truck, Inc.*, 220 F.3d 495, (7th Cir.2000), for a panel that included Judge Ripple and Judge Rovner, Judge Easterbrook wrote:

[The defendant's] lawyer does not understand the nature of the difficulty: the difference between a generic reference to

34

"compensatory damages" and the more limited scope of [a statute], which affects only "compensatory damages awarded under this section". Having stood silent when it was possible to frame questions so that the jury could reveal which of the damages had been awarded under [the statute], [defendant] has forfeited any benefit of [the statute].

…
To say that [a statute] does not entitle either side to a jury trial on back or front pay does not mean, however, that a jury trial is forbidden even if the parties are content.

In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury or, except in actions against the United States when a statute of the United States provides for trial without a jury, the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right.

Fed.R.Civ.P. 39(c). Thus an issue may be tried to the jury "with the consent of both parties" even if the issue is "not triable of right by a jury". (Some internal citations omitted).

Of course, both the ADA and USERRA give Arroyo the right to trial by jury. Volvo did not contest the right to trial by jury and her right to have the jurors determine damages in her case. Instead, Volvo's counsel sat silent and satisfied as the jury instructions were fashioned by counsel for both sides with the Court.

### a. The *Arroyo I* Verdict Was Not against the Weight of the Evidence

In *Clarett v. Roberts*, 657 F.3d 664,674 (7th Cir. 2011), before a panel that included Judge Manion and Judge Rovner, Judge Sykes wrote:

A new trial may be granted if the verdict is against the clear weight of the evidence or the trial was unfair to the moving party. On review, however, [a] new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience. (Internal citations and quotation marks omitted).

35

In *J.K.J. v. Polk County*, 960 F.3d 367, 378 (7th Cir. 2020), the more recent *en banc* opinion of the Seventh Circuit Court of Appeals, the court noted:

> We may not reweigh the evidence and must affirm the jury's verdict "unless there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party."

Even further, the *J.K.J.* court stated:

> [T]he "risk of constitutional violations" was "so high … that [Volvo's] failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation." *Id.*, at 380.

Based on the cavalier and reckless way Volvo management and supervisors trifled with Arroyo's rights under USERRA and the ADA, and mocked and treated her over the years as she went in service of our country or sought treatment for her PTSD following that service, the jury verdict should hardly shock the conscience. Volvo's hollow assertions that management and supervisors and Human Resources personnel were trying to figure out Volvo's obligations and Arroyo's rights rang fallacious to the jury in *Arroyo I.* The *Arroyo II* jury never had the opportunity to consider such evidence.

### b. Seventh Circuit's Instructions on Remand Not Scrupulously Followed And Both the USERRA and ADA Claims Should Have Been Submitted for Retrial in *Arroyo II.*

In *Creek v. Village of Westhaven*, 144 F.3d 441, 445 (7th Cir.1998), before a panel that included Chief Judge Posner and Judge Bauer, Judge Coffey wrote:

> The law of the case doctrine is a rule of practice, based on sound policy that, when an issue is once litigated and decided, that should be the end of the matter. The consistency provided by the rule "protects parties from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action... . The most elementary application of this doctrine is that when a court of appeals has reversed a final judgment and remanded the case, the district court is required to comply with the express or implied rulings of the appellate court… Therefore, it is

essential to determine what issues were actually decided in order to define what is the "law of the case." This requires a careful reading of the reviewing court's opinion: observations or commentary touching upon issues not formally before the reviewing court do not constitute binding determinations. (Internal citations and most quotation marks omitted).

At the first trial, the jury clearly found that Volvo discriminated against Arroyo and that her rights under the ADA and USERRA were violated, just as the Seventh Circuit had postulated would be possible. Now, allowing this case to proceed on only the USERRA claim and dismissing the ADA claim before retrial does violence to the mandate and explicit orders and instructions given by the Appellate Court on remand.

### c. On Remand, directions from the Seventh Circuit Were Not Scrupulously Followed in *Arroyo II* As They Had Been Carefully Followed In Arroyo I

In *Jorge Baez-Sanchez v. William P. Barr*, 947 F.3d 1033, 1035-6 (7th Cir. 2020), before a panel including Judge Bauer and Judge Hamilton, Judge Easterbrook wrote:

We remanded with instructions…

What happened next beggars belief. The Board of Immigration Appeals wrote, on the basis of a footnote in a letter the Attorney General issued after our opinion, that our decision is incorrect. Instead of addressing the issues we specified, the Board repeated a theme of its prior decision that the Secretary has the sole power to issue U visas and therefore should have the sole power to decide whether to waive inadmissibility….

… In sum, the Board flatly refused to implement our decision. Baez- Sanchez has filed a second petition for review.

We have never before encountered defiance of a remand order, and we hope never to see it again. Members of the Board must count themselves lucky that Baez-Sanchez has not asked us to hold them in contempt, with all the consequences that possibility entails.

37

> The Board seemed to think that we had issued an advisory opinion, and that faced with a conflict between our views and those of the Attorney General it should follow the latter. Yet it should not be necessary to remind the Board, all of whose members are lawyers, that the "judicial Power" under Article III of the Constitution is one to make conclusive decisions, not subject to disapproval or revision …. Once we reached a conclusion, both the Constitution and the statute required the Board to implement it. ... "Yet we have already remanded, only to be met by obduracy....

On the retrial of *Arroyo v. Volvo*, plaintiff's counsel argued to the Court, "We must be careful to not be obdurate in following the Seventh Circuit Court of Appeals directions and instructions exactly".

### E. Trial Judge Issues Additional Rulings Limiting Evidence That will be allowed in *Arroyo II*

On January 25, 2022, the trial judge read into the record additional pretrial rulings on scope of permissible evidence at trial and further interpretation of the USERRA statute and other authorities cited by Plaintiff's counsel. (Doc.#326).

On January 26, 2022, Judge Dow entered an order excluding from the trial of *Arroyo II* the testimony of Dennis Sholl, National Vice President of Volvo and the testimony of Regina Williams, the Volvo Human Resources Representative who worked with Arroyo. (Doc.#: 328).

### F. The Effect of the Trial Judge's Limiting Emails in *Arroyo II*

Judge Dow's elimination of emails from Keith Schroeder to Dennis Scholl and Regina Williams within 48 hours of Arroyo's termination from Volvo in which Schroeder bemoans and complains of Arroyo going to Colonel Gorski for intervention on the travel issue is also most important because it reveals the frustration and malicious intent of Schroeder. It was Schroeder's issues with Arroyo seeking to protect her USERRA rights all along and it is closely linked to her termination. The suspicious timing of Keith Schroeder's complaint at the time of

termination of Arroyo's employment demonstrates his frustration with the requirements to comply with USERRA obligations.

Judge Dow eliminated emails from Human Resources Representative Cecilia Jarvis because it concerned the travel issue. Jarvis wrote that she went all the way to Washington to learn that Arroyo was entitled to one additional hour travel time before and after responding to military orders.

Judge Dow eliminated emails from Colonel Gorski to Keith Schroeder because they talked about Arroyo's right to have eight hours rest time before and after travel pursuant to military orders and duties. Those emails would further explain the frustration and irritation Arroyo's response to military orders caused Volvo supervisors as Schroeder complained in writing to Bruce Olin, "I'm not sure if our policy addresses that. Michael stated, referencing his military reserve experience that she could request a transfer for an Illinois reserve unit. But I'm not sure if we can direct her to do that."[84] "I have got to be responsible for our business needs."[85]

Michael Temko complained in emails, "Luz Arroyo deployed to Iraq last April. And, according to her orders, she is due back. She contacted me one time since her deployment six months ago, and I have not heard from her since."[86]

Michael Temko wrote further in emails, "I have issues with the fact she's not keeping in contact with us".[87]

Schroeder asked Bruce Olin in an email exchange, "Does this mean she could be home for up to six months before she would be required to work?" [88]

---

[84] *Arroyo I* Trial Transcript, August 18, 2016, 520: 7-10.
[85] *Arroyo I* Trial Transcript, August 18, 2016, 522: 16-17.
[86] *Arroyo I* Trial Transcript, August 18, 2016, 527:23 to 528:1.
[87] *Arroyo I* Trial Transcript, August 18, 2016, 529:3-5.
[88]*Arroyo I* Trial Transcript, August 18, 2016, 529:3-5.

Supervisor Michael Temko complained in another email, "Since our follow-up to our previous discussion about Arroyo's military leave and her attendance, we've had more issues with Arroyo's attendance." "And there should be no reason she should not have reported to work today." "I left a voice message at Luzmaria's (sic) home. And a short time ago I received a communication from her local Army unit which states she's got orders from November 12th to the 26th."[89] "One would have thought that if Luzmaria (sic) Arroyo had received these orders on November 14th, she would have either called or faxed us the orders."[90]

### G. Emails, Testimony, and Acknowledgments Precluded, Excluded, or Disguised and Recharacterized from Jury Consideration in *Arroyo II*

#### 1. *Arroyo II* is Tried on the USERRA Claim Only And Results in a Verdict for Volvo

On February 3, 2022, the second trial on Plaintiff's USERRA claim only ended in a verdict in favor of Volvo. (Doc.#: 342).

#### 2. Motion Practice after *Arroyo II*

##### a. On March 2, 2022, Plaintiff's Rule 59 Motion for New Trial or To Alter or Amend Judgment was filed, (Doc.#: 343-1).

##### b. On March 10, 2022, because Judge Dow indicated that he had never seen a jury verdict on any other USERRA case except jury verdict in the above-captioned case, Plaintiff's counsel was given leave to research across the country regarding other USERRA jury verdicts.

##### c. On March 11, 2022, Plaintiff's counsel filed A Report to the Court of Other Jury Verdicts under USERRA

(Attachments: # 1 Exhibit Jury verdict form for $954,000 in USERRA case, # 2 Exhibit Jury verdict form for $542,000 in USERRA case, # 3 Exhibit Jury verdict form for $403,000 in USERRA case, # 4 Exhibit Jury verdict form for $225,000 in USERRA case, # 5 Exhibit Jury

---

[89] *Arroyo I* Trial Transcript, August 18, 2016, 553:23 to 554:2, 554:8-9, and 554:19-23.
[90] *Arroyo I* Trial Transcript, August 18, 2016, 555:2-4.

verdict form for $90,000 in USERRA case, # 6 Exhibit Jury verdict form for $64,564 and willful violation in USERRA case, # 7 Exhibit Jury verdict form for $40,000 in USERRA case, # 8 Exhibit Jury verdict form for $8300 in USERRA case, # 9 Exhibit Special jury verdict form in USSERA case, # 10 Report on jury verdict of $107,000 in USERRA case).

### d. On December 27, 2022, Judge Dow denied Plaintiff's Rule 59 Motion for New Trial or to Alter or Amend Judgment

By his Memorandum Opinion and Order, Judge Dow erroneously asserts the Plaintiff has waived her right to a new trial despite the title on the Rule 59 Motion. (Doc.#: 345).

See *Neely*, *supra*, at 386 U.S. 327-328:

> [T]he trial court itself [may have] caused the insufficiency in plaintiff-appellee's case by erroneously placing too high a burden of proof on [her] at trial. But issues like these are issues of law with which the courts of appeals regularly and characteristically must deal. The district court in all likelihood has already ruled on these questions in the course of the trial and, in any event, has no special advantage or competence in dealing with them. They are precisely the kind of issues that the losing defendant below may bring to the court of appeals without ever moving for a new trial in the district court. Likewise, if the plaintiff's verdict is set aside by the trial court on defendant's motion for judgment n.o.v., plaintiff may bring these very grounds directly to the court of appeals without moving for a new trial in the district court. Final action on these issues normally rests with the court of appeals. (Internal citation omitted).

See also *Juneau Square Corp. v. First Wisconsin National Bank of Milwaukee*, 624 F. 798, 806 (7th Cir. 1980), writing for a panel that included Judge Sprecher and Judge Bua, Judge Harlington Wood observed:

> [A]fter a new trial and entry of final judgment an appellate court entertaining an appeal from the final judgment may review the new trial order and, where appropriate, reinstate the original verdict.

### 3. So Much Evidence was Sanitized and Scrubbed Away in *Arroyo II*

The retrial of this case did not follow the directions of the Seventh Circuit on remand, the ADA claim was jettisoned from jury consideration, critical evidence was withheld showing Volvo's frustration when Arroyo was called away for military duties, and not available so they could "run their business". The jurors were told a sanitized story unfair to Arroyo. During *Arroyo II*, the Court observed on more than one occasion after several days of testimony and just before the case was given to the jury for deliberation:

> "This is certainly a different trial than the first one."

### 4. In *Arroyo II*, So Many Emails were Eliminated

The Seventh Circuit noted that the grant of summary judgment for Volvo "underestimates the strength of the emails as support for Arroyo's case". The Seventh Circuit ordered, directed and instructed that the jury must be allowed to consider all the emails showing the frustration of Volvo management going back to the beginning of Arroyo's employment, the repeated attempts to discipline her, her discussions of her PTSD, stress she endured in writing "My Story"[91] and the stress she experienced at work[92]. See *Arroyo*, 805 F.3d at 285-286. Still, on retrial better than two thirds of the emails were kept from jury view and consideration.[93]

### 5. The Original Jury Verdict in *Arroyo I* Must Be Reinstated

Because the orders, directions, and instructions of the Seventh Circuit were scrupulously followed during the jury trial of *Arroyo I* and later ignored and/or deliberately disobeyed in the erroneous retrial of *Arroyo II*, the original jury verdict in *Arroyo I* must be reinstated.

---

[91] Arroyo delivered "My Story" on December 21, 2010 to other soldiers at a Blue Ribbon Event. (Pl.'s Ex. 117).
[92] Arroyo told Keith Schroeder of her "panic attacks" and "stress at work" in the December 24, 2010 email when she was advising him she had self-admitted to the emergency room of a local hospital. (Pl.'s Ex. 119).

In *Latino v. Kaizer*, 58 F.3d 310, 317 (7th Cir. 1995) for a panel consisting of Judge Easterbrook and Judge Kanne, Chief District Court Judge Sharp wrote:

> With the greatest deference to [the trial judge, there was nothing demonstrably untrue about the [plaintiff's] evidence. It did not, for example, require a realignment of the laws of nature. This was a credibility-based decision—a swearing contest. The evidence for each side was essentially equal; it was merely a matter of whom to believe. "And since the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." The jury spoke its verdict, and the Seventh Amendment affords it very considerable deference.
>
> [The trial judge] usurped the jury's role in deciding the most reasonable inferences from the evidence. That flies in the face of the Seventh Amendment, and goes beyond the power of the district judge under Rule 59. With all deference, the grant of a new trial in this case was an abuse of discretion. It must most respectfully be decided here that with all good intentions the district judge did indeed cross the boundaries when he [did not follow the explicit orders, directions, and instructions from the Seventh Circuit and should not have been permitted [to second-guess the *Arroyo I* jury's award of damages within acceptable ratios]…The grant of a new trial based on [the trial judge's] reasoning was a clear abuse of discretion, and cannot be upheld.

## VIII. CONCLUSION

WHEREFORE, this Honorable Court should set aside the verdict in *Arroyo II* and reinstate the jury verdict of *Arroyo I* which was tried according to the orders, instructions, and directions of the Seventh Circuit Court of Appeals.


Respectfully submitted,                          Respectfully submitted,

/s/ John P. DeRose                               /s/ Caitlyn F. DeRose
John P. DeRose                                   Caitlyn F. DeRose

## CIRCUIT RULE 30(d) STATEMENT

In accordance with Circuit Rule 30(d) of the Rules of the Seventh Circuit Court of Appeals, I certify that the foregoing brief contains all the materials required by parts (a) and (b) of this Rule.

/s/John P. DeRose
John P. DeRose
Attorney for LuzMaria Arroyo,
Plaintiff–Appellant

## CERTIFICATE OF COMPLIANCE

In accordance with Rule 28.1(e)(1)-(3) and Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I certify that the foregoing brief complies with the type volume limitation and is proportionately spaced as required by Rule 32(b) of the Circuit Rules. The brief exclusive of tables and cover page contains 13,939 words as recorded by the word count of the word-processing system used to prepare the brief.

/s/John P. DeRose
John P. DeRose
Attorney for LuzMaria Arroyo,
Plaintiff–Appellant

John P. DeRose & Associates
615 N. York Road
Hinsdale, IL 60521
(630) 920-1111 office
(630) 920-1170 fax
john@johnderoselaw.com

44

## CERTIFICATE OF SERVICE

To: Mr. William J. McMahon IV
    Constangy, Brooks, Smith & Prophete, LLP
    100 N. Cherry Street
    Suite 300
    Winston-Salem, North Carolina 27101
    bmcmahon@constangy.com

Ms. Laura Balson
Constangy, Brooks, Smith & Prophete, LLP
300 S. Wacker Drive
Suite 1950
Chicago, Illinois 60606
lbalson@constangy.com

On June 26, 2023, Plaintiff-Appellant's Docketing Statement was filed electronically using the Court's electronic filing system from which the above listed Attorneys of Record will be served by receiving a copy.

Respectfully submitted,

/s/ John P. DeRose
John P. DeRose

John P. DeRose
Caitlyn F. DeRose
John P DeRose & Associates
615 N. York Road
Hinsdale, Illinois 60521
(630) 920-1111 office
(630) 920-1170 fax
john@johnderoselaw.com
caitlyn@johnderoselaw.com

# TABLE OF CONTENTS TO SHORT APPENDIX

**Table of Contents to Short Appendix**………………………………………….......……..SA1

**Judgment Order of the Seventh Circuit Court of Appeals, No. 14–3618,
Decided Oct. 6, 2015, Rehearing and Rehearing En Banc Denied Nov. 4, 2015**
*Arroyo v. Volvo Group North America, LLC*, **805 F.3d 278, 283 (7th Cir. 2015)**………........SA2-18

**Plaintiff's Third Amended Complaint, Doc.#:51, filed on July 30, 2013**...…………..........SA19-59

**Order: Jury Trial held: Verdict in Favor of Plaintiff Compensatory Damages:
$2,600,000.00 and Punitive Damages $5,200,000.00, (Doc.#162),
dated August 23, 2016**………………………………………………………….................SA60

**Minute entry: plaintiff's request for equitable relief is granted in part and
denied in part plaintiff awarded $141,388.53 in back pay, $84,131.92 front pay,
$41,348.61 in other employment -related compensation, $8546.10 in prejudgment
interest, and $275,415.16 in liquidated damages. The Court reduces the jury's
$2.6 million compensatory damage award to $300,000 and vacates the jury's
$5.2 million punitive damage award. (Doc.#: 176), dated July 13, 2017**……………...............SA61

**Memorandum opinion and order signed by Judge Dow, (Doc.#: 177)**………….….............SA62-95

**Memorandum opinion and order signed by Judge Dow, Defendants motion for
judgment as a matter of law, or, in the alternative, a new trial, or, in the alternative,
remittitur and amendment of judgment 192 is granted to the following extent: the
Court will enter judgment as a matter of law in favor of Defendant on Plaintiff's
ADA discrimination claim and grant a new trial on Plaintiff's USERRA claim.
Defendant's remaining requests for relief are denied. Plaintiff's motion to alter
judgment 204 is denied in its entirety as moot. (Doc.#: 227),
dated September 30, 2019** ………………………………………………….........SA96-136

**Minute entry before Judge Dow: Jury Verdict in Favor of Defendant,
Volvo Group North America, (Doc.#: 342), dated February 3, 2022**……………….................SA137

**Memorandum Opinion and Order, (Doc.#: 351), entered on December 27, 2022**………SA138-145

**Notice of Appeal, (Doc.#: 354), filed on January 24, 2023**………………………………..SA146-150

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 14-3618

LUZMARIA ARROYO,

*Plaintiff-Appellant*,

*v.*

VOLVO GROUP NORTH AMERICA, LLC,
d/b/a VOLVO PARTS NORTH AMERICA,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12-cv-6859 — **Robert M. Dow, Jr.**, *Judge*.

———————————

ARGUED MAY 26, 2015 — DECIDED OCTOBER 6, 2015

———————————

Before BAUER, KANNE, and WILLIAMS, *Circuit Judges*.

KANNE, *Circuit Judge*. LuzMaria Arroyo is an Army Reservist and veteran who suffers from post-traumatic stress disorder ("PTSD"). She worked for Volvo Group North America, LLC, d/b/a Volvo Parts North America ("Volvo") from June 2005 until she was fired in November 2011. Volvo says it fired her for violations of its attendance policy, but

Arroyo claims the real reason was discrimination on the basis of her military service and her disability.

Arroyo sued Volvo in federal district court for discrimination, retaliation, and failure to provide reasonable accommodations in violation the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* ("USERRA"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Arroyo also brought a state-law claim for intentional infliction of emotional distress. The district court granted Volvo's motion for summary judgment on all counts and awarded Volvo, as the prevailing party, its reasonable costs.

We now reverse the district court's order with respect to Arroyo's discrimination claims under USERRA and the ADA because Arroyo has raised genuine, material factual issues that should be resolved at trial. We also vacate the district court's award of Volvo's costs. In all other respects, however, we affirm the judgment of the district court.

## I. Background

Because this is an appeal from summary judgment, we summarize the facts in the light most favorable to the non-moving party and draw all reasonable inferences in her favor, without necessarily vouching for their accuracy. *Malin v. Hospira, Inc.*, 762 F.3d 552, 554 (7th Cir. 2014). LuzMaria Arroyo worked as a material handler in Volvo's Parts Distribution Center in Joliet, Illinois, from June 13, 2005, to November 8, 2011. Her main job was to retrieve vehicle parts with a

forklift and pack them for shipment. From 2009 on, she worked the second shift from 4:30 p.m. to 12:30 a.m.

*A. Arroyo's Military Leave; Management's Reaction*

Volvo hired Arroyo with knowledge that she was a member of the U.S. Army Reserve. She was the only active reservist at the Joliet facility. During her employment, she deployed twice to Iraq and Kuwait: from April 2006 to May 2007 and from April 2009 to August 2010. (She had also deployed another time before she came to work at Volvo.) Additionally, Arroyo took regular leave for weekend drills, training, and other military activities. In all, she received more than 900 days of military leave during her six-and-a-half years at Volvo. The company allowed her to modify her work schedule to take leave, and she was never directly disciplined for doing so.

But Arroyo points to evidence, including numerous internal emails obtained in discovery, suggesting that her supervisors were frustrated from the beginning about her schedule and absences. In the fall of 2005, Arroyo traveled several times to Fort Benning, Georgia, where her unit was based, for military drills. In addition to the days of actual training, Arroyo also took off time beforehand and afterward to drive to and from Georgia. That apparently frustrated material handling supervisor Michael Temko, who questioned her about why she needed the additional time. Temko later emailed Keith Schroeder, the director of distribution, to ask, "[A]re we required to give her the day before and day after for travel?" Schroeder forwarded the inquiry to Bruce Olin, the Director of Labor Relations, adding:

> I find myself with a dilemma if I were to discipline
> a person for taking too much time off for military

>reserve duty …. I certainly give her credit for serv-
>ing our country but of course I am also responsible
>for our business needs.

According to Arroyo's affidavit, Schroeder later told her in a meeting, with Temko present, that her military duties were becoming an undue hardship for Volvo and that she needed to transfer to a local unit. Corroborating this account, an email several weeks later from HR Manager Cecilia Jarvis to Schroeder referred to "the undue hardship it [*i.e.*, Arroyo's absences] is causing to our operation."

On October 28, Olin responded to Schroeder's earlier email. Olin explained:

>First, we do not have to grant time off for [Ar-
>royo's] travel time. Her legal obligation is 2 weeks
>per year, which we do give off, and 1 weekend per
>month. The drills she attended were most likely ex-
>tra training, which we do not have to grant the
>time. We do not have to give extra time for her
>travel to and from her weekend duty. She does
>have the option to transfer to a closer unit, we can-
>not make her transfer.

Schroeder forwarded the email to Temko, predicting "Luz-Maria will challenge us." Following Olin's advice, Temko told Arroyo "that she is not entitled to a travel day …. [A]ny day that she takes for travel … will fall under our attendance policy." In other words, she would be penalized.

As it turned out, Olin's advice was wrong. After doing some research, Jarvis clarified that the law "now treats vol-untary orders and involuntary orders [what Olin called 'ex-tra training'] the same." And the Employer Support for the Guard and Reserve ("ESGR"), which got involved at Ar-

royo's request, explained that she was entitled to "travel time plus an eight hour rest period following her drill before having to report to work" (as Jarvis reported to Temko at the end of December).

Arroyo deployed to Baghdad from April 2006 to May 2007. In April 2007, Temko complained to Olin that Arroyo had contacted him only once since she deployed. "For our planning/scheduling purposes," Temko explained, "it would be beneficial for us to know her status." He asked whether he could contact her unit. Olin responded: "Unfortunately, there isn't a lot we can do…. Per the law we have to wait for her. Sorry it isn't what you wanted to hear."

When Arroyo returned to work, according to her affidavit, Temko again suggested that she seriously consider transferring to a local unit, and Schroeder called her into his office and made it "very clear" that her job depended on her doing so. Therefore, in March 2008, she changed her duty station (reluctantly, she says) to Darien, Illinois.

Arroyo received orders to go on active-duty training with her new unit from April to October 2008. When she returned, Arroyo reports, Temko and Schroeder expressed dissatisfaction with the fact that she had been away for so long. The next month, Arroyo was away again for training from November 3 to 10. She had the next day off for travel, but then did not show up for three more days of work. In an internal email, Temko discussed disciplining, suspending, or possibly firing her for her absences. But when Schroeder called Arroyo, he received a copy of new orders extending her training from November 12 to 26. Although Schroeder had "issues with her lack of communications," as he ex-

plained in an email, "we likely have no recourse due to her military service."

From mid-April 2009 to mid-August 2010, Arroyo deployed overseas again in support of Operation Iraqi Freedom. Although USERRA gave her 90 days post-deployment to notify Volvo of her plans, *see* 38 U.S.C. § 4312(e)(1)(D), Schroeder opined in an email that she "should have returned to work on August 15, 2010." Management decided to offer her a voluntary severance package and expressed hope that she would accept it. They presented it to her on the first day after Arroyo returned to work, September 28, 2010. But she declined the package.

### B. Arroyo's PTSD and Requested Accommodations

After returning from her second deployment, Arroyo received treatment for symptoms of PTSD and was formally diagnosed in January 2011. She checked herself into the emergency room on December 23, 2010; the next day she emailed Schroeder to tell him what was happening and that the doctor ordered her not to work through the 30th. In an internal email, Schroeder considered disciplining her, but she later provided a doctor's note and discharge paperwork excusing the absences.

Around the same time, Arroyo provided documentation about her rights to one of her supervisors, Sherrie Jankowski. Jankowski then wrote to Schroeder on December 2, 2010, that "[Arroyo] is really becoming a pain with all this." Later that month, after Arroyo checked into the ER, Jankowski reported in an email to Schroeder (possibly in jest) "several rumors for [Arroyo's] not being here," including that "[s]he's on vacation in Hawaii."

Arroyo took FMLA and disability leave from December 23, 2010, through March 22, 2011. When she returned, she began therapy for her PTSD. Volvo allowed her to leave her shift early or arrive late once a week to attend therapy sessions from April through October 2011. Arroyo also requested a number of other accommodations. Volvo granted many of them, including: a quiet place to meditate before work and during breaks; a mentor; time off for counseling; and breaks and support during panic or anxiety attacks. Other requested accommodations—a more flexible schedule, use of earplugs or headphones in both ears, day-to-day guidance and feedback, putting all communications in writing, and disability awareness training—were under review.

### C. Volvo's Discipline and Termination of Arroyo

Material handlers at the Joliet facility were subject to a local attendance policy, administered by Temko and Schroeder. Employees receive whole or fractional "occurrences" for unexcused absences or tardiness. Each time there is an occurrence, Volvo looks back at the employee's history. If the employee compiles two occurrences within four weeks or five occurrences within six months, the company takes "corrective action." There are four progressive disciplinary steps: verbal warning, written warning, three-day suspension, and termination. If an employee goes six months without an occurrence, her disciplinary "level" decreases a step. Months spent on military or most other types of leave do not count toward the six-month clock.

In 2009, Arroyo received a verbal warning. In October 2010, after Arroyo returned from her second deployment, she received two half-occurrences for being 22 and 20 minutes late to her work station, plus one full occurrence for

missing a day of work. Therefore, on October 29, she received a verbal warning. That same day, she punched in one minute late, for which she received another half-occurrence. This triggered a formal written warning—the second disciplinary step. But Schroeder retracted that warning because Arroyo said she was unaware that there was no longer a two-minute grace period.

From the fall of 2010 to the fall of 2011, Arroyo continued to receive occurrences for tardiness, often of only a short duration. She was cited four times for being 1 minute late, once for being 2 minutes late, twice for being 5 minutes late, and once for being 10 minutes late. On August 31, 2011, Schroeder issued Arroyo a written warning (step two) for the period preceding August 19 and a suspension (step three) for the period up to August 20.

The next month, Arroyo filed an internal complaint requesting an investigation of Schroeder for disability-based harassment. Volvo assigned an investigator to the case, but Arroyo refused to answer any of her questions. One of Volvo's upper managers emailed Schroeder to reassure him, "[P]lease do not be concerned about the investigation." Arroyo also filed a discrimination charge with the EEOC on September 13, 2011.

On October 10, 2011, Arroyo punched in one minute after her shift started. After another incident on October 31, Schroeder met with Arroyo to explain that her use of the meditation/relaxation room before work did not excuse her arriving late to her work station.

Arroyo started work late again on November 2 and 4 (the record does not reflect how late), so Schroeder issued both a

verbal and a written warning. He and Temko then audited her attendance record and discovered that she had incurred five occurrences within six months. That brought Arroyo to the fourth step in the disciplinary process: termination. Volvo fired her.

Arroyo sued in the Northern District of Illinois. After discovery, Volvo moved for summary judgment, and the district court granted its motion in full. *Arroyo v. Volvo Grp. N. Am., LLC*, No. 12-cv-6859, 2014 U.S. Dist. LEXIS 138696 (N.D. Ill. Sept. 30, 2014) ("*Arroyo I*"). Arroyo filed a Rule 59 motion to reconsider, which was denied. Arroyo timely appealed.

## II. ANALYSIS

We review a district court's grant of summary judgment *de novo. Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938 (7th Cir. 2003). To obtain summary judgment, the movant must show that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### A. USERRA Discrimination Claim

USERRA prohibits employment discrimination against members of the armed services. It provides:

> A person who is a member of … a uniformed service shall not be denied … retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership ….

38 U.S.C. § 4311(a). The statute provides further that such discrimination exists where the employee's service membership was "a motivating factor" in the employer's adverse action "unless the employer can prove that the action would have been taken in the absence of such membership." *Id.*

§ 4311(c)(1). This provision creates a two-step burden-shifting scheme: (1) once a plaintiff makes out a *prima facie* case by showing that his membership was "a motivating factor," (2) the burden shifts to the employer to prove that it would have taken the same action regardless. *Crews v. City of Mt. Vernon*, 567 F.3d 860, 864 (7th Cir. 2009).

To meet the "motivating factor" standard, a plaintiff does not necessarily need a direct admission from the employer. She may rely instead on circumstantial evidence that creates a "convincing mosaic" from which a reasonable jury could infer discriminatory motive. *See Adams*, 324 F.3d at 939 (discussing the "convincing mosaic" route to proving discrimination); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736–37 (7th Cir. 1994) (same). Such evidence could include, for example, suspicious timing, statements, or behavior. In the aggregate, these individual pieces might be enough to prove—or at least to create a genuine issue about—the employer's ill motive. *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013).

Obviously, Arroyo suffered an adverse action—she lost her job. The question is whether her military service was a motivating factor in Volvo's decision to fire her. The district court did not think so. It found that the emails merely "demonstrate an awareness of Plaintiff's rights as an active service member, as well as discussions about the company's rights and obligations." *Arroyo I* at *35. Volvo was, in other words, simply trying to comply with the law.

We think this assessment underestimates the strength of the emails as support for Arroyo's case. Granted, Arroyo did a poor job of presenting her case to the district court. Her statement of undisputed facts under Local Rule 56.1 made

only general, broad-brush statements about Volvo's discrimination, accompanied by bulk citations to the emails, affidavits, and other materials. As the district court noted, she "[did] not cite to any specific emails," and it is "not the Court's job to sift through the record to find the evidence." *Arroyo I* at *34. Nevertheless, Arroyo did include the emails and other materials in the record, so we are free to consider them.[1] *See* Fed. R. Civ. P. 56(c)(3).

Taking all the evidence as a whole, a reasonable jury could infer that Volvo was motivated, at least in part, by anti-military animus toward Arroyo. There is evidence that from the beginning of her employment, her supervisors disliked the burden her frequent military leave placed on the company. They repeatedly discussed disciplining her and denied her rights, such as travel time, to which she was entitled. Some of the emails come close to a direct admission of management's frustration. For example, Schroeder discussed his "dilemma" of "disciplin[ing] a person for taking too much time off for military reserve duty." He later reportedly told Arroyo that accommodating her orders placed an undue hardship on Volvo; Jarvis repeated the same sentiment. Temko complained about Arroyo's lack of communication while she was deployed in Iraq. A jury could understandably detect in these communications animus toward Arroyo's military service.

---

[1] Arroyo also recounted the emails, quoting many of them at length, in her Third Amended Complaint. Finally, she brought them to the district court's attention when she moved for reconsideration of the summary judgment decision.

Animus or frustration alone, however, does not support a claim of discrimination. It must have been linked, as a motivating factor, to an adverse employment action. 38 U.S.C. § 4311(c)(1); *Adams*, 324 F.3d at 939. Again, we think a jury could reasonably conclude that there was such a link here. The emails expressing management's frustration often transitioned directly to a discussion about disciplining Arroyo under the local attendance policy for her tardiness and absences. In the end, she was not disciplined directly for her military leave. But she was disciplined for other instances of tardiness, often of a relatively minor nature—one or only a few minutes late. A jury could infer from the evidence that Arroyo's punishment for such infractions was actually motivated by her supervisors' long-standing frustration about her frequent absences.

These facts distinguish Arroyo's case from cases where the employer demonstrated frustration but took no materially adverse action, *e.g., Breneisen v. Motorola, Inc.,* 512 F.3d 972, 981–82 (7th Cir. 2008), where the employer's negative comments were isolated and unconnected to the termination decision, *e.g., Teruggi v. CIT Grp./Capital Fin., Inc.,* 709 F.3d 654, 656–57 (7th Cir. 2013), or where there were merely "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process," *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 545 (3d Cir. 1992). In contrast to these cases, Arroyo suffered adverse action (termination), the emails were arguably connected to the termination, and the complaining Volvo personnel were supervisors and decision-makers with power over her job.

It is true that Volvo granted Arroyo a considerable amount of military leave during her tenure at the company

and did not directly discipline her for those particular absences. That fact will likely support Volvo's arguments before a jury. But it does not negate an inference of discriminatory motive on summary judgment. *See Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 554 (8th Cir. 2005). Here, a jury could reasonably conclude that Volvo "was looking for a reason to discharge [Arroyo] because of the large number of absences from work due to [her] reserve status." *Id.* (reversing summary judgment on USERRA claims).

We conclude, then, that Arroyo presented sufficient evidence to make a *prima facie* case of USERRA discrimination. The burden therefore shifted to Volvo to show that it would have fired her even in the absence of her military service. 38 U.S.C. § 4311(c)(1). Volvo did not carry that burden; genuine issues of fact remain on this critical issue.

The district court emphasized that "Volvo's decision to hold employees to a strict start time is within its discretion." *Arroyo I* at *48–49. But that is the wrong standard. Even if Arroyo's tardiness was a "fireable offense … that is only the beginning of the analysis." *Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 20 (1st Cir. 2007) (reversing summary judgment on USERRA claims). Instead, Volvo must prove that it would have fired Arroyo regardless of her military service. *Id.*

Volvo points out that it disciplined five other employees, and not just Arroyo, for being between one and ten minutes late to work. But Volvo only contends that one of them, Victor Jackson, was disciplined and fired. Arroyo counters that Volvo did not enforce its policy so rigorously against other employees. Volvo has not conclusively established that it necessarily would have terminated Arroyo for her tardiness.

There is sufficient doubt on this issue to make it a jury question.

For these reasons, Volvo is not entitled to summary judgment on Arroyo's discrimination claim under USERRA.

### B. ADA Discrimination Claim

The ADA prohibits employers from discriminating against their employees "on the basis of disability." 42 U.S.C. § 12112(a). To establish a violation of the ADA, an employee must show "1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability…." *Winsley v. Cook Cty.*, 563 F.3d 598, 603 (7th Cir. 2009). An employee can prove discrimination either "directly" through admissions or circumstantial evidence, *Troupe*, 20 F.3d at 736–37, or "indirectly" through the familiar burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Arroyo proceeds under the direct route.[2]

The ADA claim presents a closer call than the USERRA claim for two reasons. First, the ADA standard is more exacting for Arroyo: she must prove that her PTSD was a "but for" cause of her discipline and termination. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010).[3]

---

[2] To the extent Arroyo also attempts to satisfy the indirect method, her claim fails, as the district court correctly concluded. *Arroyo I* at *36–45.

[3] It is an open question whether the 2008 amendments to the ADA, which changed the operative causation language from "because of" to "on the basis of," altered the substantive standard. *See Serwatka*, 591 F.3d at 962 n.1; *Silk v. Bd. of Trustees*, 795 F.3d 698, *12–14 (7th Cir. 2015). The

(continued…)

Second, there is less evidence of animus toward Arroyo's PTSD than there is concerning her military service.

Nevertheless, we think the evidence is sufficient to convince a reasonable jury that Arroyo was the victim of disability discrimination. Internal emails indicate that Volvo management considered disciplining Arroyo for her absences while she was in the hospital in December 2010, even though she emailed Schroeder to tell him about her condition. Another one of her supervisors, Sherrie Jankowski, joked about Arroyo's absence, writing that she heard rumors Arroyo was actually vacationing in Hawaii. A few weeks earlier, Jankowski had complained to Schroeder that Arroyo was "really becoming a pain with all this." This is enough for a jury to find discriminatory motive.

There is also enough to support a finding of "but for" causation. Management's expressions of frustration about Arroyo's military absences goes back to the beginning of her employment in 2005, but it was not until she returned from her second deployment in the fall of 2010 that Volvo began implementing the series of disciplinary steps that led to her termination. That timing coincides with the onset and diagnosis of Arroyo's PTSD. This kind of suspicious timing can support an inference of discrimination. *Hobgood*, 731 F.3d at 643–44.

We therefore conclude that summary judgment was also improper on Arroyo's ADA discrimination claim.

---

(…continued)

issue was not briefed by the parties, and the answer would not affect the outcome here in any case, so we need not resolve this issue.

*C. Remaining Claims*

On Arroyo's remaining claims, however, we agree with the district court's ruling and have little to add to its analysis. To recap briefly: Arroyo's retaliation claim fails because the statutorily protected activity in which she engaged—her internal complaint, EEOC complaint, and accommodation requests in 2011—all came after Volvo began disciplining her for her tardiness. Arroyo has not offered sufficient evidence of a causal link between her protected activity and the adverse employment actions.

Arroyo's failure-to-accommodate claim fails because the undisputed evidence shows that Volvo made numerous accommodations so that she could fulfill her military duties and cope with her PTSD (even if, as she claims, the company did so grudgingly). Volvo was also in the process of considering other requests and investigating Arroyo's complaints through an interactive process. But Arroyo was less than cooperative; for example, she refused to meet with the HR representative assigned to her case. On these facts, we perceive no genuine issue of material fact regarding the adequacy of Volvo's accommodations.

Finally, Volvo's actions, while perhaps discriminatory (that is for a jury to decide), did not rise to the level of "extreme and outrageous" under Illinois law. *See Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 684 (Ill. App. Ct. 1999) ("[I]n the absence of conduct calculated to coerce an employee to do something illegal, courts have generally declined to find an employer's retaliatory conduct sufficiently extreme and outrageous as to give rise to an action for intentional infliction of emotional distress."). Arroyo's claim for intentional infliction of emotional distress therefore fails.

*D. Award of Costs*

The district court awarded Volvo its reasonable costs, amounting to $9,476.30, as the prevailing party under Fed. R. Civ. P. 54(d)(1). In light of our decision, that award was at the very least premature and should be vacated. The district court may revisit this issue, however, after a final resolution of the case.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment on Arroyo's claims of discrimination under USERRA and the ADA; we VACATE the district court's award of Volvo's costs; and we AFFIRM in all other respects. This case is REMANDED for further proceedings consistent with this opinion.

**FILED**

**7/30/2013**

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LUZMARIA ARROYO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  1:12-CV-06859 |
| vs. | ) | |
| | ) | Honorable John Z. Lee, |
| VOLVO GROUP NORTH AMERICA, | ) | Judge Presiding |
| LLC, d/b/a VOLVO PARTS NORTH | ) | |
| AMERICA, | ) | Honorable Jeffrey Cole, |
| | ) | Magistrate Judge |
| | ) | |
| Defendant. | ) | JURY DEMANDED |

**THIRD AMENDED COMPLAINT**

NOW COMES the Plaintiff, LUZMARIA ARROYO, by and through her attorneys, John

P. DeRose & Associates, and as and for her Third Amended Complaint against Defendant,

VOLVO GROUP NORTH AMERICA, LLC, d/b/a VOLVO PARTS NORTH AMERICA states

as follows:

**JURISDICTION**

1.      This action is brought pursuant to 29 U.S.C. § 794; and the jurisdiction of this court is

invoked pursuant to 29 U.S.C. § 794(a)(1).

2.      This is an action seeking redress for violations of rights guaranteed to the Plaintiff , under

the Uniformed Service Members Employment and Reemployment  Act (USERRA), 38 U.S.C.A.

§ 4301 *et seq.*, 29 U.S.C.A. § 215(a)(3), under the Americans with Disabilities Act (ADA) of

1990, § 2 *et seq.*, 42 U.S.C.A. § 12101 *et seq.*, under Title VII of the Civil Rights Act of

1964("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, as amended, under the Rehabilitation Act of 1973

("Rehab Act"), 29 U.S.C. § 791 *et. seq.*, and under the Family Medical Leave Act (FMLA), 29

U.S.C.A. § 2615(a)(1) when she was subjected to a hostile work environment and was ultimately

1

terminated because of interference and retaliation by her employer as she sought to exercise her rights under these Acts. Plaintiff seeks mandatory injunctive relief and damages to redress Defendant's discriminatory employment practices.

3.      Venue lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §§ 1331, 1343, and 1391(b) because the events giving rise to this claim occurred in this judicial district and Plaintiff and Defendant and its employees reside in this District.

## PARTIES

4.      At all times herein mentioned, Plaintiff, LuzMaria Arroyo (hereinafter "Ms. Arroyo" or "Plaintiff"), was employed by the Defendant Volvo Group North America, LLC d/b/a Volvo Parts North America (hereinafter "Volvo" or "Defendant").

5.      At all times herein mentioned, Defendant Volvo was and is believed and alleged hereon to be a corporation duly organized, existing, and operating within the jurisdiction of this Court.

6.      Volvo is also an employer subject to suit under the Title VII and the ADA in that Defendant is in an industry affecting commerce and had 15 or more employees in each of 20 or more weeks in the current or preceding calendar year.

## FACTUAL ALLEGATIONS

7.      Defendant is a transportation company in the business of producing, servicing and distributing heavy-duty truck parts. Defendant is a government contractor and/or subcontractor with contracts greater than $10,000.

8.      Plaintiff is a disabled veteran of the United States Army Reserve who was deployed on three separate occasions to combat zones.

9.       Plaintiff has been deployed to Kuwait City, Kuwait and Baghdad, Iraq and Basrah, Iraq-- the last two deployments to Iraq of which were while in the employ of Defendant.

SA20

10.     Plaintiff is a qualified person with respect to her employment in that, with or without a reasonable accommodation, she can perform the essential functions of her job.

11.     Within 6 months after her release from active duty with the United States Army in Kuwait, Plaintiff began her employment with Defendant at its plant located in Joliet, Illinois on or about June 13, 2005.

12.     On her application for employment with Defendant, Plaintiff fully disclosed and Defendant was fully aware that she was a member of the United States Army Reserve, subject to call up to active duty and training pursuant to military orders.

13.     At all relevant times described herein, Plaintiff was employed in the position of material handler for Defendant.

14.     At all material times, Plaintiff performed her job according to her employer's legitimate expectations.

15.     Within 10 months after the commencement of her employment with Defendant, on April 15, 2006 Plaintiff was called to active duty in support of Operation Iraqi Freedom, was sent to Baghdad, Iraq, and went on military leave from her employment at the Defendant's Joliet plant.

16.     On or about May 7, 2007, Plaintiff was released from active duty in Baghdad, Iraq and reported back to work for the Defendant at its Joliet plant.

17.     At all times relevant, the Regional Manager at the Defendant's Joliet, Illinois location was Keith Schroeder (hereinafter sometimes referred to as "Schroeder").

18.     At various relevant times, Plaintiff had three immediate supervisors, Michael Temko, Sherrie Jankowski, and Patrick Dunn.

19.     At various relevant times, Defendant's supervisors (who were not even the immediate supervisor of Plaintiff) interacted with or were involved in the secret discussions and recommendations concerning the treatment of her, included, but was not limited to, Bill Balsis, Bernard Bomba, Christopher Humann, David Miller, and Jason Mussatto.

20.     At various of the relevant times, members of the Human Resources Team and the Management Team of Defendant with which plaintiff interacted or who were involved in the discussions and recommendations concerning the treatment of her, included, but were not limited to, Dennis Scholl, Bruce Olin, Regina Williams, Maureen Somerset.

21.     Almost from the inception of her return to work, Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management began to consult with each other concerning the requirements and dictates of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §4301 et seq.,  in order to grudgingly grant only minimal compliance with USERRA and deprive Plaintiff of the rights and benefits to which she is entitled in order to avoid allegations of discrimination and retaliation.

22.     After Plaintiff's return from Iraq in 2007, Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management complained about and agreed among themselves that Plaintiff's travel to Fort Benning, Georgia for her training imposed too great a burden on Defendant because Plaintiff needed and had to be granted an extra day of travel to and from Fort Benning in compliance with her military orders.

23.     Plaintiff was told by Keith Schroeder after he consulted with other of Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management to transfer from Fort Benning, Georgia to a local United States Army Reserve unit.

4

24.     Plaintiff advised Schroeder that as a soldier, she could only request a transfer and did not have the authority to demand a transfer.

25.     In December 2007 at the insistence of Schroeder, Plaintiff requested a transfer from her unit at Fort Benning, Georgia to a local drill site in Darien, Illinois for the convenience of Defendant.

26.     The team of soldiers with which Plaintiff had drilled, trained, and reported for duty at Fort Benning, Georgia were members of the unit with which Plaintiff had been deployed into combat zones in Iraq on the earlier occasion.

27.     The transfer to the unit at the local site in Darien, Illinois at the insistence of Defendant deprived Plaintiff of the camaraderie, society, and confidence she developed in her fellow soldiers, with whom she shared her experiences in harm's way.

28.     That transfer to the unit at the local site in Darien, Illinois also accelerated Plaintiff's Redeployment Schedule since there was normally a two to three-year period between deployments of particular units.

29.     In March, 2008, the United States Army placed Plaintiff on Active Duty for Training ("ADT") and Plaintiff went again on military leave status from her employment with Defendant.

30.     On or about October 1, 2008, Plaintiff returned to work at Defendant's Joliet plant from ADT.

31.     Upon Plaintiff's return to work, Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management continued to debate the requirements and dictates of USERRA in order to grudgingly grant only minimal compliance, deprive Plaintiff of the rights and benefits to which she is entitled under USERRA, and avoid allegations of discrimination.

5

SA23

32.     Spreadsheets were created and emails were exchanged among Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management concerning Plaintiff's absence from employment at Defendant's plant for drills and training, her obligation to follow orders, and Defendant's legal obligation to cooperate with those orders.

33.     On or about April 15, 2009, Plaintiff was activated for service in Operation Iraqi Freedom a second time while employed with Defendant.

34.     Although originally scheduled to be released from active duty on April 15, 2010. Plaintiff tour of duty was extended until August 15, 2010.

35.     Questioning the obligation of Plaintiff to remain on extended active duty, Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management demanded production of military orders that had not yet been produced in violation of USERRA.

36.     Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management continued to remind each other that they must not appear to be discriminatory of Plaintiff and her rights.

37.     On or about August 15, 2010, Plaintiff was released a third time from active duty with the United States Army in a combat zone.

38.     Pursuant to USERRA Plaintiff was allowed to return to her position at the Defendant up to ninety (90) days after release from active duty on August 15, 2010.

39.     Plaintiff returned to work at the Defendant's Joliet plant on or about September 27, 2010.

40.     Upon her return, Defendant failed to provide the Plaintiff with updated employment policies, failed to provide training and re-training on the essential functions of her job, and failed to provide the appropriate amount of earned time off ("ETO") Plaintiff had accrued.

SA24

41.     Throughout her employment with Defendant, as Plaintiff was experiencing concerns and problems in the workplace as a result of her quest to fulfill her military duty and obligations, she brought her questions, complaints, and problems, both verbally and in writing, to her supervisor first, then to the local Human Resources Manager, then to the next level of Regional Management, then to Regional Human Resources personnel, and finally to Defendant's upper management at the Headquarters level.

42.     As Plaintiff sought rights guaranteed to her under the Uniformed Service Members Employment and Reemployment Act (USERRA), under the Americans with Disabilities Act (ADA) of 1990, under Title VII of the Civil Rights Act of 1964 ("Title VII"), under the Rehabilitation Act of 1973 ("Rehab Act"), and under the Family Medical Leave Act (FMLA), the company retaliated against her, disciplined her, and ultimately terminated her employment.

43.     On September 28, 2010 the first day after her return to work, Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management tendered a Voluntary Severance Package to Plaintiff with the hopes that she would voluntarily terminate her employment with Defendant.

44.     Plaintiff did not accept the severance offer and continued to work for Defendant.

45.     On or about October 19, 2010, less than one month after Plaintiff's return to work from active duty, Schroeder gave Plaintiff a "verbal warning" for two "occurrence" absences between October 1, 2010 and October 19, 2010, despite the fact that Plaintiff had never been provided with any protocol promulgated by Defendant concerning absences upon a reemployment and had been, in fact, excused for one of the absences.

7

46.     On or about October 27, 2010, Plaintiff submitted a request to take military leave on the Friday before a drill and training weekend set to take place on November 5, 2010 in order to properly rest and make preparation for her drills and training.

47.     Schroeder denied the Plaintiff's request for military leave because of what Schroeder alleged, but failed to specify was an "undue hardship".

48.     Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management knew that USERRA required that Plaintiff be afforded travel time plus an eight hour rest period following her drill before having to report to work.

49.     After Schroeder denied Plaintiff's request for military leave, Plaintiff reluctantly agreed to report to work two hours prior to the start of her shift and leave two hours prior to the end of her shift on the Friday before her drill and training weekend.

50.     On or about October 29, 2010, Schroeder gave Plaintiff write-ups for the two absences of October 1, 2010 and October 19, 2010, which were originally "verbal warnings".

51.     This action taken by Schroeder against Plaintiff violated the Defendant's protocols for progressive discipline and corrective disciplinary action.

52.     On or about November 1, 2010, Schroeder disciplined Plaintiff for being one (1) minute late to work.

53.     Plaintiff refused to sign the Disciplinary Notice because the Defendant's policy allowed her to punch in up to two minutes after the start of the shift.

54.     From on or about November 10, 2010 through November 12, 2010, plaintiff's need for a leave day became apparent when she required hospitalization and medical treatment directly following drill weekend.

55.     On or about November 27, 2010, Plaintiff requested military leave on December 3, 2010 to allow her to attend a Military Reserve Training Weekend scheduled for December 4 and 5, 2010.

56.     Schroeder denied the Plaintiff's request for military leave from her employment with Defendant in order to attend the Military Reserve Training Weekend and be sufficiently rested before and after that training.

57.     On December 2, 2010, Plaintiff was instructed that a decision concerning any request for military or medical leave would only be made after she provided military or medical documentation in accordance with Defendant's attendance policy in violation of USSERA.

58.     On or about December 7, 2010, Plaintiff requested assistance from Employer Support of the Guard and Reserve (ESGR) in mediating her USERRA rights.

59.     On December 13, 2010, Schroeder offered to adjust the Plaintiff's work schedule on training weekends so that she would begin at 10:00 a.m. and end at 6:00 p.m.

60.     Schroeder's proposed schedule did not allow Plaintiff to meet the eight (8) hours of sleep plus travel time requirement as set forth in USERRA.

61.     When plaintiff did not accept his proposed schedule, Schroeder curtly denied Plaintiff's request to have a military leave day on the Friday before training weekends for the stated reason that it would be an "undue hardship" to Defendant.

62.     On or about December 23, 2010, Plaintiff self-admitted to the emergency room of the Adventist LaGrange Memorial Hospital, as she sought medical treatment for depression and anxiety.

63.     Plaintiff was diagnosed with anxiety and was provided with a note excusing her from work through December 30. 2010 which doctor's note was provided by Plaintiff to Defendant.

SA27

64.     Plaintiff was examined and treated at the Veterans Administration hospital for depression, anxiety and paranoia on January 8, 2011.

65.     Plaintiff was admitted to the Veterans Administration Hospital between January 10, 2011 and January 14, 2011 for depression, anxiety and paranoia.

66.     On or about January 18, 2011, Dr. Arvind Yekanath diagnosed Plaintiff with service-related Post-Traumatic Stress Disorder ("PTSD").

67.     Plaintiff applied for Short-Term Disability ("STD") with the Defendant, which Defendant approved on January 21, 2011 retroactive to December 27, 2010.

68.     On or about March 19, 2011, after mediation among the Plaintiff, Defendant, and the Employer Support of the Guard and Reserve ("ESGR"), Plaintiff was granted a partial military leave day in advance of drill weekends and pay for military leave for Annual Training attendance in accordance with company policy.

69.     On March 22, 2011 Dr. Arvind Yekanath wrote Defendant that "Arroyo is fit to work without restrictions".

70.     On or about March 23, 2011, Plaintiff returned to work from Short-Term Disability.

71.     On or about April 14, 2011, after the Defendant raised concerns about the impact of her PTSD symptoms on her ability to operate a forklift, Plaintiff saw the Defendant's physician for an Independent Medical Evaluation.

72.     As a result of the Independent Medical Evaluation, Defendant's physician restricted Plaintiff from operating a forklift.

73.     On or about April 26, 2011, Plaintiff requested to use two (2) hours of Earned Time off (ETO) each time she had to attend group therapy sessions required for her PTSD treatment.

74.    Schroeder and HR Representative Maureen Somerset denied Plaintiff's request and indicated that if Plaintiff wished to use ETO she would have to take a whole day off "pursuant to company policy".

75.    On or about May 2, 2011, after Plaintiff called company policy to its attention allowing employees to take ETO in one hour increments if they so desire and have available unused ETO, Defendant's Human Resources Department overruled Schroeder and allowed Plaintiff to use two hours of ETO on her PTSD group therapy session days.

76.    On or about May 20, 2011 Plaintiff requested to work overtime on Saturdays.

77.    After consultation with Schroeder, Local Human Resources Business Partner Regina Williams (hereinafter sometimes referred to simply as "Regina Williams") confirmed in writing that the only Saturday work available at Defendant's Joliet plant entailed operating the forklift.

78.    Plaintiff advised Regina Williams that she had been in the plant on Saturday and observed work being performed by another employee that she was fully able to do while on light-duty.

79.    Defendant was fully aware that the language of its policies contained no prohibition with regard to overtime while on restricted duty nor did it have any documentation placing Plaintiff on restrictive duty.

80.    Plaintiff complained that she was being discriminated against based on her disability when she was prevented from working overtime on Saturdays despite the fact that she had the ability to perform the job for Defendant.

81.    In her email to Regina Williams on May 20, 2013, Plaintiff concludes:

        Perhaps I have been discriminated against his whole time.

11

SA29

82.     On or about May 31, 2011, Plaintiff took military leave from her employment with Defendant in response to orders from her unit.

83.     Although Arroyo was released from active duty on July 5, 2011, she was required to report for drill training on July 8, 2011.

84.     Because she had no time off between active duty and her drill training, Plaintiff requested additional days off (without pay from Defendant) before reporting back to work at Volvo.

85.     Plaintiff's request for additional time off before reporting back to Defendant's plant was denied by Keith Schroeder and Regina Williams.

86.     As directed by Defendant, Plaintiff returned to work from military leave on July 11, 2011.

87.     In a letter dated the same July 11, 2011, Defendant's physician, Dr. John J. Koehler reevaluated Plaintiff and indicated that "Arroyo is released back to full duty without restriction", including the previous limitation on her driving a forklift.

88.     Schroeder had established a new system at the Joliet plant entitled "Volvo LMS Lite" to allow supervisors and management to monitor the work and gaps in work of employees.

89.     Employees were advised that "supervisors will monitor daily LMS-Lite files", "excessive gaps of unaccounted for time will be documented and communicated", "upper management will do random audits of LMS Lite files and audit log", and "an employee will receive a Red Flag after a supervisor reviews the LMS lite file if there is an accumulation of gaps of unaccounted for time meeting the listed thresholds each day".

90.     When Supervisor David Miller accused Plaintiff of an LMS Lite policy violation on August 4, 2011, Plaintiff wrote to HR Representative Regina Williams:

>           Being accused of an LMS Lite policy violation by Mr. Miller, not
>           my supervisor.  The alleged infraction occurred on the Tuesday

12

when I begin work at a later time. This correlates with time off to attend my appointments as an accommodation allowed by the company.

I am requesting intervention before I seek legal assistance.

91.  On or about August 26. I, 2011, Plaintiff wrote an email to Defendant to complain about harassment relating to her PTSD diagnosis and to request a number of reasonable accommodations for her PTSD based upon standards published by the Department of Labor ("DOL").

92.  In that email, Plaintiff wrote:

America's Heroes at Work is a U.S. Department of Labor (DOL) project that addresses the employment challenges of returning Service Members living with Traumatic Brain Injury (TBI) and/or Posttraumatic Stress Disorder (PTSD)-an important focus of the President's Veterans agenda.

93.  Plaintiff went on to report harassment she experienced at the hand of Schroeder:

On 8/23 I experienced an incident which brought about a major anxiety episode. I tried various relaxation techniques, but could not ignore the event; I have a call to action, for I no longer felt safe/protected. After careful consideration of courses of action, I decided to speak with my supervisor, Patrick Dunn (who I feel safe to approach and confirm with). The anxiety episode lasted approximately 20 minutes. After speaking with Mr. Dunn, I felt more calm and composed and was able to continue working. Mr. Dunn said he would need to speak with you [Keith Schroeder] regarding the event brought about the anxiety.

On 8/24 you requested to speak with me and Mr. Dunn at which time you threatened to fire me for my behavior. Your demeanor was aggressive and hostile and I felt intimidated/threatened. Additionally, you stated that the time that I used in order to reduce my anxiety and consider courses of action was not authorized and I would be held accountable under the LMS Lite policy. You also stated that continued breaks for managing anxiety will result in termination. When I requested this information in writing, you refused to provide it to me and still have not provided it to date.

13

> On 8/25 you again requested to speak with me; this time cornering me in a small office with 2 other supervisors and Ms. Maureen Somerset behind the closed door in a room with no windows and no way to escape. You provided me with the workplace violence policy and the harassment policy and then allowed me to leave.
> ….

94.    On or about August 31, 2011 Schroeder and Williams suspended Plaintiff for violation of the company attendance policy.

95.    That suspension was in violation of Defendant's own progressive discipline and disciplinary protocol since Plaintiff had not received any written warnings for attendance violations in the previous six (6) months.

96.    On or about September 13, 2011, Plaintiff filed an EEOC Complaint alleging discrimination in violation of the Americans with Disabilities Act ("ADA").

97.    On or about September 19, 2011, Williams requested to interview the Plaintiff in relation to her PTSD harassment claims.

98.    Plaintiff indicated that she wanted to obtain legal representation before speaking with Regina Williams about the harassment.

99.    In the meanwhile, Regina Williams and Plaintiff came to an understanding regarding some of the accommodations Plaintiff had requested in August, one of which was to allow her the use of the supervisor's office at the back of the plant so that she could meditate and compose herself before starting work each morning.

100.    On or about November 1, 2011, Schroeder informed Plaintiff that he could not agree to a later start time on the dates during which she had her PTSD treatments without a call-in and a doctor's note.

SA32

101.    Schroeder further clarified that Plaintiff was expected to have her personal protective equipment on prior to the start of her shift at 4:30 p.m. and was expected to be walking towards her forklift at the start of the shift.

102.    Plaintiff indicated that she would put on her safety equipment before going to the meditation room, but requested to be paid by Defendant for doing so, which request Schroeder denied.

103.    When Plaintiff asked if this was official policy, Schroeder indicated that he had not communicated these requirements to any other employee and that this was not the policy for any employee other than the Plaintiff.

104.    On or about November 2, 2011, Plaintiff arrived at Defendant's Joliet plant and punched in 20 minutes early in order that she could use the meditation room before starting work as agreed.

105.    On or about November 3, 2011, Schroeder provided Plaintiff with a written Disciplinary Action Form for violation of the Defendant's alleged "Shift Start Rule Policy", contending that Plaintiff had been late 3 minutes on November 2, 2011 because she was not on her forklift when the bell rang.

106.    Plaintiff refused to sign this false write-up and informed Schroeder that Plaintiff's attorney was going to be engaging in mediation with the Defendant at the EEOC on November 18, 2011 to resolve all ADA issues.

107.    Schroeder also advised Plaintiff that there was a parking restriction that prohibited her from parking in the back of the plant at the entrance nearest to the meditation room; and when questioned by Plaintiff about it, Schroeder admitted that the parking restriction was just for her, it was not a parking policy, and he had never before promulgated it.

108.     Only because Plaintiff questioned him on the parking restriction, Schroeder posted a "parking policy" for all employees 2 days later.

109.     The new parking policy now necessitated that Plaintiff would have to leave the meditation room and take the approximately 10 minute walk to the front of the plant and put on her safety equipment and harness in order to be prepared for the start of work.

110.     On or about November 4, 2011, Plaintiff left work early pursuant to her agreement with the Defendant to use military leave on military drill weekends.

111.     On or about November 8, 2011, Schroeder disciplined the Plaintiff for alleged tardiness on November 4, 2011 and terminated the Plaintiff for her alleged absences over the past (6) months.

112.     Defendant's reason for Plaintiff's termination is false and merely pretext for illegal retaliation against her for reporting Schroeder's harassment and discrimination of her and to further deprive Plaintiff of the rights and benefits to which she is entitled under USERRA by Defendant's Supervisors, Managers, Human Resources Representatives, and Upper Management.

113.     On or about November 30, 2011, Plaintiff filed an amended charge with the EEOC adding a claim for retaliation.

114.      Plaintiff was terminated because of her disability, PTSD and in retaliation for her EEOC complaint for violation of the ADA filed on September 13, 2011 and in retaliation for her attempt to secure reasonable accommodations and working conditions under USERRA.

115.     As a result of the aforesaid acts of the Defendant, Plaintiff has lost her employment, income and benefits in an amount to be proven at the time of trial and claims such damages together with prejudgment interest as permitted by law.

16

116.    The aforementioned acts of the Defendant were reckless, willful, wanton, malicious, oppressive, and in callous disregard to and indifference to Plaintiff's rights.

### COUNT I
### DISCRIMINATION ON THE BASIS OF PLAINTIFF'S DISABILITY
### VIOLATION OF USERRA, TITLE VII, THE ADA, AND THE REHAB ACT

117.    Plaintiff realleges and incorporates the foregoing paragraphs 1 through paragraph 116 of this Second Amended Complaint as though fully set forth at this place.

118.    Plaintiff is disabled in that she was diagnosed with PTSD and is substantially limited in the major life activity of brain function.

119.    Defendant also treated Plaintiff as a person with a disability by granting some of the accommodations she requested.

120.    Plaintiff was qualified for the job she held with Defendant and performed all job functions to Defendant's legitimate employment expectations.

121.    Despite Plaintiff's qualifications and job performance, Defendant discriminated and retaliated against her because of her disability and active military service.

122.    Defendant's discrimination and retaliation against Plaintiff and denial of her rights under USERRA was intentional.

123.    Defendant discriminated against Plaintiff in the terms and conditions of her employment.

124.    Similarly situated non-disabled employees and employees who were not in the United States military service were not subjected to the same terms and conditions of employment as the Plaintiff.

125.    Defendant's reason for Plaintiff's termination was false and merely pretext for illegal discrimination.

SA35

126.    Defendant's actions, as described above, are in violation of USERRA, the ADA and
Rehab Act in that Defendant acted to discriminate and retaliate against Plaintiff in the terms and
conditions of her employment because of her disability and in a studied attempt to deprive her of
rights, benefits and protection under those statutes.

127.    As a direct and proximate result of said unlawful employment practices and in disregard
of the Plaintiff's rights and sensibilities, Plaintiff has suffered lost wages, the indignity of
discrimination, which has manifested in emotional distress and further has negatively impacted
her future ability to support herself, harmed her earning capacity, disrupted her personal life, and
caused loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff, LuzMaria Arroyo requests the following relief:

A.      That Plaintiff be granted general and compensatory damages in an amount to be
determined at trial;

B.      That Plaintiff be granted punitive or liquidated damages in an amount to be
determined at trial;

C.      That the Court grant to Plaintiff her reasonably incurred attorneys' fees, costs,
litigation expenses, and pre-judgment interest; and

D.      That the Court grant such other and further relief as the Court may deem just or
equitable.

## COUNT II
## RETALIATION IN VIOLATION OF USERRA,
## TITLE VII, THE REHAB ACT, AND THE ADA

128.    Plaintiff realleges and incorporates the foregoing paragraphs 1 through 127 of this
Second Amended Complaint as though fully set forth at this place.

129.    Plaintiff met her employer's legitimate employment expectations.

SA36

130. Plaintiff engaged in protected activity when she reported the harassment and violations of USERRA, and the ADA to the Defendant on May 20, 2011 and August 21, 2011.

131. On September 13, 2011, Plaintiff filed a Charge of Discrimination against Defendant with the EEOC.

132. After engaging in said protected activity, Defendant has engaged in many acts of retaliatory actions which include, but are not limited to, conspiring among its Supervisors, Managers, Human Resources Representatives, and Upper Management to deprive plaintiff of rights, benefits and protections guaranteed to her under the law, continually refusing to provide Plaintiff with a reasonable accommodation in her working conditions although Plaintiff is a qualified employee, terminating Plaintiff although she was performing to her employer's legitimate expectations and could continue to perform her job, and otherwise harassing Plaintiff in various ways designed to deprive her of those rights, benefits, and protections to which she was entitled and to impede her ability to work for Defendant.

133. There is a causal connection between Plaintiff's protected activity and Defendant's retaliatory actions.

134. Similarly situated employees who did not engage in protected activity were treated more favorably than Plaintiff.

135. Defendant's reason for Plaintiff's termination is false and merely pretext for illegal retaliation.

136. Defendant's actions, as described above, are in violation of USERRA, the ADA and Title VII as the Defendant has engaged in acts of retaliation because of Plaintiff's engagement in protected activities.

SA37

137.    As a direct and proximate result of said unlawful employment practices and in disregard of the Plaintiff's rights and sensibilities, Plaintiff has suffered lost wages, the indignity of discrimination, which has manifested in emotional distress and further has negatively impacted her future ability to support herself, harmed her earning capacity, disrupted her personal life, and caused loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff, LuzMaria Arroyo requests the following relief:

A.    That Plaintiff be granted general and compensatory damages in an amount to be determined at trial;

B.    That Plaintiff be granted punitive or liquidated damages in an amount to be determined at trial;

C.    That the Court grant to Plaintiff her reasonably incurred attorneys' fees, costs, litigation expenses, and pre-judgment interest; and

D.    That the Court grant such other and further relief as the Court may deem just or equitable.

## COUNT III
## FAILURE TO PROVIDE A REASONABLE ACCOMMODATION
## IN VIOLATION OF USERRA, THE ADA, AND THE REHAB ACT

138.    Plaintiff realleges and incorporates the foregoing paragraphs 1 through paragraph 137 of this Second Amended Complaint as though fully set forth at this place.

139.    Plaintiff is an active member of the United States Army Reserve and is disabled in that she is substantially limited in major life activity of brain function.

140.    Plaintiff is a qualified person with a disability in that Plaintiff can perform the essential functions of her job, or a job, with a reasonable accommodation.

SA38

141.    Defendant was able to provide a reasonable accommodation to Plaintiff in the form of actions such as allowing plaintiff sufficient time-off from work so that she could safely travel to and from and adequately perform for military duties, allowing her time to attend her PTSD therapy sessions, allowing Plaintiff to work overtime on a machine other than the forklift, and allowing Plaintiff time to put on her protective gear prior to starting her shift.

142.    Such reasonable accommodations would not cause an undue hardship on Defendant.

143.    Defendant refused to provide Plaintiff with these reasonable accommodations.

144.    Defendant failed to engage in the required interactive process to determine what it could do to provide Plaintiff with a reasonable accommodation.

145.    Defendant's actions, as described above, are in violation of USERRA, the ADA, and Rehabilitation Act, as Defendant did not offer Plaintiff, a qualified individual with a disability, an available reasonable accommodation.

146.    As a direct and proximate result of said unlawful employment practices and in disregard of the Plaintiff's rights and sensibilities, Plaintiff has suffered lost wages, the indignity of discrimination, which has manifested in emotional distress and further has negatively impacted her future ability to support herself, harmed her earning capacity, disrupted her personal life, and caused loss of enjoyment of the ordinary pleasures of life.

        WHEREFORE, Plaintiff, LuzMaria Arroyo requests the following relief:

        A.    That Plaintiff be granted general and compensatory damages in an amount to be determined at trial;

        B.    That Plaintiff be granted punitive or liquidated damages in an amount to be determined at trial;

C.      That the Court grant to Plaintiff her reasonably incurred attorneys' fees, costs, litigation expenses, and pre-judgment interest; and

D.      That the Court grant such other and further relief as the Court may deem just or equitable.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

147.  The Plaintiff repeat and re-allege paragraphs 1 through 146 of this Complaint as paragraphs 1 through 146 of Count IV as though fully set forth herein.

148.  Having been repeatedly advised of the rights of Plaintiff and knowing full well of her PTSD and the need for understanding and accommodation, the actions of Defendant, its supervisors, its Human Resources Department, and its high management employees were extreme and outrageous.

149.  The actions of the Defendant, its supervisors, its Human Resources Department, and its high management employees were done intentionally and maliciously to cause severe emotional distress to Plaintiff.

150.  Defendant, its supervisors, its Human Resources Department, and its high management employees knew or reasonably should have known that their actions had a high probability of causing severe emotional distress to Plaintiff.

151.  The actions of Defendant, its supervisors, its Human Resources Department, and its high management employees were intentional and malicious and demonstrated a willful and wanton disregard for the rights of Plaintiff and had a high probability of causing severe emotional distress to her.

152.  Plaintiff has suffered and continues to suffer from severe emotional distress.

SA40

153.  From the very inception of her employment with Defendant and her absence from the workplace pursuant to military orders and obligations that Plaintiff was required to follow and fulfill, Defendant's management, supervisors, and Human Resources leadership plotted and planned illegal and inappropriate discipline and obstruction of her even though she was not an indispensable employee and her absence was not an undue hardship to Defendant and its business needs.

154.  From the very inception of her employment with Defendant, and because of the refusal of Defendant's management, supervisors, and Human Resources personnel to provide Plaintiff with rights guaranteed her under USERRA, Plaintiff furnished Defendant's supervisors and managers with publications setting forth those rights and requested that they be forwarded to upper management and Defendant's Human Resources Department for their review and understanding, all of which requests met with ridicule from Defendant.

155.  When Defendant found Plaintiff's absence from work to travel to and from Fort Benning, Georgia for drills and training to be too inconvenient for its work schedule, Plaintiff was compelled by Defendant's management to transfer to a local Army Reserve site in the State of Illinois, an improper order which Plaintiff followed. Counselor redeployment on the Penguin and 25 okay.

156.  On August 25, 2005, only 2 months after her commencement of employment with Defendant, supervisor Michael Temko wrote Keith Schroeder:

>   Tuesday night LuzMaria was a no call, no show. Wednesday morning I tried to contact her through her Army unit and at home. I was unable to get a hold of her, but left a message to call me back. Wednesday night, she shows up with a document from her unit that said she worked there on Monday. I questioned her as to why she returned to work Wednesday night if she only had to work Monday. She said she drove back from her unit which is Georgia. I informed her that we had no problem with her military service, but

23

that she still has to keep us informed as to what is going on. She said next time she will call and let us know.

What do you advise I do in response to her 3 days no call, no show?

157.   Keith Schroeder responded:

I have numerous questions we must clarify before we take any disciplinary action.
…
4. Does she have any attendance disciplinary actions in her file? If so, what level of action?
5.  What is her performance, attitude and interaction with peers? I overheard a conversation this week that indicated that she was a problem employee. I don't recall discussing this with you.

… If attendance action is in order we must do so expeditiously.

158.   On August 26, 2005, Michael Temko responds to Keith Schroeder's questions:

…
4.  She has no disciplinary actions for attendance. …

5.  … Attitude and interaction with peers-Nothing really negative or positive to say here. Not a lot of interaction. She, for the most part, keeps to herself. In my opinion, LuzMaria's biggest problem is she is "burning the candle on both ends". She works here full-time, works as a part-time supervisor at UPS, and she is in the Army Reserves. By the time she gets here, she doesn't appear to have "much in the tank".

159.  On October 19, 2005, Michael Temko wrote to Keith Schroeder:

I don't know [if] she plans on making it to work from Georgia when she has to drill on Sunday. I guess the question is, since she travels out of state for drill, are we required to give her the day before and the day after for travel? As a probationary employee, is she entitled to all the same military benefits as a nonprobationary employee?

160.   Schroeder sought assistance in the answering the questions from Defendant's

Human Resources Department:

24

SA42

> …
> LuzMaria continued to work for UPS while working for us and it
> impacted her performance in absenteeism, tardiness. She has since
> quit UPS in September and her performance has improved.
>
> Now I find myself with a dilemma if I were to discipline a person
> for taking too much time off for military reserve duty when taking
> into consideration the current state of our country. Apparently her
> military reserve unit is in Georgia and she needs added time to
> drive to and from Georgia. Not sure if our policy addresses that….
>
> I certainly give her credit for serving our country. But of course I
> am also responsible for our business needs.

161.    Bruce Olin, one of the highest ranking members of the Defendant's Human

Resources hierarchy responded with an answer that is clearly in violation of the law:

> In reviewing the dates she has taken off, most were during the
> week. First, we do not have to grant time off for her travel time.
> Her legal obligation is 2 weeks per year, [for] which we do give
> off, and 1 weekend per month. The drills she attended were most
> likely extra training, [for] which we do not have to grant the time.
> We do not have to give extra time for her travel to and from her
> weekend duty.
>
> She does have the option to transfer to a closer unit,….

162.    Thereafter, at the insistence of Keith Schroeder, Plaintiff transferred to a local

Army Reserve unit, severing her ties with the soldiers with whom she had been deployed to Iraq,

had developed camaraderie, and had shared experiences in harm's way.

163.    On December 5, 2005, Michael Temko wrote to Celia Jarvis from Defendant's

Human Resources Department:

> LuzMaria has requested to speak with you in regards to her
> military service. She believes that she is entitled to a travel day to
> return to work following drill weekends and other training. I
> explained to her (per our discussion) that she is not entitled to a
> travel day, just the days that are on her orders or her drill schedule.
> I explained that any day that she takes for travel outside of this,
> from here on out, will be under our attendance policy.

164.    Of course, that information "discussed" among Defendant's supervisors, management, and Human Resources representatives was completely wrong and violative of the law and Plaintiff's rights.

165.  Because of her transfer to the local Army Reserve unit, Plaintiff's redeployment was hastened and pursuant to military orders she returned to Iraq in April 2006.

166.  In April 2007, Michael Temko wrote to Bruce Olin and Keith Schroeder:

> LuzMaria Arroyo deployed to Iraq last April and according to her orders she is due back. She contacted me one time since her deployment (approximately 6 months ago) and I have not heard from her since, our conversation was very brief, and we got disconnected. For our planning/scheduling purposes, it would be beneficial for us to know her status. Would it be appropriate to contact her unit to inquire about her deployment status? If not, what are our rights and her responsibility in keeping us informed of her deployment status?

167. Bruce Olin responded:

> Unfortunately, there isn't a lot we can do. We can contact the unit if they have any information.  All she has to do is to inform us within 6 months of her release. According to the law we have to wait for her. Sorry, it isn't what you wanted to hear.

168.  On May 14, 2007, Michael Temko wrote:

> All, LuzMaria called me last night and would like to return to work. She will return to work on Tuesday night.

169. In her Post Deployment Health Reassessment in August 2007, Plaintiff answered among other questions, as follows:

> Health since Most Recent Deployment: Much Worse Now Than before I Deployed
>
> …
> I have nightmares
> I am Constantly on Guard, Watchful and Easily Startled
> …

26

SA44

I am interested in receiving assistance for stress and emotional concern.

170. With each deployment and/or extended training of Plaintiff pursuant to military orders, Defendant's management ordered its supervisory personnel to document and create spreadsheets of her absence from the workplace in contemplation of her termination from its employment.

171. On November 7, 2008, Keith Schroeder forwarded to Bruce Olin a spreadsheet detailing all of Plaintiff's military orders since the commencement of her employment with Defendant in June 2005.

172. On November 17, 2008, Bruce Olin advised Keith Schroeder:

… Under the law she is within her rights to volunteer for assignments which cause her to use military leave. The only real restriction is when she uses five years of leave, not including weekends and her annual 2 week required duty. Sorry, but nothing we can do.

173. The following day Michael Temko wrote of his plan to discipline and terminate Plaintiff because of her absence from Defendant's place of employment while she was fulfilling her military duty:

This is a follow-up to our previous discussions about LuzMaria Arroyo's military leave and her attendance. Since our discussion with Bruce Olin last week we have had more issues with LuzMaria's attendance. Please review the following timeline:

Sat and Sun, 11/1 and 11/2-- Reserve Drill Weekend (schedule attached)
Mon, 11/3 to Mon, 11/10-- AT Training for 8 duty days (order attached)
Tues. 11/11-- absent from work. Acceptable due to travel from Fort McCoy, Wisc. She is allowed her travel time plus an 8 hour rest period.

LuzMaria has a verbal warning waiting for her when she finally comes back. If we were to give her occurrences for Thursday,

27

SA45

> November 13 and Tuesday, November 18 this would put her at a 3
> day suspension for attendance. If we were too, also, give her an
> occurrence for Wednesday, November 12 this would bring her to
> termination for her attendance.

174.  On November 19, 2008, having repeatedly discussed with Defendant's supervisors

and managers at the Joliet facility their desire to terminate LuzMaria Arroyo, Bruce Olin

forwarded to Keith Schroeder a document discussing discrimination under USERRA claiming:

> Keith, just an FYI. This is part of the law which allows her to take
> the military leave. The last paragraph is our "out" to hold her to
> our policies.

175.  The last paragraph of "the law" Bruce Olin had forwarded to Keith Schroeder and

contended gave defendant in an "out" reads:

> Employees, including past, present or future service members, are
> subject to all employment policies affecting employees'
> performance and working conditions as long as these policies do
> not penalize a person for service in the uniformed services. All
> employees must follow an employer's policies and procedures
> established specifically to address non-USERRA related
> employment issues and grievances. ***Policies or procedures that
> contain provisions infringing on a service member's rights under
> USERRA may be a violation of USERRA.*** (Emphasis in bold and
> italics not in original).

176.  On November 19, 2008, Keith Schroeder wrote:

> To All: I left a voice message at LuzMaria Arroyo's phone, and a
> short time ago, I received the attached communication from
> LuzMaria Arroyo's local army unit, which states that she has
> orders for November 12 to November 26, issued November 14.
> One would have thought that if LuzMaria had received these
> orders on November 14, she would have either called or faxed us
> the orders. While I have issues with her lack of communications,
> we likely have no recourse due to her military service.

177.  Once again, Keith Schroeder expressed his frustration because Defendant was

without recourse or reason to terminate Plaintiff's employment as she answered the call to duty

pursuant to military orders.

178.  On April 6, 2009, Plaintiff received orders indicating that she was being mobilized to support Operation Iraqi Freedom for 400 days, which was later extended until September 2, 2010.

179.  In a Post Deployment Health Assessment completed by Plaintiff on March 17, 2010, among other answers, she indicated she sought a " Referral for: Neurological Problems" because she experienced the following during her most recent deployment:

> Ringing in Ears, Lost Consciousness and Got Knocked out;
> Dazed, confused, and saw stars; constantly on guard, watchful, and easily startled;

180. Although the Separation Date from her most recent deployment was August 15, 2010 and, by law, Plaintiff had up to 90 days thereafter to notify Defendant either orally or in writing of her desire to return to her former employment and she did return to work well within the allotted time, Defendant's highest management discussed methods and offers to terminate Plaintiff's employment.

181.  Keith Schroeder wrote to Bruce Olin:

> Bruce, LuzMaria Arroyo returned to active work on September 27, 2010. Mike and I reviewing her military records and we need to clarify some things before we speak to her regarding company activity during her absence in the military. Additionally, it appears we may have misunderstood what the military orders and discharge documents tell us regarding her required date to return to work.
>
> Questions
> 1) reported to active duty April 15, 2009 for 400 days
> 2) Discharge record indicates separation date of August 15, 2010;
> • assume she had 90 days from above date August 15, 2010 to report to work;
> • 400 days from April 15, 2009 is May 20, 2010, so does this August 15, 2010 date [mean] the date she should have returned to work?
> 3) Need to confirm Volvo policy on ETO [Earned Time off] days.

29

4) Need to confirm whether LuzMaria is eligible for the April 2010 Voluntary Severance package.

182. Keith Schroeder advised Dennis Scholl, the second highest ranking employee of Defendant in North America:

> Bruce, Mike and I reviewed the military records and our Volvo policy for this case. 1) After military records review we believe that LuzMaria should have returned to work on August 15, 2010. I believe she knew this and now has been out an additional 6 weeks yet. 2) Bruce, Mike and I support that we offer the Voluntary Severance package to LuzMaria pending your approval. …

183. Also desirous of terminating Plaintiff's employment with Defendant and its obligations under the law to secure reemployment for their only Army Reservist returning from duty, Dennis Scholl responded:

> Yes I am ok with offering the package. Do you think she will accept?

184. Michael Temko, Plaintiff's supervisor who had previously given Plaintiff the second highest grades possible, all "VGs", in reviewing performance for Joliet PDC Employee Evaluation/Updates, answered the question:

> Depending on how much time we give her to make her decision, I think it is possible. LuzMaria has always been a below average performer. When she sees how she measures up against the LMS, I think she will strongly consider it.

185. Defendant's management and supervisors commenced heightened scrutiny and discipline of Plaintiff in hopes that "she will strongly consider" their offer to terminate her employment.

186. In November 2010, Keith Schroeder advised Bruce Olin of personal issues of depression that Plaintiff was experiencing and attempted to discipline her for being 1 minute tardy:

30

SA48

Bruce, LuzMaria is now at step 2 corrective action plan in accordance with our attendance policy. Below is a summary of events and communications with LuzMaria since her return from military duties on September 27, 2010

•     October 29, 2010
o     Issued step one of attendance policy, exceeded 2 occurrences in one month (approved by Bruce Olin HR)
o     Reference attached attendance record
•     November 2, 2010
o     I met with LuzMaria at her request to discuss her attendance CAP [Corrective Action Plan]
LuzMaria stated to me that she is having personal issues of depression since her return from active military duty. She stated that her absence on October 29, 2010 should be considered excused as she was seeking support from the military for her medical issues. I stated to LuzMaria that in accordance with our attendance policy she is required to provide written documentation to support her absence.
…

187. Bruce Olin responded to Keith Schroeder:

The only issue I have concerns the late tardy of one minute. Yes, she signed the form, but has been away from work for some time. Were the policies reviewed with her when she returned? I understand we enforce the rules completely and non-discriminatory, but I can see some outsider having a different view of this.

188. Because of the frustration Plaintiff was experiencing in the workplace, she provided

further documentation to Sherrie Jankowski, her supervisor and requested that it be forwarded to

Defendant's management.

189. On December 2, 2010 Sherrie Jankowski wrote to Keith Schroeder:

LuzMaria just came in and asked me to forward you the following document. It is the LAW posted on the ESRG website pertaining to employees of the military. She is really becoming a pain with all this. She wanted me to read this, but I told her I did not have the time right now!

Enjoy the reading....it's only 24 pages!!!!!

31

SA49

190.  On Christmas Eve 2010, Plaintiff wrote Keith Schroeder that the doctor had ordered

her not to return to work for the next 7 days, and advised:

> Self-admitted to the emergency room yesterday. Doctor gave me a
> note of no work through December 30, 2010. Between the stress at
> work and the stress of reliving the events of my deployment
> through writing my story, I have been having panic attacks. I have
> been waking up feeling scared. Not able to get more than 4 hours
> of sleep a day.

191.  Notwithstanding the written notice to him within 24 hours of her hospitalization,

Keith Schroeder again plotted and planned discipline leading to termination of Plaintiff's

employment with Defendant:

> HR issues to be resolved before I give formal discipline
>
> Bruce attached to this email is a communication from LuzMaria
> advising she will be off a total of 5 days beginning 12.23 to 12.30.
> In accordance with our corporate "Volvo Salary Continuation and
> Long Term Disability Plan" LuzMaria would need to be off more
> than 5 days to be considered STD so these absences fall under our
> ETO - local attendance policy. Assuming LuzMaria provides a
> medical document when she returns to work 12.23 and 12.27
> would be excused days and is then at our cap of 5 excused days.
> 12.28, 12.29, and 12.30 would be occurrences so under our
> attendance policy on 12.29 LuzMaria would be issued Step 2
> Formal Written CAP and on 12.30 Step 3, 3 day suspension.
>
> At this time I am not aware of any rule or guideline in our
> corporate "military" policy that would excuse these days.
> Additionally, LuzMaria is awaiting our decision on the ESGR -
> military federal policy ruling.
>
> These two outstanding issues with this employee require HR
> review before I administer the attendance CAP disciplinary action
> when she returns on January 3rd 2011.

192.  On December 29, 2010 Sherrie Jankowski advised, Keith Schroeder:

> Last night I was hearing some rumors about LuzMaria, all to which
> I did not comment, but I thought you might like to know about.
> There are several rumors for her not being here. 1. She fell and
> hurt herself and is on A&S 2. She's on workers comp 3. She's on

32

vacation in Hawaii (this sounded far-fetched until I realized that
she is on vacation next week too!) just thought I'd let you know.

193.  On January 14, 2011, Dr. Wendy Yin wrote to Defendant regarding Arroyo's stay at

the Hines VA Hospital from January 10-14, 2011:

Arroyo has a follow-up appointment on January 18, 2011
Should not return to work at this time.

194.  On January 18, 2011, Dr. Arvind Yekanath of the Hines Veterans Administration

Hospital wrote to Defendant concerning Plaintiff:

Diagnosis: PTSD
Prognosis: I expect her to resume full work related activities soon.
Ms. Arroyo should continue to see me on an outpatient basis once
monthly for medication management. I recommend she continue
seeing her therapist Brian Fask at Orland Park Vet Center weekly.
She will soon be enrolled in a group psychotherapy  program at
Hines VA Hospital for PTSD victims.

195.  On April 5, 2011, J. Richard Monroe, PhD completed a U.S. Department of Labor

Certification of Health Care Provider and forwarded it to Defendant indicating:

Ms. Arroyo has a diagnosis of posttraumatic stress disorder
(PTSD) secondary to military service. The symptoms include, but
are not limited to, intrusive memories, emotional distress,
interpersonal detachment, hyper vigilance, ease of startle response,
and concentration problems. Symptoms may be persistent, but can
respond well to ongoing psychological therapies and/or medication
management. Clinical outcomes studies support both these
treatment options.

It is possible that symptoms could increase, particularly in
response to stress, making it more difficult to fulfill job duties.

196.  On April 21, 2011 Keith Schroeder wrote to Defendant's high management and

Human Resources Personnel:

On Thursday, April 21, 2011, Patrick Dunn and I met with
LuzMaria Arroyo regarding medical documents she provided to us.
LuzMaria presented to us a list of questions regarding Volvo's
policies.

> During this conversation, LuzMaria's stated that her case is leading
> to an EEOC complaint. In this case there are 2 pending issues; one
> is the safety concern as documented in the IME report, the other is
> her work and medical treatment for PTSD.

> This military veteran's case is very difficult as at every turn when
> we try to work with her, she rejects all local offers of support,
> resulting in outside mediation, i.e ESGR.

197.    On May 21, 2011, two of Plaintiff's supervisors reported to Keith Schroeder that

she announced that she was considering filing a complaint of discrimination because of the

treatment she was receiving during her employment with Defendant. Michael Temko wrote:

> …
> She told me that she was going to call HRSC and go above Keith
> and Regina Williams….

Sherrie Jankowski wrote:

> Just an FYI, but I heard that Luz is going around the warehouse
> telling people that she is being discriminated against….

198.  Two days later, Keith Schroeder wrote an email to every supervisor in Defendant's

plant, which stated in capital letters across the top "READ AND DELETE—DO NOT PRINT":

> To All: Due to the ongoing job issues and concerns with LuzMaria
> Arroyo, I strongly urge you to have a witness whenever you have a
> conversation with this employee.

199.  In the first week of July 2011, Keith Schroeder and Regina Williams discussed

Defendant's obligation to release Plaintiff to attend Mindfulness Meditation in Trauma Services

group therapy sessions every Tuesday night for 13 weeks from 4:00-5:30 PM as ordered by her

doctors at the Veterans Administration Hospital.

200.  Keith Schroeder inquired of the Veterans Administration whether this was merely

"elective medical services" and whether it could be "rescheduled to another time" because

Plaintiff worked the second shift from 4:30 PM to 12:30 AM.

201. Because the Veterans Administration had scheduled the mandated group therapy for the benefit of several veterans, Schroeder was told "no", the group therapy sessions could not be rescheduled to accommodate Defendant's 2nd shift needs.

202. On August 26, 2011, Plaintiff wrote to Keith Schroeder and Regina Williams:

> …
> On 8/23 I experienced an incident which brought about a major anxiety episode. I tried various relaxation techniques, but could not ignore the event; I had a call to action, for I no longer felt safe/protected. After careful consideration of courses of action, I decided to speak with my supervisor, Patrick Dunn (who I feel safe to approach and confer with). The anxiety episode lasted approximately 20 minutes. After speaking with Mr. Dunn, I felt more calm and composed and was able to continue working. Mr. Dunn said he would need to speak with you regarding the event that brought about the anxiety.
>
> On 8/24 you requested to speak with me and Mr. Dunn at which time you threatened to fire me for my behavior. Your demeanor was aggressive and hostile and I felt intimidated/threatened. Additionally, you stated that the time that I used in order to reduce my anxiety and consider courses of action was not authorized and I would be held accountable under the LMS Lite policy. You also stated that continued breaks for managing anxiety will result in termination. When I requested this information in writing, you refused to provide it to me and still have not provided it to date.
>
> On 8/25 you again requested to speak with me; this time cornering me in a small office with 2 other supervisors and Ms. Maureen Somerset behind the closed door in a room with no windows and no way to escape. You provided me with the workplace violence policy and the harassment policy and then allowed me to leave.
>
> Based on the information in the attachment, I feel my actions were reasonable.
>
> However I feel that you are making it difficult (hostile) for me to deal with my condition, as opposed to being cooperative and supportive. Because I feel unsafe when speaking with you, I request that human resources on the phone AND ONLY Mr. Patrick Dunn OR Ms. Maureen Somerset present during any further discussions with you. Additionally, I request human resources to provide reasonable accommodation with providing

35

SA53

YOU, the supervisors and my coworkers with disability awareness training. Additionally, I request a quiet space be provided for me to be able to meditate/utilize relaxation techniques (usually done at breaks and before work begins). Finally, as was the case on 8/23, I request empathy in realizing that sometimes I may not use words to request a "reasonable accommodation", however, I will act with the skills and techniques that I am learning in counseling will mitigate my anxiety and PTSD symptoms, and request a cooperative relationship from you as my employer in helping me to do so.

203. At the time of writing her report to Keith Schroeder and Regina Williams, Plaintiff's

Human Resources Business Partner at the Joliet facility, the Volvo Human Resources U.S.

Policies & Procedures regarding Harassment, Workplace Violence provided in pertinent part:

…. Accordingly, harassment of any employee… by any individual because of that employee's… disability, veteran status, or for any other reason, will not be tolerated on the job, on company property, or in any company-sponsored activity. Therefore, the company expects that all relationships among persons in the workplace will be business-like and free of bias, prejudice, or harassment.

Procedures for Reporting Harassment:
Employees who have experienced conduct they believe is contrary to this policy have an obligation to take advantage of this complaint procedure. An employee's failure to satisfy this obligation could affect his or her legal rights in pursuing subsequent legal action.

Any employee or business associate who feels he/she has been harassed should immediately report such incidents to his/her Human Resources Business Partner at the facility in which they are employed or to another senior manager/executive within the company before the conduct becomes more severe and pervasive.

Employees should not feel hesitant or embarrassed about reporting harassment. The company is dedicated to making sure that the workplace is productive and free from harassing conduct. The company can only achieve this goal if employees report and cooperate in investigation of all possible violations of this policy.

204. On August 28, 2011 Keith Schroeder wrote to Regina Williams and Dennis Scholl:

36

SA54

> I will need HR guidance on the attached to determine what
> accommodations we must comply with for this employee.
> LuzMaria personal physician and our IME released her to work yet
> in my opinion this employee has severe mental issues which must
> be addressed by HR....The case of LuzMaria Arroyo has caused
> significant stress to my staff.

205.  Each of the accommodations requested by Plaintiff were set forth in a publication given by her to Defendant and entitled *America's Heroes at Work*,  a US Department of Labor project that addresses the employment challenges of returning Service Members living with Traumatic Brain Injury (TBI) and/or Posttraumatic Stress Disorder (PTSD).

206.  After providing an office at the back of the plant where Plaintiff could "meditate/utilize relaxation techniques prior to work start and then break for lunch" as an accommodation, Defendant's supervisors and management began to document when, in their opinion, Plaintiff was "late 1 minute" in getting to her workstation.

207.  No such hyper vigilance, scrutiny, or record keeping was exercised with respect to any other of Defendant's employees.

208.  On September 3, 2011, Plaintiff wrote for the first time to Dennis Scholl seeking his assistance:

> Sir,
> My name is LuzMaria Arroyo and I am one of your employees at
> the Joliet PDC. I am writing you based on the instructions in our
> companies, Conflict/Problem Resolution Process, Policy Number
> WP- 04.
>
> My conflict is disability-based harassment. According to our
> companies Equal Employment Opportunity/Affirmative Action
> Policy Number CR-02, our company is aware of this responsibility
> under the Americans with Disabilities Act (ADA). However,
> because I wish to engage the company in a cooperative relationship
> and not seem hostile in nature, I am providing excerpts from the
> US Employment Equal Opportunity Commission EEOC Notice
> Number 915.002 (please read the attached document). My intent is

to inform my company of my rights and its responsibilities to me so that we can engage in a cooperative relationship.

In November 2010, I began to seek medical assistance with mental health issues as a result of my post deployment activities. As information regarding my condition was made available to me, I provided our company (specifically, Keith Schroeder) with it. In January 2011, I was diagnosed with a qualifying disability (while on short term disability approved by our company). In March 2011, I returned to full duty at Joliet PDC only to have my duties restricted by Mr. Schroeder, following a medical evaluation in January 2011, I requested reevaluation and restrictions were lifted. Mr. Schroeder has suspended me from work for a period of 3 days, using the local BA/BU Attendance Policy as justification.

The first and main issue I would like to address to you is notification of my disability to Mr. Schroeder and his continued harassment with regards to such. I have worked in conjunction with our local business partner, Ms. Regina Williams, with no resolution. According to the guidelines related within the EEOC notice, "an employer should initiate the reasonable accommodation, interactive process without being asked if the employer: (1) knows that the employee has a disability, (2) knows, or has reason to know, that the employee is experiencing workplace problems because of the disability, and (3) knows, or has reason to know that the disability prevents the employee from requesting a reasonable accommodation….

… Where was the opportunity afforded if both the written warning, and suspension are delivered on the same day?

Which brings me to my second issue, Mr. Schroeder's blatant disrespect for our company's policies and the laws of our state and federal government. Mr. Schroeder has engaged in behavior that is in violation of company's harassment policy number WP06-03-0, by creating an intimidating and hostile work environment with relation to me and my disability. He has violated our company's Code of Conduct with regard to Equal Employment Opportunity Harassment, and Accuracy of Books and Records. Ms. Regina Williams has also violated our company's Code of Conduct with regard to employee privacy. I am making a formal complaint to you here and now and requesting an investigation of these actions.

… With regards to violation of Accuracy of Books and Records, Mr. Schroeder, provided me with a document of attendance infractions and recorded disciplinary action to justify my

suspension. On this document, Mr. Schroeder indicates a no call, no show on 23, December 2010. This is a false statement as my sister-in-law made the phone call to indicate she was driving me to the hospital and I would not be able to come into work. I can provide phone records, as well as the hospital discharge paperwork to prove such. Additionally, 19 August 2011 indicates disciplinary action had been in taken on that date with regards to my being given a written warning. However, if you look at the date of the written warning that I was actually given, it states 31 August 2011. The same is said of the 3 day suspension with the date of 20 August 2011 on the document he provided, but a date of 31 August 2011 on the actual letter of suspension. I can only guess the reason for his actions, and in my opinion, Mr. Schroeder has targeted me for termination and is doing everything within his power to achieve such.

…

I wish our company will take my complaints seriously, and I expect feedback regarding my request for accommodation and my allegations. I will give you until Close of Business 13 September to respond to my requests. After some time, I will be filing a complaint with the EEOC and seeking legal assistant. I will let legal assistance speak with the VP of HR. Thank you for your time, patience and understanding.

209.  In an undated response by Dennis Scholl attached to an email sent to Plaintiff on

September 13, 2011, Defendant's Vice President wrote:

Ms. Arroyo:

I am writing to acknowledge receipt of your September 3 and September 6, 2011 emails. From your correspondence, I have identified 3 issues requiring attention. 1st, nor your request for accommodations. 2nd, you cite to concerns regarding Mr. Schroeder's behavior. 3rd, state your concerns regarding Ms. Williams not allowing you to view your personnel records. I want to address all Volvo parts North America will address each of these issues you present.

…. Ms. Williams will continue the interactive process and will respond to your remaining requests in writing as expeditiously as possible.

Regarding Mr. Schroeder's behavior, Ms. Regina Williams, as a human resources representative for the Chicago parts distribution

39

SA57

> center, has been assigned to investigate the alleged harassment in
> accordance with Volvo's harassment policy. She will also explore
> your concerns regarding potential code of conduct violations
> regarding equal opportunity and accuracy of records and records
> by Mr. Schroeder….

210.  Within less than an hour after assuring Plaintiff that there would be an investigation of her allegations which he has admitted under oath are "most serious allegations", Dennis Scholl wrote to Keith Schroeder:

> Keith, as you read the response to LuzMaria please do not be
> concerned about the investigation Regina will perform. It is the
> only response we could make as we have an employee who has
> filed a complaint so as you know we are obligated to investigate.
>
> If you wish to talk tomorrow call my cell.

211.  No investigation of the "most serious allegations" has ever been undertaken and no discipline of Keith Schroeder has ever been contemplated.

212.  Instead, on November 8, 2011 Plaintiff's employment was terminated by Keith Schroeder, with the concurrence of Regina Williams after Defendant's on-site management and/or supervisors allegedly observed Plaintiff arrive at her workstation 1 to 3 minutes after the start bell, although they knew that she had arrived at work and had been present 20 to 30 minutes early each day in order to use the meditation room.

WHEREFORE, Plaintiff respectfully prays this Honorable Court to grant the following relief:

A.     Compensatory damages against Defendant in the amount of $1,000,000.00;

B.     Punitive damages against Defendant in the amount of $1,000,000.00;

C.     Reasonable attorney's fees and costs of this suit; and

D.     Such other relief as this Honorable Court deems just and appropriate.

Respectfully submitted,


S/ John P. DeRose
John P. DeRose
One of Plaintiff's Lawyers

John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, Illinois  60521
(630) 920-1111 Office
(630) 920-1170 Fax
john@johnderoselaw.com

SA59

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Ayorro

,

Plaintiff(s),

v.

Volvo Parts North America,

Defendant(s).

Case No. 12-cv-6859
Judge Robert M. Dow

## **ORDER**

Jury trial held. Jury instructions given. Jury deliberates. Defendant's supplemental oral 50(a) motion stated on the record and is taken under advisement. Jury verdict returned. The jury finds as follows: Section I: Liability For Plaintiff's ADA Discrimination Claim I - For Plaintiff, LuzMaria Arroyo and against Defendant Volvo Group North America, LLC. Section II: Damages For Plaintiff's ADA Discrimination Claim, Part A, Compensatory Damages - amount of compensatory damages to which Plaintiff LuzMaria Arroyo has proved that she is entitled to on her claim is: $2,600,000.00. Part B: Punitive Damages - Jury awards Plaintiff LuzMaria Arroyo $5,200,000.00. Section III: Liability For Plaintiff's USERRA Discrimination Claim - As to whether Plaintiff LuzMaria Arroyo proved the following three facts by a preponderance of the evidence: 1. Plaintiff LuzMaria Arroyo performed service in a uniformed service; 2. Defendant Volvo Trucks terminated Plaintiff LuzMaria Arroyo; and 3. Plaintiff LuzMaria Arroyo's service in a uniformed service was a motivating factor that prompted Defendant Volvo Trucks to take that action. Jury checked, YES. Did Defendant Volvo Trucks prove by a preponderance of the evidence that it would have terminated Plaintiff LuzMaria Arroyo even if Defendant Volvo Trucks had not taken Plaintiff LuzMaria Arroyo's service in a uniformed service into account: Jurors checked, NO. Did Defendant Volvo Trucks willfully violate USERRA when it terminated Plaintiff LuzMaria Arroyo's employment? Jurors checked, YES. Section IV: Signed by the Foreperson and seven jurors. Jury polled.

3:15

Date: 8/23/2016

Robert M. Dow, Jr.
United States District Judge

SA60

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.1.1.2
### Eastern Division

Luzmaria Arroyo

                    Plaintiff,

v.                                        Case No.: 1:12−cv−06859
                                        Honorable Robert M. Dow Jr.

Volvo Group North America, LLC

                    Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, July 13, 2017:

      MINUTE entry before the Honorable Robert M. Dow, Jr: Plaintiff's request for equitable relief [167] is granted in part and denied in part. The Court awards Plaintiff $141,388.53 in back pay, $84,131.92 in front pay, $41,348.61 in other employment−related compensation, $8,546.10 in prejudgment interest, and $275,415.16 in liquidated damages. Pursuant to 42 U.S.C. § 1981a(b)(3), the Court reduces the jury's &#036;2.6 million compensatory damages award to $300,000 and vacates the jury's $5.2 million punitive damages award. All other forms of equitable relief are denied. Final judgment will be entered in favor of Plaintiff. The parties have until August 10, 2017 to file any Rule 50 or 59 motions, responses are due September 7, 2017, and replies are due September 21, 2017. For further details see the Memorandum Opinion and Order. Mailed notice(cdh, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LUZMARIA ARROYO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-6859 |
| | ) | |
| VOLVO GROUP NORTH AMERICA, LLC, | ) | Judge Robert M. Dow, Jr. |
| d/b/a VOLVO PARTS NORTH AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff LuzMaria Arroyo sued Defendant Volvo Group North America, LLC, d/b/a Volvo Parts North America ("Volvo") for discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* ("USERRA"). On August 23, 2016, a jury returned a verdict in favor of Plaintiff, awarding $2.6 million in compensatory damages and $5.2 million in punitive damages on Plaintiff's ADA claim. The jury also found Defendant liable for willfully violating USERRA when it terminated Plaintiff's employment. Now before the Court is Plaintiff's request for equitable relief [167].

For the reasons set forth below, Plaintiff's request [167] is granted in part and denied in part. Upon review of the parties' presentation at trial and the parties' post-trial briefing, the Court awards Plaintiff $141,388.53 in back pay, $84,131.92 in front pay, $41,348.61 in other employment-related compensation, $8,546.10 in prejudgment interest, and $275,415.16 in liquidated damages. Pursuant to 42 U.S.C. § 1981a(b)(3), the Court also reduces the jury's $2.6 million compensatory damages award to $300,000 and vacates the jury's $5.2 million punitive damages award. All other forms of equitable relief are denied. With these matters decided, final

judgment will be entered in favor of Plaintiff. The parties will have until August 10, 2017 to file any motions pursuant to Federal Rules of Civil Procedure 50 and 59, responses are due September 7, 2017, and replies are due September 21, 2017.

## I.    Background

Plaintiff LuzMaria Arroyo worked as a material handler for Defendant at its Chicago Parts Distribution Center in Joliet, Illinois from June 13, 2005, until she was fired on November 8, 2011. Plaintiff was a member of the U.S. Army Reserve, and Volvo hired her with that knowledge. Plaintiff received more than 900 days of military leave over six and half years of employment at Volvo. Plaintiff was treated for service-related post-traumatic stress disorder in December 2010 and formally diagnosed in January 2011. After her termination, Plaintiff filed a lawsuit against Defendant under the ADA and USERRA, alleging that she was discriminated against because of her military service and her PTSD. Plaintiff sought compensatory and punitive damages as well as equitable relief in the form of back pay, front pay, prejudgment interest, reemployment, benefit reinstatement, notification to the Office of Federal Contracting Compliance Program ("OFCCP") of Defendant's violations, and tax compensation. The Court bifurcated the trial such that Phase I would be a jury trial covering liability on Plaintiff's ADA and USERRA claims, damages on Plaintiff's ADA claim, and a finding of whether Defendant's USERRA violation was willful. In Phase II, the Court would decide any equitable relief.

On August 23, 2016, following a seven-day jury trial, the jury returned a verdict for Plaintiff on all counts. Under Section I, titled "Liability for Plaintiff's ADA Discrimination Claim," the jury marked the box for Plaintiff. [161, at 1.] Section II is titled, "Damages for Plaintiff's ADA Discrimination Claim." *Id.* at 2. Part A of this section is titled "Compensatory Damages," and the jury awarded $2.6 million. *Id.* Part B of this section is titled "Punitive

Damages," and the jury awarded $5.2 million. *Id.* In total, the jury awarded $7.8 million on Plaintiff's ADA claim. Section III is titled, "Liability for Plaintiff's USERRA Discrimination Claim." *Id.* at 3. The jury found that Plaintiff proved that her military service was the motivating factor that prompted Defendant to terminate her, Defendant failed to prove that it would have terminated her even if it had not taken her military service into account, and that Plaintiff proved that Defendant had "willfully" violated USSERA when it terminated her employment. *Id.* Now before the Court are Plaintiff's requests for equitable relief.

## II.   Legal Standard

If an employer has been found to have intentionally engaged in an unlawful employment practice, a district court may order back pay, reinstatement, and "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g)(1). Back pay "represents the wages the plaintiff would have earned had she not been fired between the time of the firing and the date of judgment." *Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1255 (N.D. Ill. 2015) (citing Seventh Circuit Pattern Civil Jury Instruction 3.11). If reinstatement is not appropriate, a court can award front pay in lieu of reinstatement. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001); accord *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 614 (7th Cir. 2002). "Front pay represents the wages the plaintiff would have earned had she not been fired measured from the date of the judgment to some reasonable point in the future." *Gracia*, 130 F. Supp. 3d at 1255. "Back pay and front pay are not considered 'compensatory damages' under Section 1981a, and thus are not subject to any statutory caps or limitations." *Parker v. Madison Cty. Reg'l Office of Educ.*, 2013 WL 4600625, at *1 (S.D. Ill. Aug. 29, 2013); accord *Pollard*, 532 U.S. at 848. Moreover, "the granting of prejudgment interest is left to the sound discretion of the district court." *United States v. Bd. of Educ. of Consol. High Sch. Dist. 230, Palos Hills, Ill.*, 983 F.2d 790, 799 (7th Cir. 1993). "The court has broad discretion under 42 U.S.C.

§ 2000e–5(g) to craft equitable relief necessary to make [a prevailing plaintiff] whole."  *Pickett*

*v. Sheridan Health Care Ctr.*, 2009 WL 2407736, at *6 (N.D. Ill. Aug. 4, 2009).

## III.     Analysis

Before discussing Plaintiff's entitlement to equitable relief, both parties put the jury's

verdict on Plaintiff's ADA claim front and center.  The Court addresses that issue first.

### A.     Jury's ADA Compensatory and Punitive Damages Award

ADA claims are subject to the statutory damages caps of 42 U.S.C. § 1981a(b)(3).  See

*E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 831 (7th Cir. 2013) (applying Section 1981a(b)(3) to

ADA claims).  Section 1981a(b)(3)(D) provides that "[t]he sum of the amount of compensatory

damages awarded under this section for future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the

amount of punitive damages awarded under this section, shall not exceed * * * in the case of a

respondent who has more than 500 employees in each of 20 or more calendar weeks in the

current or preceding calendar year, $300,000."  Backpay, interest on backpay, and front pay are

excluded from the definition of "compensatory damages."  42 U.S.C. § 1981a(b)(2).  Because

Volvo has more than 500 employees [170, at 5], this statutory command requires the Court to

reduce the jury's $7.8 million ADA award to $300,000, at most.

To avoid this result, Plaintiff advances two arguments.  First, she points to the party's

"Joint Statement on Division of Responsibility Between Judge and Jury" regarding Plaintiff's

damages claims.  [See 141.]  In that Joint Statement, the parties itemized four categories of

damages and whether the judge or jury had responsibility for awarding those damages:  (1) "Lost

wages through March 4, 2016 (Judge)"; (2) "Punitive and Liquidated damages for Volvo's

intentional violation of USERRA and the ADA (Jury)"; (3) "Attorney's Fees (Judge)"; and

"Case Costs to Date (Judge)."  *Id.* at 1–2.  Plaintiff characterizes this document as a "definitive

pretrial agreement in an action at law for damages" that "should be binding on all parties after trial." [167, at 5.] As a result, Plaintiff contends that "the parties have stipulated and agreed that the *jury* was to determine liquidated damages under USERRA if an intentional violation was found" (*id.* at 8 (emphasis added)) and Defendant "has forfeited any benefit of compensatory, punitive, or liquidated damages caps on the amounts awarded by the jury" [172, at 18–19].

Plaintiff's argument must overcome the fact that the verdict form in this case was clear. It included on one page a section for "damages for Plaintiff's ADA discrimination claim" with a subsection for "compensatory damages" and another for "punitive damages." [161, at 2.] The following page is titled "liability for Plaintiff's USERRA discrimination claim" and does not include any damages subsections. *Id.* at 3. The jury was expressly directed not to award damages on the USERRA claim [156, at 28] and there are no blank spaces where the jury could have written a damages figure. Indeed, the jury did not write in any numbers on this section of the verdict form. Thus, nothing on the verdict form or in the Court's instructions suggests that the jury awarded any damages for Plaintiff's USERRA claim.

Plaintiff essentially argues that the Court should rewrite the verdict form in light of the parties' Joint Statement to mean that the jury did award uncapped "liquidated" USERRA damages as part of its ADA award. The Court is unaware of any authority by which it could do that, and Plaintiff cites none. The Court also cannot see how Defendant forfeited the statutory caps based on the Joint Statement. The parties never expressly waived Section 1981a(b)(3)'s damages caps (assuming that parties could consent to that) and Plaintiff offers no basis to think that the parties agreed to that result *sub silentio*. In fact, were the Court to agree with Plaintiff that this "binding" Joint Statement modifies the jury's verdict, the Court would be required to eliminate the $2.6 million compensatory damages award entirely because the Joint Statement

only says the jury would decide "Punitive and Liquidated damages." [141.] In reality, the Joint Statement memorializes the fact that the jury would decide compensatory and punitive damages for Plaintiff's ADA claim (as is ordinarily true) and the factual issues required for imposition of "liquidated" damages under 38 U.S.C. § 4323(d)(1)(C) (*i.e.*, whether Defendant's violation of USERRA was "willful"). See *DeLee v. City of Plymouth, Ind.*, 773 F.3d 172, 174 n.1 (7th Cir. 2014) ("A plaintiff is entitled to a jury trial on a liquidated damages claim under USERRA," meaning that it will up to the jury to decide wither a defendant's violation of USERRA was "willful."). That is exactly how the issues were presented to the jury here.

Second, Plaintiff invokes *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495 (7th Cir. 2000), and argues that the questions presented to the jury regarding compensatory damages were ambiguous and the "jury was not instructed that they were only being asked to render a verdict on the value of discrimination that [she] experienced under the ADA." [167, at 7; 172, at 9–10, 18–19.] In *Pals*, the jury was provided a general verdict form and asked to determine "compensatory damages" under the ADA without specifying whether the jury would also determine "back and front pay." 220 F.3d at 499–500. The Seventh Circuit held that "[n]either back nor front pay counts against a maximum award of compensatory damages under § 1981a(b)(3)." *Id.* at 499. Because the jury in *Pals* "did not separate compensatory damages *under* § 1981a from other monetary relief [such as front or back pay], it is impossible to know whether the verdict includes more than $100,000 in" the specific types of compensatory damages capped by Section 1981a(b)(3). *Id.* at 500. The Seventh Circuit explained that defendant could have raised this issue regarding the jury instructions or verdict form but failed to do so, which meant it had "forfeited any benefit of § 1981a(b)(3)(B)." *Id.*. The Seventh Circuit further noted that although issues of front and back pay under the ADA were equitable issues, the parties could

6

consent to have a jury decide back and front pay and had impliedly done so in this case. *Id.* at

501.

Unlike *Pals*, the jury in this case received the following compensatory damages

instruction on Plaintiff's ADA claim:

> In calculating damages, you should <u>not</u> consider the issue of lost wages and benefits. The court will calculate and determine any damages for past or future lost wages and benefits. You should consider the following types of compensatory damages, and no others:
>
>> 1. The physical, mental, and emotional pain and suffering that Plaintiff LuzMaria Arroyo has experienced. No evidence of the dollar value of physical, mental, or emotional pain and suffering has been or needs to be introduced. There is no exact standard for setting the damages to be awarded on account of pain and suffering. You are to determine an amount that will fairly compensate Plaintiff LuzMaria Arroyo for the injury she has sustained.
>>
>> 2. The reasonable value of medical care that Plaintiff LuzMaria Arroyo reasonably needed and actually received.

[156, at 22.] The jury received a separate instruction about how to calculate punitive damages.

See *id.* at 23–24. Consistent with the requirements of 42 U.S.C. § 1981a(c)(2), the Court did not

inform the jury of the statutory damages caps. The jury was also instructed

> If you find that Plaintiff LuzMaria Arroyo has proved her USERRA discrimination claim against Defendant Volvo Trucks, you will *not* consider the question of damages as to that claim. Damages for violations of USERRA are determined by the Court. Your only job with respect to Plaintiff's USERRA discrimination claim is to determine the issue of liability.

[156, at 28.]

Nothing about these instructions suggests that (1) the jury should have been confused

about whether they were calculating back pay or front pay as part of a compensatory damages

award under the ADA; (2) it is ambiguous whether the jury thought that were awarding damages

under USERRA and the ADA; or (3) the statutory caps under ADA no longer applied to this

7

case. The instructions removed front and back pay from the jury's compensatory damages consideration and distinguished who was responsible for awarding damages for Plaintiff's ADA and USERRA claims. *Pals* cannot be relied upon to avoid Section 1981a(b)(3)(B)'s statutory damages caps for Plaintiff's ADA claim, and the jury's compensatory and punitive damages award here must be reduced to no greater than $300,000 total.

Section 1981a(b)(3) "contains no command as to how a district court is to conform a jury award to the statutory cap." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 441 (7th Cir. 1997). The Seventh Circuit has "upheld a decision that took the entire cut out of the award of punitive damages and another that took the entire cut out of the award of compensatory damages." *Lust v. Sealy, Inc.*, 383 F.3d 580, 589 (7th Cir. 2004). It has also noted that "in a normal suit punitive damages are something added on by the jury after it determines the plaintiff's compensatory damages," so it is "probably the sensible thing for the judge * * * not to make a pro rata reduction * * * but instead to determine the maximum reasonable award of compensatory damages, subtract that from $300,000, and denote the difference punitive damages." *Id.* Compensation is the primary purpose of Section 1981(a)'s remedies, and "[t]he more common approach is to take the entire cut from punitive damages." *Alford v. Aaron's Rents, Inc.*, 2011 WL 2669626, at *1 (S.D. Ill. July 7, 2011); accord *Tart v. Elementis Pigments, Inc.*, 191 F. Supp. 2d 1019, 1024 (S.D. Ill. 2001); *Williams v. Pharmacia Opthalmics, Inc.*, 926 F. Supp. 791, 794 (N.D. Ind. 1996).

Here, the jury found that Plaintiff required a significant damages award to compensate her for Defendant's ADA violations. Consistent with that judgment, the Court will first apply the jury's compensatory award toward the statutory cap. That award exhausts the entire

$300,000 limit, leaving no room for additional punitive damages under the ADA.[1]  The Court, therefore, reduces the $2.6 million compensatory damages award to $300,000 and vacates the jury's $5.2 million punitive damages award.[2]

## B.    Back Pay

Employees who prove employment discrimination are presumptively entitled to back pay.  See *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003); *Gracia*, 130 F. Supp. 3d at 1256.  The prevailing plaintiff bears the initial burden of establishing the amount of back pay, and then the burden "shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts."  *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994); see also *Taylor v. Philips Indus., Inc.*, 593 F.2d 783, 787 (7th Cir. 1979) ("Not until the plaintiff establishes what she contends are her damages does the burden of going forward to rebut the damage claim or to show plaintiff's failure to mitigate damages, fall on defendant.").  "When assessing back pay, or awarding front pay in lieu of reinstatement, the judge must respect the findings implied by the jury's verdict."  *Pals*, 220 F.3d at 501.  "But whatever discretion the facts allow with respect to back pay and front pay belongs to the judge rather than the jury."  *Id.*

### 1.    Plaintiff's Burden

Plaintiff was terminated from Volvo on November 8, 2011, and the jury returned its verdict on August 23, 2016.  The relevant question is what Plaintiff would have earned in this more than four year period between November 8, 2011, and August 23, 2016, had she remained

---

[1] The jury's retributive and deterrent objectives in awarding punitive damages will be accomplished, at least in part, through the liquidated damages award under USERRA.

[2] Defendant indicates that it plans to file motions under Federal Rules of Civil Procedure ("Rule") 50 and 59, on whether Plaintiff presented any evidence of compensatory damages at trial.  [See 170, at 4–7.]  The Court expresses no opinion on that claim and nothing in this opinion should be construed as foreclosing Defendant from arguing that additional reductions in Plaintiff's ADA award are required.

SA70

employed by Volvo. [172, at 25.] Plaintiff's opening brief omits any discussion of her back pay calculations. While she attaches a document that includes various calculations [167-1], she provides very little explanation of those figures and no supporting evidence. Based on documents and amounts corroborated by Defendant [1701-1] and supplemented by Plaintiff on reply, Plaintiff's proposed estimated lost earnings are represented in the following chart:

| Year | Base Pay | Shift Differential[3] | Overtime Hours[4] | Overtime Rate[5] | Overtime Pay | Total Pay |
|------|----------|-----------------------|-------------------|------------------|--------------|-----------|
| 2011 | $56,014.40 | $5,601.44 | 390 | $40.40 | $15,756.00 | $77,371.84 |
| 2012 | $57,699.20 | $5,769.92 | 0 | $41.61 | $0.00 | $63,469.12 |
| 2013 | $59,425.60 | $5,942.56 | 0 | $42.86 | $0.00 | $65,368.16 |
| 2014 | $61,193.60 | $6,119.36 | 0 | $44.13 | $0.00 | $67,312.96 |
| 2015 | $63,044.80 | $6,304.48 | 858 | $45.47 | $39,013.26 | $108,362.54 |
| 2016 | $64,937.60 | $6,493.76 | 819 | $46.83 | $38,353.77 | $109,785.13 |
| **Total** | $362,315.20 | $36,231.52 | 2,067 | N/A | $93,123.03 | $491,669.75 |

There are two obvious problems with these estimates. First, Plaintiff does not prorate her pay for 2011 or 2016 notwithstanding the fact that she worked until November 2011 and could only receive back pay through August 23, 2016.[6] Second, Plaintiff offers no support for her projected overtime hours beyond saying that "she never refused overtime pay opportunities whenever offered and, in fact, actively pursued those overtime opportunities" [172, at 31], which is evidenced by an email in which she claims to have been "denied the ability to perform Saturday overtime as offered to all employees" [172-24]. Plaintiff worked fewer than 20 overtime hours most years, and the most that she ever worked was about 78 hours in 2005. [170,

---

[3] This figure represents 10% of Defendant's annual pay. [167-1, at 3; 170-1.]

[4] Plaintiff states that Defendant failed to produce overtime information for 2012 through 2014, although Plaintiff identifies no explanation for the figures from 2011, 2015, or 2016. [167-1, at 3.]

[5] This figure represents each year's hourly rate multiplied by 1.5. [167-1, at 3; 170-1.]

[6] In her offset calculations described below, Plaintiff deducts her $40,803.04 in net pay from her 2011 earnings. [167-1, at 4; 172-23, at 2.] However, she uses her gross pay for estimating her base pay amount. To simplify matters and avoid improperly inflating her back pay, the Court simply prorates her base pay for the seven weeks of 2011 after she was terminated.

at 12–13.] She offers no evidence that she would have worked eleven times that amount in 2015. Moreover, for the first 10 months of 2011, Plaintiff worked fewer than 75 hours of overtime. *Id.* at 13. If Plaintiff has a reason that she would have worked an additional 315 overtime hours in the next seven weeks to reach a yearly total of 390, she does not disclose it.

Plaintiff worked on average 34.7 hours of overtime per year in her seven years of employment with Volvo. *Id.* Based on this information, the Court sets Plaintiff's overtime hours at this average for the relevant back pay time period. Plaintiff's estimated lost earnings must be revised as follows:

| Year | Base Pay | Shift Differential | Overtime Hours | Overtime Rate | Overtime Pay | Total Pay |
|------|----------|--------------------|----------------|---------------|--------------|-----------|
| 2011 | $7,540.40 | $754.04 | 0[7] | $40.40 | $0.00 | $8,294.44 |
| 2012 | $57,699.20 | $5,769.92 | 34.7 | $41.61 | $1,443.87 | $64,912.99 |
| 2013 | $59,425.60 | $5,942.56 | 34.7 | $42.86 | $1,487.24 | $66,855.40 |
| 2014 | $61,193.60 | $6,119.36 | 34.7 | $44.13 | $1,531.31 | $68,844.27 |
| 2015 | $63,044.80 | $6,304.48 | 34.7 | $45.47 | $1,577.81 | $70,927.09 |
| 2016[8] | $41,696.43 | $4,169.64 | 22.3 | $46.83 | $1,043.41 | $46,909.48 |
| **Total** | $290,600.03 | $29,060.00 | 161.1 | N/A | $7,083.64 | $326,743.67 |

The next issue for Plaintiff is how much these amounts must be offset by her other sources of income between 2011 and 2016. See 42 U.S.C. § 2000e-5(g)(1) ("Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."). In May 2012, Plaintiff began her employment with Schneider Trucks as a Team Over the Road Driver, which involves driving distances greater than 500 miles in teams. [170-7, at 6.] That employment ended in May 2014. [174, at 2.] Plaintiff then started work for Bear Cartage & Intermodal, Inc. within that same month (*id.*), but was terminated on May 20, 2015 [170-2]. Plaintiff also received unemployment

---

[7] Plaintiff worked 74.89 hours of overtime in 2011, which is close the maximum amount she ever worked and more than double her average. Plaintiff fails to satisfy her burden to show that she would have worked any more overtime in the remainder of 2011.

[8] These amounts are prorated for the 64.21 percent of 2016 that Plaintiff would have worked at Volvo.

11

benefits in 2012, 2013 and 2014, and she deducts these amounts from her own calculations.  See *Smith v. Farmstand*, 2016 WL 5912886, at *22 (N.D. Ill. Oct. 11, 2016) ("Whether to deduct unemployment compensation from an award of back pay is within the discretion of the trial court.").  In 2016, Plaintiff was hired by the Department of Veterans Affairs at the Edward Hines, Jr. VA Hospital [174-1, at 14].  Plaintiff's sources of income between 2011 and 2016 are reflected in the following chart:

| Year | Unemployment | Schneider | Bear | VA | Total Other Compensation |
|------|-------------|-----------|------|-----|------------------------|
| 2011 | $0.00 | $0.00 | $0.00 | $0.00 | $0 |
| 2012 | $11,748.00 | $10,782.84 | $0.00 | $0.00 | $22,530.84 |
| 2013 | $257.00 | $15,264.80 | $0.00 | $0.00 | $15,521.80 |
| 2014 | $0.00 | $10,443.18 | $29,001.63 | $0.00 | $39,444.81 |
| 2015 | $9,931.00 | $0.00 | $13,187.95 | $6,930.00[9] | $30,048.95 |
| 2016 | $0.00 | $0.00 | $0.00 | $20,522.00[10] | $20,522.00 |
| **Total** | $21,936.00 | $36,490.82 | $42,189.58 | $27,452.00 | $128,068.40 |

Taking these charts and totals together, Plaintiff's initially showing is that she is entitled to $198,675.27 in back pay.[11]

### 2.    Failure to Mitigate

Generally, "a discharged employee must mitigate damages by using reasonable diligence in finding other suitable employment."  *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989) (internal quotation marks and emphasis omitted).  Because Section 2000e–5(g)(1) requires subtracting amounts "earnable with reasonable diligence" from any back pay award, a plaintiff "cannot just leave the labor force after being wrongfully discharged in the hope of

---

[9] Plaintiff's resume states that she was receiving VA benefits from August 2015 through January 2016 at $8.25 per hour for 40 hours a week [174-1, at 23].  Plaintiff's calculations [167-1] omit these payments.

[10] Plaintiff originally deducted $28,683.20 from her backpay calculations [167-1, at 4], but her 2016 W-2s show that she earned $31,960.75 in 2016 [174-1, at 1].  The Court has prorated that amount for 2016.

[11] Plaintiff seeks an additional $48,865.30 in "Army pay" related to her weekend drills for 2011 through 2016.  [167-1, at 4.]  She never discusses this request in her briefs and fails to justify it with any evidence or law suggesting that Defendant bears responsibility for this pay.  Her request for Army pay is denied.

SA73

someday being made whole by a judgment." *Hutchison*, 42 F.3d at 1044. Likewise, a lack of job-seeking success will not excuse a plaintiff from the duty to mitigate. See *Payne v. Security Savings & Loan Assoc.*, 924 F.2d 109, 111 (7th Cir. 1991). Although the duty to mitigate falls on the plaintiff, see *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982), it is the employer's burden to establish that the plaintiff failed to mitigate her damages, see *Hutchison*, 42 F.3d at 1044. "To establish the affirmative defense of a plaintiff's failure to mitigate damages, the defendant [ ] must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence." *Hutchison*, 42 F.3d at 1044 (citation omitted); see also *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234 (7th Cir. 1986). Defendant argues that Plaintiff's back pay calculations should be reduced for three reasons.

First, Defendant contends that Plaintiff's back pay cut-off is May 2015—the date that she was terminated from Bear Cartage. According to Plaintiff's termination letter, Bear Cartage ended her employment because she "failed to report to work and ha[d] not answered or returned [its] phone calls," which left Bear Cartage "no choice but to assume [she] no longer want[s] to work." [170-2.] Plaintiff does not dispute that account, admitting that this job was "too physically demanding" and required her to "seek therapy." [172, at 27.] Plaintiff then applied for work at Hines as part of the Department of Veterans Affairs' Compensated Work Therapy ("CWT") program. As described by the Social Security Administration, the VA "administers the * * * CWT program[] that provide[s] therapeutic and rehabilitative services to eligible veterans with mental illness who are unable to work and support themselves." Soc. Sec. Admin. Program Operations Manual Sys. SI 00830.311, https://secure.ssa.gov/apps10/poms.nsf/lnx/0500830311 (last visited July 13, 2017). Plaintiff agrees that CWT "is specifically designed for employees

13

who were unable to function in the customary job market." [172, at 27.] She also describes CWT as a program that helps former service members "iron out the 'issues' that keep them from being productive members of society." [170-4, at 3.] Plaintiff states that she is "presently employed in Environmental Management Services as a House Keeping Aide at" Hines. [172, at 27; 174 at 2; 174-1, at 14.] Based on this work history, Defendant argues that "this Court should not consider any time period after [Plaintiff] left the job market in May 2015" for purposes of calculating backpay. [170, at 11.]

Plaintiff responds that she "did not voluntarily abandon jobs or voluntarily remove herself from the workforce." [172, at 27.] In light of her Bear Cartage termination letter and her enrollment in the CWT program, that assertion is insufficient. See, *e.g.*, *Flowers v. Komatsu Min. Sys., Inc.*, 165 F.3d 554, 557 (7th Cir. 1999) ("[W]e find that to award back pay to Flowers for the entire period from his termination to the trial was an abuse of discretion. Clearly, there are times when Flowers could not work, with or without an accommodation."). Both of those events indicate that Plaintiff either did not want (or was incapable of continuing) to work as a material handler. Plaintiff attempts to support her claim that she did not stop looking for similar work by attaching "a list of the various places where [she] sought gainful employment after her termination from Volvo" (*id.* at 26). [See 172-20.] That "list" is a collection of job seeking correspondence that Plaintiff sent. It also includes a list of companies to which it was recommended that she apply. *Id.* at 6. None of this correspondence post-dates May 2015, and thus does not show that Plaintiff was looking for comparable work after this date. *Payne*, 924 F.2d at 111 (affirming reduction in backpay after plaintiff's "job search had slowed to a trickle").

14

Plaintiff's transition from working as a housekeeping aide at Hines through the CWT program to working as a housekeeping aide at Hines as a VA employee does not alter this conclusion. In July 2015, Plaintiff described why she entered the CWT program:

> in my case, i can do ANY job. but i have no clue what job i WANT to do. where would i find my purpose and passion and thus be happy the job that i am doing? i chose truck driving as a knee jerk reaction and it served its purpose well at that time. i was able to earn a living, run away from people and my problems and just focus on working, my lawsuit, what did i want in my life and so on. but i am now at a different level in my development and thus need a different type of job and living environment. this therapy is helping me to figure all that out. how to balance work/money, with spending time with friends/family/self care, all while finding the job in what I am doing/instead of fighting for everything * * *.

[170-4, at 3.] Plaintiff's decision to pursue full-time employment as a housekeeping aide at Hines at the conclusion of her CWT program is consistent with the sentiment that she wanted a "different type of job" than a truck driver. Plaintiff does not suggest that she looked for any other job when her CWT enrollment ended or describe her job seeking efforts, if any. In short, her decision to pursue full-time housekeeping work at Hines reinforces the conclusion that she was not diligently searching for jobs similar to her old material handler job in 2016. See, *e.g.*, *Hutton v. Sally Beauty Co.*, 2004 WL 2397606, at *4 (S.D. Ind. Oct. 22, 2004) (Plaintiff "has introduced no evidence in support of a good faith effort to secure *comparable* employment.").

Plaintiff contends that she simply could not find "comparable employment," which is defined as a position that affords the prevailing party "virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status as the position from which she was discharged." *Hutchison*, 42 F.3d at 1044. Specifically, Plaintiff contends that "comparable $90,000 jobs are not readily available to [Plaintiff] in the Chicagoland community without a college degree." [172, at 28.] Plaintiff's briefs never articulate how she arrived at the $90,000 figure, which is significantly higher than Plaintiff's own backpay calculations (excluding overtime) for every year between 2011 and 2016 [167-1]. In response to

15

the Court's supplemental order requesting that Plaintiff substantiate that figure [173], Plaintiff submitted earnings statements from other self-described "comparator" employees who work at Volvo [174, at 3]. Even putting aside that Plaintiff never explained how she is similarly situated to those employees, none of these comparators earned $90,000 for *any* year between 2011 and 2016 [174-1, at 35–50]. Plaintiff's contention that the only comparable job for her is one that provides a $90,000 annual salary is not based in fact.

Based on the evidence in the record and evidence readily available to the Court, see Fed. R. Evid. 201, the Court concludes that there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence. Defendants offer evidence from a job search website showing fulltime material handler jobs within 25 miles of Joliet result in 809 hits, and submit job postings for fifteen of these positions. [175, at 2; 175-1.] Plaintiff does not explain why, for example, the jobs that she took at Schneider Trucks or Bear Cartage, the other jobs for which she applied [170-20, at 18], or any of the other jobs for which it was recommended that she apply (*id.* at 6) were not comparable employment.[12] Furthermore, Plaintiff does not offer any evidence to support her claim about the kind of jobs that are readily available in Chicago for someone of her education and skill level. These unsubstantiated arguments are insufficient to defeat Defendant's affirmative defense.

Plaintiff separately argues that her backpay award should not be reduced after 2015 because she "enrolled at Lewis University in Romeoville, Illinois" to secure a college degree "to increase her chances of securing a $90,000 job." [172, at 28–29.] She also "reports that she has not had very much success in college the past 2 semesters and fears that she might not be able to finish her college degree." *Id.* at 29. It is not clear when exactly Plaintiff enrolled in school

---

[12] The website for at least one of those jobs, Roehl Transport, Inc., states that drivers make "$50,000 - $82,500 a year." See https://www.roehl.jobs/ (last visited July 13, 2017). Those amounts are in line with the wages earned by most of Plaintiff's self-selected "comparators" for most years. [174-1, at 35–50.]

(despite the Court's request that she provide this information [173]) and Plaintiff does not elaborate further on her decision to go to college. However, the Seventh Circuit has affirmed a district court's order concluding that a plaintiff was entitled to back pay while attending school. *Hanna v. Am. Motors Corp.*, 724 F.2d 1300 (7th Cir. 1984). In *Hanna*, the plaintiff was unemployed when he enrolled in school, which he did not attend to "reap greater future earnings" but because he "didn't have a job * * * and it was a means of getting some money" in the form of veterans' benefits that he received for enrolling. *Id.* at 1308; see also *Dailey v. Societe Generale*, 108 F.3d 451, 457 (2d Cir. 1997) ("We believe that a fact-finder may, under certain circumstances, conclude that 'one who chooses to attend school only when diligent efforts to find work prove fruitless,' satisfies his or her duty to mitigate." (citations omitted)); *Miller v. AT&T Corp.*, 250 F.3d 820, 839 (4th Cir. 2001) ("[T]he central question a court must consider when deciding whether a student-claimant has mitigated [his] damages is whether an individual's furtherance of [his] education is inconsistent with [his] responsibility to use reasonable diligence in finding other suitable employment." (citation omitted)).

Unlike in *Hanna*, Plaintiff states that she enrolled in college "to increase her chances of" earning a higher salary. [172, at 28–29.] Her major is listed as "Human Resource Management, Psychology" and most of the courses she has taken to date involve accounting, management, and economics. [174-1, at 33; 174, Ex. 12.] Moreover, she told medical counselors at the VA that she "would like to return to school in order to pursue a degree in law." [170-3, at 11.] This evidence stands in contrast to the plaintiff in *Hanna*, who testified that "that while attending [college] he applied for and was at all times ready, willing, and available to accept employment comparable to that of [defendant]." *Id.* at 1308. Plaintiff does not offer any representation of the sort, including whether her commitment to college would have precluded her from accepting

17

employment equivalent to her material handling job at Volvo. See *Miller v. Marsh*, 766 F.2d 490, 492 (11th Cir. 1985) (Plaintiff's "time commitment as a first-year law student would necessarily preclude her from accepting employment equivalent to her former position."). The more likely conclusion is Plaintiff enrolled in college to "reap greater future earnings" and "an award of lost wages for the period in which one attends school, and thereby curtails [her] present earning capacity in order to reap greater future earnings, constitutes a double benefit." *Id.* Accordingly, Plaintiff's actions show that that she effectively stopped looking for comparable work as of May 2015, and any backpay must be prorated to the first 21 weeks of 2015.

Second, Defendant contends that Plaintiff's back pay award must be further offset because she received GI Bill benefits while working at Schneider Trucks. [170, at 14.] Plaintiff acknowledges that she received GI Bill benefits [167, at 17] and does not otherwise dispute that these benefits should offset her backpay award. However, despite the Court's supplemental order directing Plaintiff to file evidence showing "the amount of GI Benefits that Plaintiff received from 2011 through 2016" [173], she did not provide any such information.[13] Because Plaintiff has repeatedly failed to submit this evidence and it would be inequitable for Plaintiff to receive a backpay award that does not deduct job-training VA benefits, the Court will estimate these benefits for Plaintiff.

The GI bill offers apprenticeship and on-the-job-training benefits of 100 percent of the service member's monthly housing allowance for the first six months of the job, decreasing by 20 percent every six months thereafter, and a $1,000 books and supplies stipend. See

---

[13] Instead, Plaintiff filed documentation of her disability rating [174-1, at 3–5]; a letter summarizing her disability status and entitlement to VA benefits in June 2017 (*id.* at 9); a form showing the amount of her VA employer-provided healthcare for 2016 (that is, an employment benefit provided by virtue of her work at Hines) (*id.* at 10), and her civilian leave and earnings statement from June 2017 (*id.* at 13). None of this information provides any insight into the dollar amount of the GI benefits that Plaintiff received between 2011 and 2016.

http://www.benefits.va.gov/gibill/resources/benefits_resources/rates/ch33/Ch33rates080112.asp#
MHA (last visited July 13, 2017). Because the monthly housing benefit in Hickory Hills, Illinois
is $1,956 and Plaintiff was with Schneider for roughly two years, the Court estimates that
Plaintiff received total $5,476.80 in undisclosed GI benefits, which is deduced from Plaintiff's
back pay award.

Third, Defendant argues that Plaintiff "was not working full time at all times during her
employment," and her backpay award should be reduced even further. [170, at 14.] Defendant's
claim is based on the fact that Plaintiff earned less than the wages advertised on Schneider
Trucks' website [170, at 15–16] and her VA medical progress notes refer to the fact that she
missed three weeks of work due to a suspended license, had ongoing reserve duty obligations,
and had "asked for more limited hours" at Bear Cartage after she experienced some increased
depression (*id.*; 170-3, at 8). The Court is not persuaded by these arguments. The fact that
Plaintiff earned less than Schneider's advertised wages does not show that she was not trying
hard enough to be fully employed. Nor does the fact that Plaintiff had ongoing reservist
obligations mean that she was not exercising "reasonable diligence" in seeking to maintain
sufficient earnings from Schneider—a finding that would be difficult to square with the jury's
verdict in this case. *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 790 F. Supp. 2d 708, 722 (N.D.
Ill. 2011) ("[T]he Court must take care not to contradict factual determinations that the jury
impliedly made."). Defendant does not explain how the Court could quantify the impact of
Plaintiff's vague request to scale back her hours at Bear Cartage, even assuming that this request
was ever honored. Thus, Defendant fails to sustain its burden to show that Plaintiff failed to
mitigate her damages by working with sufficient diligence in her post-Volvo employment.

19

In short, the Court concludes that Defendant has successfully established, in part, that Plaintiff failed to mitigate her damages. Taking all of this information together and as represented in the chart below, Plaintiff's total back pay award is $141,388.53.

| Year | Base Pay | Shift Differential | Overtime Hours | Overtime Pay | Total Other Compensation | Total Pay |
|------|----------|--------------------|-----------------|--------------|--------------------------|-----------|
| 2011 | $7,540.40 | $754.04 | 0 | $0.00 | $0.00 | $8,294.44 |
| 2012 | $57,699.20 | $5,769.92 | 34.7 | $1,443.87 | -$22,530.84 | $42,382.15 |
| 2013 | $59,425.60 | $5,942.56 | 34.7 | $1,487.24 | -$15,521.80 | $51,333.60 |
| 2014 | $61,193.60 | $6,119.36 | 34.7 | $1,531.31 | -$39,444.81 | $29,399.46 |
| 2015 | $25,460.40 | $2,546.04 | 14.1 | $637.19 | -$13,187.95[14] | $15,455.68 |
| **Total** | $211,319.20 | $21,131.92 | 118.2 | $5,099.61 | -$96,162.20[15] | $141,388.53 |

### 3. Pre-Judgment Interest

Plaintiff requests prejudgment interest as part of her back pay award. Prejudgment interest is presumptively available. See *Shott v. Rush–Presbyterian–St. Luke's Med. Ctr.*, 338 F.3d 736, 745 (7th Cir. 2003). However, "the decision whether or not to award such interest is within the discretion of the trial court." *Taylor*, 593 F.2d at 787. The decision "turns upon whether the amount of damages is easily ascertainable." *E.E.O.C. v. Gurnee Inn Corp.,* 914 F.2d 815, 820 (7th Cir. 1990) (quoting *Donnelly v. Yellow Freight Sys.*, 874 F.2d 402, 411 (7th Cir. 1989)). Plaintiff is entitled to prejudgment interest on her back pay award notwithstanding any other damages she receives. See, *e.g.*, *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 282 (2d Cir. 1987) ("It follows, therefore, that prejudgment interest does not provide a double recovery to victims of age discrimination who have proven their entitlement to liquidated damages as well as back pay." (citation and internal quotation marks omitted)).

When calculating prejudgment interest, courts should use the prime rate. *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002). Although Plaintiff originally urged

---

[14] Because Plaintiff effectively stopped looking for work after May 2015, the Court does not use the unemployment benefits or CWT benefits that she received after this date as an offset.

[15] This total adds in Plaintiff's estimated $5,476.80 in undisclosed GI benefits.

the Court to calculate interest quarterly [167, at 19], both sides now agree that prejudgment interest should be compounded monthly [170, at 18; 172, at 29]. The Court awards prejudgment interest on the $141,388.53 back pay award at a rate of 3.25 percent,[16] compounded monthly for the approximately 42-month period spanning from November 8, 2011 to May 20, 2015, or $8,546.10 in interest.[17]

### 4. Other Employment Benefits

Plaintiff also seeks equitable relief for several other employment benefits, including health care benefits, 401(k) contributions, pension benefits, vacation time, bonuses, profit-sharing benefits, and stock options.[18] The Court addresses most of these benefits separately.

Plaintiff's computation of health care benefits covers her medical, dental, vision, accident death and dismemberment insurance, and long-term disability insurance. [167-1, at 5.] The parties largely agree on these calculations, although Defendant (more generously) includes basic life insurance among these benefits and (less generously) prorates these amounts for 2011 and 2015. [170-5.] Because the Court concludes that Plaintiff's back pay should be prorated and seeks to make Plaintiff whole, the Court includes the amount for basic life insurance and prorates these benefits. For owed health care benefits, the Court awards $474.75 for 2011, $5,879.49 for 2012, $6,417.93 for 2013, $6,230.54 for 2014, and $2,621.40 for 2015, or a total of $21,624.11.

---

[16] This is the average prime rate between November 2011 and May 2015. See Board of Governors, Federal Reserve System, *Data Download Program,* https://www.federalreserve.gov/datadownload/Choos e.aspx?rel=H15 (last visited July 13, 2017) (download spreadsheet for "Bank prime loan" and "monthly" and format package to include relevant dates).

[17] Defendant does not attempt to calculate prejudgment interest, and Plaintiff does not sufficiently explain how she arrived at her estimate of $157,812.83. [167-1, at 4.] The Court averages Plaintiff's total earnings of $141,388.53 over this 42 month period, which comes to $3,366.39 per month and the Court calculates the interest payment based on the earnings as they accrued.

[18] Plaintiff's calculations do not apply prejudgment interest to these other benefits. [167, at 24; 167-1.] The Court follows Plaintiff's lead and excludes these benefits from its prejudgment interest calculation.

Nevertheless, Defendant argues that this entire health care benefit award should be eliminated, however, because "upon information and belief, Plaintiff receives full medical care and treatment free of charge from the VA due to her service." [170-1, at 1 n.2.] Allegations based on information and belief are insufficient to sustain Defendant's burden at this stage. Defendant presumably has records showing whether Plaintiff received medical benefits from Volvo during her employment or whether she opted to receive her medical care from the VA. In addition, Defendant offers no evidence about the amount of these VA benefits based on Plaintiff's disability rating or whether all of these benefits (including AD&D, LTD, and Basic Life insurance) are provided at the same rate as Volvo. To the extent Defendant contends that Plaintiff had "similar benefits through Schneider" [170, at 1], it does not provide any evidence of those benefits or elaborate further. The Court declines to reduce Plaintiff's health care benefits award on these unsubstantiated arguments.

Plaintiff also seeks $61,762.00 in 401(k) contributions [167, at 24], although these calculations are difficult follow. As best the Court can tell, this total is based on taking 10 percent of her total Volvo earnings per year (base pay plus shift differential plus overtime) adding a figure that she claims is 75 percent of the first 6 percent of her contribution (representing Volvo's employer match) plus an unknown interest rate. [167-1, at 5.] Defendant acknowledges that it matches 75 percent of an employee's first 6 percent of income contributed to a 401(k) account, but argues that any additional award beyond this employer-match would be improper since Plaintiff could only have availed herself of these 401(k) benefits by contributing those amounts to her 401(k) from her annual wages. [170, at 10.] Plaintiff does not respond to that argument. The Court agrees that Plaintiff is not entitled to receive an additional 10 percent of her wages as if she was not required to contribute a portion of her earnings to a 401(k)

account. Although Plaintiff uses the total earnings figure to calculate Volvo's 401(k) match [167-1, at 5], Volvo's program matches only base pay, excluding shift differentials, overtime, and bonuses [175, at 1]. Using Plaintiff's base pay figures, Plaintiff is entitled to $339.32 in 2011, $2,596.46 in 2012, $2,674.15 in 2013, $2,753.71 in 2014, and $1,145.72 in 2015. Her total 401(k) employer match is $9,509.36.[19]

Plaintiff seeks $12,901.41 in pension benefits for 2011 through 2016 [167, at 24], but does not offer supporting evidence or any underlying calculations. Defendant includes pension benefits in its backpay calculations [170, at 21–21] and breaks down this benefit by year [170-1], but arrives at a total of $13,082.69. Neither side explains this discrepancy. Because the Court must prorate these benefits for 2011 and 2015 too, the Court awards $181.33 in 2011, $2,307.93 in 2012, $2,377.02 in 2013, $2,447.74 in 2014, and $1,018.42 in 2015 [170-5], for a total of $8,332.44.

Plaintiff requests "vacation time, bonuses, profit sharing, and stock options" under the heading "other nonmonetary relief." [167, at 22.] She offers no further information about these benefits or a specific proposal for what "nonmonetary" relief the Court could award here.[20] Defendant ignores all of these requests except profit sharing. Defendant concedes that Plaintiff could have received $1,348.73 in 2011 and $533.97 in 2012, but no other amounts. Because

---

[19] Defendant asks the Court to further reduce this amount based on the contention that Schneider offers a 401(k) match of up to 4% of "an employee's earnings." [170, at 16.] Defendant does not submit any documentation regarding this program or explain how the match is calculated (such as whether the program varies based on length of employment or whether total earnings are used for the calculation). Because this argument is underdeveloped, the Court declines to reduce Plaintiff's 401(k) employer match.

[20] Plaintiff's opening brief notes that she is "still awaiting information" about computation of bonuses or incentives paid by Volvo between 2011 and 2016. [167-1, at 3.] In lieu of that information, Plaintiff could have provided historical information about bonuses and incentive that she received from Defendant. Instead, she left that information blank. Defendant asserts in response that "there has been no Christmas/holiday bonus program for the material handlers at the Joliet facility." [170, at 22.] Although neither side provides any information about whether there were bonus or incentive programs available other than the holiday bonus program, Plaintiff ignores this issue in its reply. On this record, the Court cannot award Plaintiff any bonuses as equitable relief.

Defendant concedes that these amounts should be awarded, the Court awards $1,882.70 in profit sharing. Otherwise, the Court denies this request as unsupported.

Totaling these amounts, the Court awards $41,348.61 in equitable relief for this other employment-related compensation.

### C. Reinstatement

Plaintiff ostensibly seeks reinstatement to her old employment as a material handler at Volvo's Joliet facility. [167, at 12–13.] She also requests that the Court order Defendant to provide her with eleven accommodations. *Id.* at 13–14. Some of those accommodations relate to changes in her work schedule, including time-off for counseling "as needed," the ability to take breaks during panic attacks, and a flexible work schedule when she is tardy. *Id.* She requests both the ability to use noise damping devices and audio relaxation devices. *Id.* She asks for a place to meditate and relax before shifts, daily feedback from a supervisor, and "an assigned mentor agreeable to [her]." *Id.* at 14. Two of her requested accommodations are that the Court order "companywide" education regarding USERRA and "Disability Awareness" and specific disability awareness training for all "persons who interact with [her]."

In the alternative, Plaintiff posits that "perhaps she could be transferred to an office location to perform the work as a Human Resources Partner for Volvo" [167, at 14]—a job she has never held at Volvo and, according to Defendant, "does not exist at the Joliet facility" [170, at 19]. Plaintiff suggests the HR job "[t]o avoid the sudden load noises and banging that occur as a picker/packer" and "the deleterious effects that [her old job would] have on [her] PTSD." [167, at 14.] According to Plaintiff, "[o]bviously, hostility and disagreement has existed among [Plaintiff] and high Management, Human Resources Personnel, and Supervisors at [Volvo] for years" and "[f]rustration and hostility [have] increased" over time. *Id.* at 15–16. Because

24

"[r]einstatement of her employment * * * might cause difficulties in many quarters" at Volvo, Plaintiff contends that the Court could award front pay in lieu of reinstatement. *Id.* at 16–17.

"Reinstatement generally is favored over front pay." *Wescher v. Chem–Tech Int'l*, 2016 WL 7441655, at *1 (E.D. Wis. Dec. 27, 2016). Despite its "preferred" status, this "discretionary" remedy "is not always appropriate" and "should not be used where the result would be undue friction and controversy." *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1141 (7th Cir. 1994); *McKnight v. Gen. Motors Corp.*, 908 F.2d 104, 115 (7th Cir. 1990). In some circumstances, "the employer does not want the employee back" and "probably the employee does not want to be working for this employer, and hopes to be bought out." *McKnight*, 908 F.2d at 115. "Each party will want to make life as miserable as possible for the other party" and "[c]ourts do not want to involve themselves in the industrial equivalent of matrimonial squabbling * * * that may last for many years." *Id.* Courts may consider a "number of factors" in exercising their discretion, "including hostility in the employment relationship and the lack of an available position to which to reinstate the plaintiff." *Downes*, 41 F.3d at 1141.

Based on these factors, Plaintiff's reinstatement is not appropriate. First, Plaintiff readily acknowledges the extensive acrimony between her and Defendant. [167, at 16–17.] Indeed, she requests an alternative position as a Human Resources Partner notwithstanding the "hostility" between her and Volvo's HR staff. It is difficult to see how her reinstatement at Volvo would result in anything other than the Court's indefinite mediation of the parties' inevitable employment disputes. Tellingly, Plaintiff does not attempt to explain how her relationship with Volvo is reparable. It plainly is not.

Second, the number of accommodations she requests (some of which, such as the mandatory company-wide education or an assigned mentor subject to her approval, are (at best)

atypical accommodations under 42 U.S.C § 12111(9)), her proposal to be moved to HR to avoid the "deleterious effects" of her old job, her decision to enroll in college, her HR major, and her statements to VA medical counselors that she plans to pursue a law degree [170-3, at 11] all cast doubt on whether Plaintiff genuinely seeks reinstatement to her old position at Volvo. Indeed, Plaintiff does not dispute *any* of Defendant's claims that she pursues reinstatement strategically. *McKnight*, 908 F.2d at 116 ("If the employee desires reinstatement for strategic purposes, that is a valid basis for denial."). "Equity does not engage in idle gestures" and the Court will not order Plaintiff to work as a material handler at Volvo without it being unambiguously clear that she still wants this job. *Shango v. Jurich*, 681 F.2d 1091, 1105 (7th Cir. 1982).

Third, Plaintiff offers no evidence that her old job is available at the Joliet facility. See *Sheils v. Gatehouse Media, Inc.*, 2015 WL 6501203, at *11 (N.D. Ill. Oct. 27, 2015) (denying reinstatement where Plaintiff "offered no evidence that [her old] position * * * is currently available at [her former employer] or that an innocent employee would not be harmed by [plaintiff's] reinstatement"). Likewise, she provides no support for her argument that she could be assigned an HR position at Volvo. For example, she does not explain whether such a position is "equivalent in seniority, status, and pay" or the "nearest approximation" to her old job. 38 U.S.C. § 4313(a)(3). Nor does she respond to Defendant's argument that she is unqualified for this position and, in fact, no such job exists at the Joliet facility [170, at 19]. *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1370–71 (7th Cir. 1992) (affirming trial court's conclusion that reinstatement was inappropriate where plaintiff "asked for a 'completely different job and to be relocated in a new city'"). Accordingly, the Court declines to award reinstatement.

26

### D.    Front Pay

As a substitute for reinstatement, Plaintiff requests front pay.  As noted, front pay "represents the wages the plaintiff would have earned had she not been fired measured from the date of the judgment to some reasonable point in the future." *Gracia*, 130 F. Supp. 3d at 1255.  Said differently, front pay is "the discounted present value of the difference between the earnings an employee would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis, inferior employment." *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 953 (7th Cir. 1998) (internal alterations omitted).  The award "must be grounded in available facts, acceptable to a reasonable person and not highly speculative." *Downes*, 41 F.3d at 1142.  Front pay awards often are limited in duration, and are awarded for "a reasonable period of time, until a date by which the plaintiff, using reasonable diligence, should have found comparable employment." *Williams*, 137 F.3d at 954 (quotation omitted); see also *Biondo v. City of Chi.*, 382 F.3d 680, 691 (7th Cir. 2004) ("Front pay cannot extend past the time a reasonable person needs to achieve the same or an equivalent position in the absence of discrimination").  "The familiar common law duty of mitigating damages is imposed:  the employee must make a diligent search for comparable employment." *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 771 (7th Cir. 2006).

Plaintiff proposes that she should receive a front pay award representing a $90,000 annual salary for four years—$360,000 total—because she "will not achieve the same or an equivalent position that she had prior to the termination of her employment until she acquires her college degree which, with diligence, will take 4 years." [172, at 30.]  As discussed, this $90,000 figure is unjustifiable.  In addition, Plaintiff does not offset this award based on her Hines earnings or provide a discount rate. *Williams*, 137 F.3d at 954 ("Giving the employee the

27

earnings from her old job without taking account of her earnings from her new (or expected) job would result in overcompensation.").  Based on these deficiencies and the fact that Plaintiff failed to mitigate her damages by continuing to look for comparable work in connection with her backpay award, Defendant urges the Court to deny Plaintiff any front pay.

The Court chooses a middle path in light of the jury's findings.  Had Plaintiff been employed at the end of 2016, she could have received $73,056.36 in compensation.[21]  Based on Plaintiff's earnings history, her base salary and overtime rate increased by about 3 percent each year.  The Court concludes that it "should" take roughly two years of diligent searching for Plaintiff to find and secure comparable employment.[22]  See Williams, 137 F.3d at 954.  Had Plaintiff been employed by Volvo those years, she would have received about $75,248.05[23] in 2017 and $77,505.32[24] in 2018.  The Court also assumes that each year she would have earned $31,960.75—the amount she received from Hines in 2016 (and the only year for which there is any information).  [174-1, at 1.]  Subtracting those earnings, the Court estimates that Plaintiff would have received an additional $43,287.30 in 2017 and $45,544.57 in 2018 had she remained employed with Volvo.  Using a discount rate of 3.67 (the average of the interest rates between August 2016 and the present), the Court estimates that Plaintiff should receive the present value of $41,754.90 for 2017 and $42,377.02 for 2018, or a total of $84,131.92 in front pay.

---

[21] $64,937.60 in base pay, $6,493.76 in shift differential, and $1,625 in overtime.

[22] In light of the six months between when Plaintiff applied to and started her employment with Schneider, the gaps in her resume based on CWT treatment, and the efforts needed to find comparable $70,000 a year work, the Court does not consider this relatively brief period of time *unduly* speculative. See *Mehringer v. Vill. of Bloomingdale*, 2003 WL 21506856, at *15 (N.D. Ill. June 27, 2003) ("Although [a front pay award is] speculative in nature, the longer the period of time for which a front pay award is sought, the more speculative it becomes.").

[23] $66,885.73 in base pay, $6,688.57 in shift differential, and $1,673.75 in overtime (34.7 hours at $48.23 per hour).

[24] $68,892.30 in base pay, $6,889.23 in shift differential, and $1,723.79 in overtime (34.7 hours at $49.68 per hour).

28

### E.    Liquidated Damages Under USERRA

38 U.S.C. § 4323(d)(1)(B) provides that a court "may require the employer to compensate the person for any loss of wages or benefits suffered by reason of such employer's failure to comply with" USERRA.  Moreover, a court "may require the employer to pay the person an amount equal to the amount referred to in subparagraph (B) as liquidated damages, if the court determines that the employer's failure to comply with the provisions of this chapter was willful."  *Id.* § 4323(d)(1)(C).  Here, the jury found Defendant's violation of USERRA was willful [161, at 3], making a liquidated damages award pursuant to Section 4323(d)(1)(C) proper.

Plaintiff argues that "should the court determine that the full amount of punitive damages reflected in the jury's verdict ought not be sustained, [she] requests that the Court assess liquidated damages under USERRA by doubling the amount of any *equitable relief*."  [172, at 21 (emphasis added).]  Defendant argues that USERRA "does not allow for the recovery of compensatory damages" and, indeed, the Court should not award *any* liquidated damages under USERRA.  [170, at 8–9.]  Thus, neither side contends that the Court should count the jury's damages award for emotional distress and medical costs under the ADA in any liquidated damages calculation.[25]  See *Bello v. Vill. of Skokie*, 2014 WL 4344391, at *6 (N.D. Ill. Sept. 2, 2014) (USERRA "does not authorize damages for emotional distress, but it permits recovery for lost pay and benefits.").  Defendant also argues that any decision to award "both punitive damages under the ADA and liquidated damages under USERRA would be duplicative" and

---

[25] Plaintiff's opening brief argues that "the jury award of $2,600,000 for compensatory damages is not violative of USERRA in any way and accomplishes its goal of compensating a service member" for USERRA violations.  [167, at 9.]  The jury's ADA compensatory damages award was for "physical, mental, and emotional pain and suffering" and the "reasonable value of medical care" [156, at 22], whereas USERRA provides damages for "loss of wages or benefits," 38 U.S.C. § 4323(d)(1)(B).  In other words, these ADA-damages do not overlap with damages that could be awarded under USERRA.  And (as noted) the jury was instructed *not* to award USERRA damages.  Plaintiff cannot simply borrow this amount for her USERRA damages when it has nothing to do with lost wages or benefits.

result in a double recovery.   Because the compensatory damages award maxes out Section 1981a(b)(3)'s statutory cap and the Court vacates the jury's punitive damages award, there is no concern (to the extent this argument has merit) regarding the possibility of Plaintiff's double recovery for punitive damages under the ADA and liquidated damages under USERRA.   See *Tomao v. Abbott Labs., Inc.*, 2007 WL 2225905, at *14–15 (N.D. Ill. July 31, 2007).

Therefore, the Court awards an amount equal to Plaintiff's total equitable relief (that is, her awards for back pay, front pay, other employment benefits, and prejudgment interest) as liquidated damages under USERRA, which comes to $275,415.16.   See also *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1232 (7th Cir. 1995) ("Since reinstatement and double damages are normally awarded in the same case, and front pay is a substitute for reinstatement, there is no rule against awarding both double damages and front pay in the same case.").

**F.     Tax Component**

Plaintiff requests that the Court fashion a tax component award to avoid the negative consequences from receiving this lump-sum damages award.   [167, at 21.]  As in *Smith*, Plaintiff cites *EEOC v. Northern Star Hospitality, Inc.*, 777 F.3d 898, 904 (7th Cir. 2015), where the Seventh Circuit held that district courts can issue a tax-component award to Title VII plaintiffs to compensate them for the negative consequences of receiving lump-sum back pay awards.   *Smith* also explained that the Seventh Circuit cautioned "district courts to show their work if and when they adjudge similar tax-component awards in the future," which lead this district court to deny the plaintiff in *Smith* a tax award because he "provide[d] no guidance as to how the court might go about calculating an appropriate tax-component."   *Smith*, 2016 WL 5912886, at *25 (internal quotation marks omitted).

30

Plaintiff does not do much better here. She attaches to her brief a list of numbers that she claims represent her "employer tax liability," her "personal tax liability increase, with the increase in earnings at a regular tax rate[] (26.35%)," and her "personal tax liability increase * * * at the one-time taxation rates (40.35%)." [167-1, at 6.] There is no information about the formula or inputs she uses to derive these "computations." *Id.* She does not discuss these calculations in her opening brief and made no effort to clarify them on reply after Defendant suggested they were "utterly unclear." [170, at 21.] As Defendant notes, the top federal income tax bracket is 39.6 percent (*id.*), and Plaintiff does not indicate how she arrived at a "one-time taxation rate" of 40.35 percent. The same is true for the 26.35 percent tax rate, which is not a readily identifiable tax bracket. Moreover, Plaintiff does not discuss her current tax bracket (which would be necessary for calculating the increase from a lump-sum award), her deductions (if any), whether her "computations" reflect state and federal taxes, and which categories of damages she factors into her calculations. Because Plaintiff does not provide the Court with anywhere close to sufficient information to calculate an appropriate tax-component award, Plaintiff's request for a tax component award is denied.

## G. Other Non-Monetary Relief

Plaintiff also seeks two forms of non-monetary equitable relief: (1) an order enjoining Defendant "from any intentional violations of USERRA and affirmatively requiring the company to comply with all the terms of USERRA"; and (2) notice to OFCCP of the jury's verdict with the aim that Defendant's federal contractor status "should be in jeopardy now." [167, at 22.] Neither request is appropriate.

Plaintiff's "obey-the-law" injunction suffers from a host of problems. First, "[a]n obey-the-law injunction departs from the traditional equitable principle that injunctions should prohibit

31

no more than the violation established in the litigation or similar conduct reasonably related to the violation." *AutoZone*, 707 F.3d at 841. Plaintiff's request is not tailored to any specific provisions of USERRA, types of conduct, personnel, geographic locations, or time periods. "[T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if [it] shall at any time in the future commit some new violation unlike and unrelated to that with which [it] was originally charged." *N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435–36 (1941).

Second, Rule 65 requires injunctions to "state its terms specifically" and "describe in reasonable detail * * * the act or acts restrained." Fed. R. Civ. P. 65(d)(1). "An injunction simply requiring the defendant to obey the law is too vague to satisfy the specificity requirements of [Rule] 65(d)." *Shepard v. Rangel*, 2014 WL 7366662, at *20 (D. Colo. Dec. 24, 2014) (collecting cases). Plaintiff does not provide the Court with any specific language to draft an injunction—indeed, her request for this relief is limited to a single sentence [167, at 22]—and Plaintiff has not equipped this Court to fashion an injunction on its own. See *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 675 (7th Cir. 2008) ("A litigant has a feeble claim for a preliminary injunction when he can't articulate what he wants enjoined[.]"); accord *AutoZone*, 707 F.3d at 841–42 (collecting cases).

Third, while "the district court has broad statutory authority to fashion appropriate remedies, including injunctive relief, for proven violations of the anti-discrimination laws," the Court must "assess whether the proven discriminatory conduct could possibly persist in the future." *AutoZone*, 707 F.3d at 842 (citation and internal quotation marks omitted). Plaintiff offers no evidence "suggest[ing] that the proven illegal conduct may be resumed." *Id.*

32

Fourth, while a Court may "require the employer to comply with the provisions" of USERRA as a remedy, 38 U.S.C. § 4323, Volvo is no longer Plaintiff's "employer." Said differently, an order directing Volvo to comply with USERRA would not benefit her, raising redressability and standing concerns. See *Dees v. Hyundai Motor Mfg. Ala., LLC*, 605 F. Supp. 2d 1220, 1229 (M.D. Ala. 2009) (dismissing injunctive relief under USERRA); *Richards v. Canyon Cty.*, 2014 WL 1270665, at *4 (D. Idaho Mar. 26, 2014) (same); see also *Feit v. Ward*, 886 F.2d 848, 857 (7th Cir. 1989) ("[Plaintiff] seeks to bar the defendants from disciplining or discharging *employees* for exercising their first amendment rights. Because [plaintiff] is no longer an employee of the Forest Service, even if we were to grant the relief he requests, he would not benefit from this relief."). USERRA directs that courts should use their equity powers "to vindicate fully the rights or benefits of persons" injured under the statute. 38 U.S.C. § 4323(e). Requiring Volvo to comply with USERRA for all other employees prospectively does not accomplish this purpose. Her request to enjoin Volvo to comply with USERRA is denied.

Regarding the OFCCP notice request, Plaintiff fails to identify any court that has issued such a notice. She also does not explain how such an order makes her whole. This request appears to be little more than an attempt to exact retribution on Volvo. Defendant represents (and Plaintiff does not dispute) that OFCCP has already investigated Plaintiff and Volvo's dispute and "concluded that Volvo did not violate" the law governing federal contractor obligations with veterans. [170, at 22–22.] Neither equity nor law demands this notice.[26]

### H. Attorney's Fees

A prevailing plaintiff under USERRA may receive "reasonable attorney fees, expert witness fees, and other litigation expenses" connected with that claim. 38 U.S.C. § 4323(h)(2).

---

[26] Plaintiff originally asked "the court to issue an injunction to Volvo, or any sub-agency, be barred from engaging in business with the United States Federal Government for not less than a period of 3 years" [1858, at 3], but that request does not appear in her briefs and the Court does not consider it.

The prevailing party in an ADA action may also receive "a reasonable attorney's fee, including litigation expenses, and costs" directly attributable to that claim. 42 U.S.C. § 12205. The parties have agreed to settle their attorney's fee dispute pursuant to Local Rule 54.3. [164, at 4.] Following resolution of any motions seeking relief under Rule 50 and 59, the Court will enter a briefing schedule on Plaintiff's request for reasonable fees and costs.

## IV.    Conclusion

For these reasons, Plaintiff's request for equitable relief [167] is granted in part and denied in part. The Court awards Plaintiff $141,388.53 in back pay, $84,131.92 in front pay, $41,348.61 in other employment-related compensation, $8,546.10 in prejudgment interest, and $275,415.16 in liquidated damages. Pursuant to 42 U.S.C. § 1981a(b)(3), the Court reduces the jury's $2.6 million compensatory damages award to $300,000 and vacates the jury's $5.2 million punitive damages award. All other forms of equitable relief are denied. Final judgment will be entered in favor of Plaintiff. The parties have until August 10, 2017 to file any Rule 50 or 59 motions, responses are due September 7, 2017, and replies are due September 21, 2017.


Dated: July 13, 2017

_____
Robert M. Dow, Jr.
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LUZMARIA ARROYO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-6859 |
| | ) | |
| VOLVO GROUP NORTH AMERICA, LLC, | ) | Judge Robert M. Dow, Jr. |
| d/b/a VOLVO PARTS NORTH AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff LuzMaria Arroyo sued Defendant Volvo Group North America, LLC, d/b/a Volvo Parts North America ("Volvo") for discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* ("USERRA"). Before the Court are (1) Defendant's motion for judgment as a matter of law, or, in the alternative, a new trial, or, in the alternative, remittitur and amendment of judgment [192] and (2) Plaintiff's motion to alter judgment [204]. For the reasons set forth below, Defendant's motion [192] is granted to the following extent: the Court will enter judgment as a matter of law in favor of Defendant on Plaintiff's ADA discrimination claim and grant a new trial on Plaintiff's USERRA claim. Defendant's remaining requests for relief are denied. In addition, the Court denies Plaintiff's motion to alter judgment [204] in its entirety as moot. This case is set for further status hearing on October 10, 2019 at 9:30 a.m.

I.      **Background**

A.      **Procedural History**

Plaintiff LuzMaria Arroyo worked at Defendant Volvo Group North America, LLC (d/b/a Volvo Parts North America) from June 2005 until November 2011. In Plaintiff's third amended

complaint, Plaintiff alleged discrimination, retaliation, and failure to provide reasonable accommodations under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq., and Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 et seq. ("USERRA"), along with a state law claim for intentional infliction of emotional distress. [See 51.] The Court granted summary judgment against Plaintiff and in favor of Defendant on all claims. The Seventh Circuit affirmed the Court's ruling with respect to Plaintiff's claims for retaliation, failure to accommodate, intentional infliction of emotional distress, and with respect to the Court's analysis of Plaintiff's ADA discrimination claim under the now defunct "indirect method" of proof. However, the Seventh Circuit reversed the Court's ruling with respect to Plaintiff's USERRA claim and Plaintiff's ADA discrimination claim under the "direct method" of proof.

After a trial on the merits of Plaintiff's remaining ADA and USERRA claims, a jury returned a verdict in favor of Plaintiff on both claims. [See 161.] The jury awarded Plaintiff $2,600,000.00 in compensatory damages and $5,200,000.00 in punitive damages on Plaintiff's ADA discrimination claim. [*Id*. at 2.] The jury concluded that Defendant did not prove its affirmative defense under USERRA by a preponderance of the evidence. [*Id*. at 3.] The jury further concluded that Defendant willfully violated the USERRA when it terminated Plaintiff's employment. [*Id*.] After post-trial briefing, the Court awarded Plaintiff $141,388.53 in back pay, $84,131.92 in front pay, $41,348.61 in other employment-related compensation, $8,546.10 in prejudgment interest, and $275,415.16 in liquidated damages. [177, at 1.] Pursuant to 42 U.S.C. § 1981a(b)(3), the applicable damages cap under the ADA, the Court also reduced the jury's $2.6 million compensatory damages award to $300,000 and vacated the jury's $5.2 million punitive

2

damages award. [*Id*.] The Court denied all other forms of equitable relief. [*Id*.] Defendant filed a motion for judgment as a matter of law, or, in the alternative, a new trial, or, in the alternative, remittitur and amendment of judgment [192]. Plaintiff filed a motion to alter judgment [204]. These motions currently are before the Court.

### B. Plaintiff's Early Employment and Military Service

The trial evidence established that Plaintiff was employed as a material handler at Defendant's facility in Joliet, Illinois from June 2005 until her employment was terminated in November 2011. When Plaintiff began her employment with Defendant, she was in the Army Reserves. [Tr. 1059.] Plaintiff informed Defendant of her status as an active reservist in the Army by noting it on her resume. [Tr. 492.] Throughout her employment, Plaintiff was subject to the facility's attendance policy (the "Attendance Policy"), which was administered by supervisors Keith Schroeder and Michael Temko. After Plaintiff was employed with Defendant for a couple months, she had a discussion with Schroeder and Human Resources Manager Celia Jarvis (who was present telephonically) about time off of work to travel to and from Fort Benning, Georgia for Plaintiff's Army Reserves duties. [Tr. 807.] During that discussion, Jarvis told Plaintiff that the extra time she needed to travel to and from Fort Benning was not authorized. [Tr. 807-08.] Plaintiff responded that the time should be authorized under USERRA. [Tr. 808.]

Plaintiff presented emails indicating that Plaintiff's supervisors were unhappy with Plaintiff taking time off to travel to and from her military service in Fort Benning, Georgia. [See, *e.g.*, 205-1 (Pl.'s Ex. 19); 205-2 (Pl.'s Ex. 20); 205-3 (Pl.'s Ex. 21); 205-4 (Pl.'s Ex. 22); 205-6 (Pl.'s Ex. 24); 205-7 (Pl.'s Ex. 25); 205-8 (Pl.'s Ex. 32); 205-9 (Pl.'s Ex. 50).] For example, Plaintiff presented an email in which Temko questioned Plaintiff about why she needed the additional travel time. [205-1 (Pl.'s Ex. 19), at 2.] Temko also emailed Schroeder to ask whether

3

Defendant was required to provide this time for travel. [205-3 (Pl.'s Ex. 21), at 1-2.] Schroeder forwarded the inquiry to Bruce Olin, stating "I find myself with a dilemma if I were to discipline a person for taking too much time off for military reserve duty * * * I certainly give her credit for serving our country but of course I am also responsible for our business needs." [*Id.* at 1.]

On October 28, Olin responded to an earlier email from Schroeder discussing various legal authorities provided by Plaintiff, stating:

> First, we do not have to grant time off for [Plaintiff's] travel time. Her legal obligation is 2 weeks per year, which we do give off, and 1 weekend per month. The drills she attended were most likely extra training, which we do not have to grant the time. We do not have to give extra time for her travel to and from her weekend duty. She does have the option to transfer to a closer unit, we cannot make her transfer.

[205-4 (Pl.'s Ex. 22), at 1.] Schroeder forwarded the email to Temko, predicting "LuzMaria will challenge us." [*Id.*] As noted by the Seventh Circuit, the advice regarding travel time initially given by Defendant was wrong. [110, at 4.] Jarvis did additional research and concluded that the law treats voluntary and involuntary orders the same, and Plaintiff was entitled to travel time plus an eight-hour rest period following her drill before having to report to work. [205-7 (Pl.'s Ex. 25), at 1.][1] Plaintiff also presented emails in which supervisors complained about a lack of communication from Plaintiff regarding her military leave. [205-1 (Pl.'s Ex. 19), at 2 (Temko); 205-9 (Pl.'s Ex. 50), at 1 (Schroeder).] Temko sent an email to Schroeder and others discussing the benefits to Defendant of Plaintiff transferring to a local Reserve facility in Darien, Illinois so that she would not have to travel to Georgia anymore. [225-1 (Pl.'s Ex. 40); Tr. 542-44.] According to Plaintiff, in 2007, after she returned from a tour of duty in Iraq, Schroeder told her

---

[1] Although this docket entry is difficult to read, a more legible version of the same document is on the docket. [See 78-3.]

that her military service was becoming an undue hardship on the company and that it would greatly help the company if Plaintiff could move to a local unit. [Tr. 817-18.]

After Plaintiff forwarded to her supervisors materials regarding Defendant's obligations under USERRA, Plaintiff's supervisor Sherrie Jankowski stated that Plaintiff was "becoming a pain with all this." [211-3 (Pl.'s Ex. 107).] Jankowski testified that she simply meant that Plaintiff was being burdensome by forwarding materials relating to USERRA to Jankowski and not to Schroeder, as had been requested. [Tr. 333.] Plaintiff also asserts that Jankowski and Schroeder did nothing to curtail rumors in the workplace that Plaintiff was on vacation in Hawaii. In support of that assertion, Plaintiff cites to an email from Jankowski to Schroeder discussing these rumors and testimony in which Jankowski explained that she told employees to stop spreading rumors. [211-5 (Pl.'s Ex. 124); Tr. 338-344.]

Plaintiff was deployed twice during her time working for Defendant—these deployments were from April 17, 2006 through May 7, 2007 and from April 15, 2009 through August 15, 2010. [Tr. 210.] When Plaintiff came back from Iraq in 2010, Temko sent an email to Schroeder and Somersett discussing how Plaintiff could decide when she returned back to work. [225-5 (Pl.'s Ex. 62).][2] Upon her return, Temko and Schroeder took steps to offer her a severance package that had been offered to other employees while Plaintiff was on a tour of military duty. [225-6 (Pl.'s Ex. 69); Tr. 163-64.]

## C. Defendant's Attendance Policy

Under the Attendance Policy, when an employee was late or absent without providing the required documentation, the employee was issued a whole or fractional "occurrence." [Tr. 1012.]

---

[2] Plaintiff cited to Exhibit 61 in one of her submissions to the Court. [204, at 16.] However, as noted by Defendant [226], the exhibit was not introduced into evidence. The Court therefore did not consider Exhibit 61 or other exhibits not admitted into evidence.

SA100

Each time an employee received an occurrence, Defendant applied a four-week and six-month look-back period to determine whether the employee incurred enough occurrences during either of those periods to receive a step in the progressive disciplinary process. [Tr. 1014-15.] Corrective action would be taken if the employee had a total of two occurrence points within the four-week period or a total of five occurrences within the six-month period. [*Id*.] The disciplinary steps under the policy were (1) verbal warning, (2) formal written warning, (3) three-day suspension, and finally, (4) termination. [205-15 (Def.'s Ex. 11), at 4.] For the purposes of calculating time periods under the Attendance Policy, Defendant did not count absences other than ETO vacation and scheduled holidays. [Tr. 580-82.]

The evidence at trial established that the Attendance Policy changed during the course of Plaintiff's employment. When Plaintiff started working for Defendant in 2005, any unexcused absence from work (including tardies) ranging from three minutes to one hour would result in 0.25 occurrences. [Tr. 1026-27.] After the policy changed [Tr. 1027], any absence from work for an hour or less would result in a half occurrence. [205-15 (Def.'s Ex. 11).] Defendant also previously had an unwritten policy that effectively gave employees a two-minute grace period, meaning that the employee would not receive an occurrence for being less than three minutes late. [Tr. 587-88.] However, Defendant eliminated the policy in 2008 after employees were abusing it. [Tr. 210-11, 586.]

Schroeder testified that he may have had discretion to excuse Plaintiff from coming in one to three minutes late. [Tr. 649-51.] Although Schroeder testified that he had exercised his discretion to excuse tardies for other employees that purportedly resulted from car trouble or weather issues [*id*.], he did not say whether those employees provided documentation for any such

6

excused tardies. Schroeder did testify, however, that the Attendance Policy allows for tardies resulting from car trouble to be excused. [Tr. 650-51.]

### D. PTSD

On December 23, 2010, Plaintiff sent an email to Schroeder describing her serious medical issues relating to stress at work and her military service. [225-9 (Pl.'s Ex. 119); Tr. 593-98.] In that email, Plaintiff stated:

> The doctor gave me a note for no work through 12/30. * * * Between the stress at work and the stress of reliving the events of my deployment through writing my story, I have been having panic attacks. I have been waking up feeling scared. Not able to get more than 4 hours of sleep a day.

[*Id.*] After receiving the email, Schroeder discussed disciplining Plaintiff for her subsequent absences with Olin. [Tr. 593-98.] Although Plaintiff's December 23, 2010 absence initially was categorized as inexcused, on September 6, 2011, Temko retroactively changed Plaintiff's attendance record to reflect an excused absence for that date. [205-21 (Def.'s Ex. 24).] The parties stipulated that Plaintiff was treated for Post-Traumatic Stress Disorder ("PTSD") in December 2010 and formally diagnosed in January 2011. [Tr. 434.] Schroeder later learned of this diagnosis, but he could not remember exactly when. [Tr. 600-01.] The parties further stipulated that Plaintiff's PTSD was due to and caused by her military service. [Tr. 434.] PTSD is a mental disorder that can develop after a person is exposed to a traumatic event, such as warfare. [*Id.*] The symptoms of PTSD may include disturbing thoughts, feelings or dreams related to the events, mental or physical distress to trauma-related cues, attempt to avoid trauma-related cues, alterations in how a person thinks and feels, and increased arousal. [*Id.*] The term "posttraumatic stress disorder" came into use in the 1970s in large part due to the diagnoses of US military veterans of the Vietnam War. [*Id.* at 434-35.] It was officially recognized by the American Psychiatric

7

SA102

Association in 1980 in the third edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-III). [*Id*. at 435] PTSD is a disability under the ADA. [*Id*.]

As an accommodation for Plaintiff's PTSD, Plaintiff was allowed to use a meditation room for up to fifteen minutes before the start of her shift. [Tr. 871, 873.] Plaintiff also was given a revised schedule to allow her to attend PTSD therapy appointments. [Tr. 227-28.] When Plaintiff punched in late after those appointments, Plaintiff did not incur any occurrences. [Tr. 640, 958.]

### E.    Attendance Issues and Termination

After Plaintiff returned from her tour of duty in 2010, she was issued a corrective action plan for being one minute late on October 29, 2010. [Tr. 866.] However, Plaintiff explained that she was unaware that the grace period had been eliminated. [211-2 (Pl.'s Ex. 95), at 2.] At trial, Plaintiff presented an email from Olin to Schroeder expressing some concern about disciplining Plaintiff for this tardy, stating:

> The only issue I have concern is the last tardy of one minute. Yes, she signed the form, but has been away from work for some time. Were the policies reviewed with her when she returned? I understand we enforce the rules completely and non-discriminatory, but I can see some outsider having a different view of this.

[211-2 (Pl.'s Ex. 95), at 1.] Ultimately, Plaintiff was not assessed an occurrence for her October 29, 2010 tardy. [Tr. 867.] On November 4, 2010, Plaintiff was given a copy of the Attendance Policy. [Tr. 867.]

On August 31, 2011, Plaintiff received a three-day suspension for accumulating a total of five occurrences in a six-month period, from October 19, 2010 through August 20, 2011 (excluding A&S, FMLA, and military leave). [211-16 (Def.'s Ex. 22).] Specifically, Plaintiff incurred one occurrence for being absent on October 19, 2010 for an undocumented family issue. [205-17 (Def.'s Ex. 15), at 3; Tr. 573.] Plaintiff also incurred half of an occurrence for being two minutes late on November 23, 2010, half of an occurrence for being ten minutes late on April 14, 2011,

half of an occurrence for being one minute late on May 10, 2011, half of an occurrence for being one minute late on May 12, 2011, half of an occurrence for being five minutes late on May 27, 2011, half of an occurrence for being one minute later on July 29 2011, half of an occurrence for being five minutes late on August 19, 2011, and half of an occurrence for being one minute late on August 20, 2011. [*Id.* at 1, 3.] Plaintiff earlier had received a verbal warning (Step 1) in connection with her unexcused absence on October 19, 2010 and a written warning (Step 2) in connection with her tardy on August 19, 2011. [*Id.*] Although Defendant used a look-back period of more than six months in disciplining Plaintiff, this was pursuant to the Attendance Policy, which did not include absences other than ETO vacation or scheduled holidays in calculating time periods under the Attendance Policy. [Tr. 582.]

Around this time, tensions between Plaintiff and her supervisors increased. Plaintiff started telling Schroeder and others that they were not following the law. [Tr. 608.] Plaintiff told Schroeder that she was afraid of him. [Tr. 608-09.] Although Schroeder denies that it ever happened, Plaintiff claimed that Schroeder cornered her in a room with no windows in it. [Tr. 609.] At some point, Plaintiff started parking behind the warehouse of the Joliet facility to access the meditation room that she was allowed to use before work. [Tr. 871.] On October 24, 2011, Schroeder sent an email to management instructing them not to park in the rear of the building. [225-10 (Pl.'s Ex. 226A).] In that email, Schroeder stated:

> [T]o avoid a charge of retaliation[,] I must first review this with legal. We cannot afford a circumstance where it is perceived that I am singling out [Plaintiff] when others in this facility have on occasion been allowed to do this.

[*Id.*] The email was marked "Read and Delete" and instructed recipients not to print the email. [*Id.*; Tr. 622-23.] At trial, Schroeder could not explain why he included this language. [Tr. 623.]

On October 27, 2011, Jankowski sent Schroeder an email stating:

9

> I was just informed that today when [Plaintiff] got to work, she parked in the first
> parking spot by the door, punched in, sped around to the back of the building (nearly
> hitting John Sarpalious) and parked by Door 24. After the 4:30 bell rang, she left
> Bernie's office, went back to her car, drove to the front, THEN went to the locker
> room to get her shoes and other work gear. So once again she is doing whatever
> suits her.

[225-10 (Pl.'s Ex. 226A).] At trial, Jankowski testified that she did not believe that there was a

prohibition against parking in the back at that time. [Tr. 382.] Temko testified that Schroeder

several times had told Temko and others not to park in the back and Temko stopped once so

directed. [Tr. 240.] Temko also explained that there were no parking spaces in the back and noted

that it was dangerous to park back there because of the 18-wheeler trucks that were in that area.

[*Id.*] Still, there was no evidence presented at trial indicating that Plaintiff previously had been

told not to park in the back.

On November 1, 2011, Plaintiff had a meeting with Schroeder and Plaintiff's supervisor

Patrick Dunn. At the meeting, Plaintiff was told that she could not park at that location because it

was a safety issue. [Tr. 871.] Plaintiff also was told that her use of the meditation room did not

negate Plaintiff's obligation to be prepared to start work when the bell rang. [Tr. 872; 205-22

(Def.'s Ex. 27).] After leaving the meeting, Plaintiff returned and asked Schroeder whether the

rule applied to all employees or just to Plaintiff. [Tr. 852.] According to Plaintiff's testimony,

Schroeder then stated that all of the supervisors knew of the rule, but that he hadn't yet

communicated the rule to all employees.[3] [*Id.*] This testimony was corroborated by an email sent

by Schroeder to management on November 3, 2011, stating:

> After the meeting [Plaintiff] returned to the office and made an inquiry "Are all the
> employees aware of the parking rule or am I singled out on this?["] My reply was
> that management is aware of this rule yet the hourly group is not yet[.] I plan to
> communicate this rule to all. Attached is the statement I plan to post.

---

[3] Plaintiff references Exhibit 227 in her briefing. Schroeder testified that the exhibit showed that a
supervisor was parking in the rear of the building. However, it is not clear from the record when the
photograph was taken.

[225-12 (Pl.'s Ex. 233), at 2.]

On November 2, 2011, Plaintiff again waited until the bell rang before leaving the meditation room. [Tr. 872.] Plaintiff then proceeded to her car parked in the south truck–trailer area of the facility property. [205-23 (Def.'s Ex. 31).] On November 3, 2011, Plaintiff was given a verbal warning for violating the start time rule on November 2, 2011. [*Id.*] At trial, Temko testified that the start time rule prohibits employees from being outside the building after the start bell rings. [Tr. 1048.] Plaintiff also was given half of an occurrence for her November 2, 2011 violation of the start time rule. [*Id.*] Plaintiff again left the building after the start bell on November 4, 2011. [205-24 (Def.'s Ex. 32).] This time, Plaintiff was given a written warning for violating the start time rule. [*Id.*] Plaintiff also was given another half of an occurrence for this violation. [*Id.*] The occurrence issued on November 4, 2011 resulted in Plaintiff having 5 occurrences over the preceding sixth-month period (as calculated under the Attendance Policy). [205-25 (Def.'s Ex. 35); 205-17 (Def.'s Ex. 15).] This resulted in Plaintiff's termination on November 8, 2011. [*Id.*]

On November 2, 2011, Plaintiff was in the meditation room for approximately 40 minutes when the start bell rang. [Tr. 873.] On November 4, 4011, Plaintiff was in the meditation room for approximately 25 minutes before the start bell rang. [Tr. 874.] Plaintiff testified that it never occurred to her to leave the meditation room five minutes earlier so that she could repark her car in the front of the building before the start bell rang. [Tr. 874.] Although Plaintiff punched in to work before going to the meditation room,[4] her attendance records were altered by Temko to reflect

---

[4] Plaintiff's opening brief in support of her motion to amend suggests a connection between Plaintiff's tardies and the bottleneck at the time clock. [204, at 17-19.] However, the testimony cited does not establish that Plaintiff ever received an occurrence because of any bottleneck. Nor does the testimony cited establish that other employees were violating the start time rule because of the bottleneck.

SA106

that she was three minutes late on November 2, 2011 and November 4, 2011 to account for the start rule violations. [Tr. 1080.] Temko acknowledged that Plaintiff punched in timely on November 2, 2011 and November 4, 2011. [Tr. 1080.] However, Plaintiff was marked tardy for violating the start time rule, which is independent of when an employee punches in. [*Id.*]

Plaintiff notes that she only was given a verbal warning and a written warning with respect to her start rule violations. [See 205-23 (Def.'s Ex. 31 (verbal warning)); 205-24 (Def.'s Ex. 32 (written warning)).] However, in those corrective action plans, Plaintiff was advised that she also was being assessed partial occurrences for each start rule violation. [*Id.*] Plaintiff already had been given a 3-day suspension—the third step in the disciplinary process—in relation to her attendance. [211-16 (Def.'s Ex. 22).]

Plaintiff also notes that other employees were allowed to punch in up to a half-hour early and then wait in the breakroom for the start bell. [Tr. 202.] However, because the employees were in the building ready to work, this would not be a violation of the start rule. Temko testified that the start rule requires employees to be in the building ready to work when the start bell rang. [Tr. 1048.]

It is undisputed that Plaintiff was not terminated for performance issues. Defendant contends that Plaintiff simply was terminated for violating the Attendance Policy. [205-25 (Def.'s Ex. 35; see also Tr. 499-500 (Schroeder testimony).]

## III. Defendant's Motion for Judgment as a Matter of Law

Defendant moves for judgment as a matter of law, arguing that Plaintiff failed to present evidence at trial that would allow a reasonable jury to find that Defendant in fact discriminated against Plaintiff based on her disability or military status. Defendant also argues that Plaintiff failed to present evidence of compensatory damages, punitive damages, or a willful violation of the USERRA.

SA107

### A.    Legal Standard

Pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, the Court is authorized "to enter judgment against a party who has been fully heard on an issue during a jury trial if 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011) (quoting Fed. R. Civ. P. 50(a)). "The law imposes a high standard for overturning a jury verdict." *Pierson v. HartleyEyeglasses*, 391 F.3d 898, 903 (7th Cir. 2004). Under this "stringent standard," the Court "must construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier-Bartels*, 634 F.3d at 376. "Although the court examines the evidence to determine whether the jury's verdict was based on that evidence, the court does not make credibility determinations or weigh the evidence." *Id*. In sum, the Court inquires "only whether the evidence, viewed in the light most favorable to [Plaintiff], was sufficient for a jury to find" Defendant liable. *Pierson*, 391 F.3d at 903.

### B.    Liability under the USERRA

"USERRA prohibits employment discrimination against members of the armed services." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 284 (7th Cir. 2015). It provides:

> A person who is a member of * * * a uniformed service shall not be denied * * * retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership.

38 U.S.C. § 4311(a). "The statute provides further that such discrimination exists where the employee's service membership was 'a motivating factor' in the employer's adverse action 'unless the employer can prove that the action would have been taken in the absence of such membership.'" *Arroyo*, 805 F.3d at 284 (quoting 38 U.S.C. § 4311(c)(1)). "This provision creates a two-step burden-shifting scheme: (1) once a plaintiff makes out a *prima facie* case by showing

13

that his membership was 'a motivating factor,' (2) the burden shifts to the employer to prove that it would have taken the same action regardless." *Id*. (citing *Crews v. City of Mt. Vernon,* 567 F.3d 860, 864 (7th Cir. 2009)).

In this case, the jury found that Plaintiff proved by a preponderance of the evidence that her service was a motivating factor in her termination. [204-2, at 3.] The burden therefore shifted to Defendant to prove that they would have taken the same action regardless. On that issue, the jury concluded that Defendant failed to make such a showing by a preponderance of the evidence. [*Id*.] Defendant argues that the jury's decisions at both stages of the analysis were not supported by the evidence.

### 1.  *Discriminatory Animus*

According to Defendant, the evidence presented at trial establishes as a matter of law that Defendant was not motivated by military service animus in terminating Plaintiff's employment. In order to establish her USERRA claim, Plaintiff had to present evidence sufficient to establish that her military service was a "motivating factor" in the adverse employment action at issue— here, Defendant's decision to terminate Plaintiff's employment in November 2011. See *Crews v. City of Mt. Vernon*, 567 F.3d 860, 864 (7th Cir. 2009).

The Seventh Circuit previously concluded that—based on the evidence identified at summary judgment—"a reasonable jury could infer that [Defendant] was motivated, at least in part, by anti-military animus toward [Plaintiff]." [110, at 11.] In reaching that conclusion, the Seventh Circuit noted that Plaintiff presented evidence indicating that "her supervisors disliked the burden her frequent military leave placed on the company" from "the beginning of her employment." [110, at 11.] Plaintiff presented the same and/or similar evidence to the jury. [See,

14

e.g., 205-1 (Pl.'s Ex. 19); 205-2 (Pl.'s Ex. 20); 205-3 (Pl.'s Ex. 21); 205-4 (Pl.'s Ex. 22); 205-6

(Pl.'s Ex. 24); 205-7 (Pl.'s Ex. 25); 205-8 (Pl.'s Ex. 32); 205-9 (Pl.'s Ex. 50).]

For example, Plaintiff presented emails indicating that Temko was frustrated by Plaintiff

taking time off before and after military drills to travel to and from Fort Benning, Georgia, where

Plaintiff's unit was based.  Temko questioned Plaintiff about why she needed the additional travel

time.  [205-1 (Pl.'s Ex. 19), at 2.]  Temko also emailed Schroeder to ask whether Defendant was

required to provide this time for travel.  [205-3 (Pl.'s Ex. 21), at 1-2.]  Schroeder forwarded the

inquiry to Olin, stating "I find myself with a dilemma if I were to discipline a person for taking

too much time off for military reserve duty * * * I certainly give her credit for serving our country

but of course I am also responsible for our business needs."  [*Id.* at 1.]

On October 28, Olin responded to an earlier email from Schroeder discussing various legal

authorities relating to USERRA provided by Plaintiff, stating:

> First, we do not have to grant time off for [Plaintiff's] travel time.  Her legal
> obligation is 2 weeks per year, which we do give off, and 1 weekend per month.
> The drills she attended were most likely extra training, which we do not have to
> grant the time.  We do not have to give extra time for her travel to and from her
> weekend duty.  She does have the option to transfer to a closer unit, we cannot make
> her transfer.

[205-4 (Pl.'s Ex. 22), at 1.]  Schroeder forwarded the email to Temko, predicting "[Plaintiff] will

challenge us."  [*Id.*]  However, after doing additional research, Jarvis concluded that the law treats

voluntary and involuntary orders the same, and Plaintiff was entitled to travel time plus an eight-

hour rest period following her drill before having to report to work.  [205-7 (Pl.'s Ex. 25), at 1.][5]

Plaintiff also presented emails in which supervisors complained about a lack of communication

from Plaintiff regarding her military leave.  [205-1 (Pl.'s Ex. 19), at 2 (Temko); 205-9 (Pl.'s

---

[5] Although this docket entry is difficult to read, a more legible version of the same document is on the
docket elsewhere.  [See 78-3.]

Ex. 50), at 1 (Schroeder).]  Looking at this evidence on Plaintiff's motion for summary judgment, the Seventh Circuit concluded that "[a] jury could understandably detect in these communications animus toward [Plaintiff's] military service."  [110, at 11.]

Although the Seventh Circuit decision relied on the no longer applicable "convincing mosaic" standard, Defendant has not cited to any cases indicating that this means that the Seventh Circuit's substantive conclusion no longer applies.  In fact, although the Seventh Circuit abandoned the convincing mosaic legal standard in *Ortiz v. Warner Enterprises, Inc.*, the Seventh Circuit expressly stated that it was not holding that prior cases applying that standard were "wrongly decided."  834 F.3d 760, 765 (7th Cir. 2016).  Rather, the Seventh Circuit stated that "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself."  *Id*.  While courts in the Seventh Circuit now look at direct and indirect evidence of discrimination together, the Seventh Circuit previously concluded that Plaintiff identified sufficient evidence to establish that Defendant acted with a discriminatory animus under the direct method of proof.  [110, at 14-15.]  The Court sees no reason why such evidence also would not support a finding of discriminatory animus under the approach set forth in *Ortiz*.

Defendant argues that the emails presented at trial are insufficient to support an inference of discrimination under the USERRA because they were not made around the time of the decision.  Although many of the arguably discriminatory emails presented at trial were sent years before the adverse employment action at issue, Plaintiff's evidence was not limited to those emails.  Plaintiff presented an email from Schroeder dated November 8, 2011—the date Plaintiff was terminated— stating that Plaintiff "clearly shows her intent to do everything possible to delay and waste company time."  [211-10 (Pl.'s Ex. 245), at 1.]  In that email, Schroeder goes on to say:

16

> Also of importance is the fact that never once has [Plaintiff] cooperated or offered any compromise or leniency to the company in any situation unless we agree to her terms. The best example of this is the ESGR case.

[*Id*.]  At trial, Schroeder admitted that "there was some level of frustration" with Plaintiff. [Tr. 762-65.]  Furthermore, the jury may have taken Schroeder's efforts to stop vehicles from parking behind the facility once he learned that Plaintiff was parking behind the facility as evidence that his animus toward Plaintiff's military service continued.

Plaintiff also presented an email from Jankowski stating that Plaintiff was "becoming a pain" after Plaintiff forwarded Jankowski materials regarding Defendant's obligations under USERRA. [211-3 (Pl.'s Ex. 107).]  Defendant argues that this email should be disregarded because Jankowski was not a decision maker.  However, Jankowski was Plaintiff's supervisor.  As the Court previously stated on the record, Jankowski's statements must be considered as evidence of animus under the law of the case.  [See Tr. 1130-32 (discussing the Seventh Circuit's decision).]  Accordingly, although Plaintiff's case is by no means overwhelming or even strong, the Court concludes that the jury did have a legally sufficient evidentiary basis to find animus toward Plaintiff's military service.

### 2.  *Volvo's Affirmative Defense*

Defendant argues that it has established as a matter of law that it would have terminated Plaintiff regardless of her military service, which is an affirmative defense under the USERRA. 38 U.S.C.A. § 4311(c)(1).  During her employment with Defendant, Plaintiff was subject to Defendant's Attendance Policy, which was administered by Schroeder and Temko.  Under the Attendance Policy, when an employee was late or absent without providing the required documentation, the employee was issued an "occurrence."  The value of the occurrence depended on the amount of time that the employee is not at work.  During the time period when Plaintiff was

SA112

issued the occurrences that led to her termination, an employee would receive half of an occurrence for missing an hour or less of work. [Tr. 1012; 205-15 (Def.'s Ex. 11), at 3.] An employee would receive three-quarters of an occurrence for missing more than one hour but less than four hours of work. [*Id*.] Finally, an employee would receive a full occurrence for missing four hours or more of work. [*Id*.] The accrual of occurrences resulted in discipline. [*Id*. at 1013.] When an employee was issued an occurrence, Defendant looked back to see whether the employee had a total of two occurrences in one month or a total of five occurrences in six months. [*Id*. at 1014.] If so, the employee would be issued a disciplinary step. [*Id*. at 1015.] Pursuant to the Attendance Policy, corrective action would be taken if an employee had a total of two occurrences within a four-week period or a total of five occurrence points within a six-month period. [205-15 (Def.'s Ex. 11), at 3.] The four disciplinary steps under the Attendance Policy were: (1) Verbal Warning, (2) Formal Written Warning, (3) Three-Day Suspension, and (4) Termination. [*Id*. at 4.] If an employee went six months without an additional disciplinary step, the employee would go back a step. [Tr. 1015-16.]

Defendant argues that it established its affirmative defense as a matter of law by showing that the Attendance Policy uniformly was enforced. Defendant further notes that—to the extent any discretion was used in the enforcement of the Attendance Policy against Plaintiff—Defendant exercised its discretion to help Plaintiff avoid discipline. For example, Defendant gave Plaintiff the benefit of the doubt regarding her contention that she was unaware that the two-minute grace period had been eliminated and did not count her tardy on October 29, 2010 against her for that reason. [Tr. 709-12; 205-17 (Def.'s Ex. 15).] Defendant updated Plaintiff's attendance records in September 2011 to excuse her absence on December 23, 2010. [Tr. 1045-47; 205-21 (Def.'s Ex. 24).] Plaintiff did not receive occurrences for being tardy for days on which she had PTSD

therapy appointments. [Tr. 227-31, 639-42, 864, 958.] Finally, Defendant warned Plaintiff on November 1, 2011 that she was expected to be in the building and ready to begin work at the shift start bell and did not issue Plaintiff any occurrence for any start rule violations occurring before that warning. [Tr. 724-32, 964-66; 205-17 (Def.'s Ex. 15); 205-22 (Def.'s Ex. 27); 205-23 (Def.'s Ex. 31); 205-24 (Def.'s Ex. 32).]

Plaintiff responds that a reasonable jury could find that Defendant did not establish its affirmative defense because Defendant did not enforce its policy against Plaintiff evenly or at all before Plaintiff's military service. In support of that argument, Plaintiff cites to the fact that Plaintiff incurred seven attendance infractions as a probationary employee from June 2005 through August 2005 but did not received any disciplinary steps during that time. [209, 38-39.] Applying the policy that Defendant relied upon to discipline Plaintiff in 2010 and 2011, Plaintiff should have been given a disciplinary step. However, Defendant notes that—under the local attendance policy in effect in 2005—each instance of tardiness between three minutes and 59 minutes was worth less of a fractional occurrence than under the version of the policy in effect during 2010 and 2011. And, as discussed above, Defendant had a two-minute grace period that was eliminated in 2008. Thus, Plaintiff was not assessed a step for her seven attendance infractions as a probationary employee from June 2005 through August 2005. [Tr. 1026.]

Still, at the summary judgment stage, the Seventh Circuit concluded that Defendant had not presented sufficient evidence to establish as a matter of law that it necessarily would have terminated Plaintiff for her tardiness. [110, at 13-14.] Although Defendant argued that it was entitled to judgment as a matter of law based on the examples of other employees who were issued occurrences for minor tardiness, the Seventh Circuit found that kind of evidence insufficient for Defendant to satisfy its burden as a matter of law. The Court recognizes that the Seventh Circuit

19

only discussed a few of the comparators identified by Defendant, including only one comparator who was terminated because he was a few minutes late (in addition to other attendance infractions). However, many more comparators were in the record before the Seventh Circuit. Indeed, the two additional comparators discussed by Defendant—Scotty Senephimmachac and Sam Zweig—also were before the Seventh Circuit. [77-5, at 101-06, 111-122.] The Court assumes that the Seventh Circuit considered all of the evidence before it, given its detailed review of the record. Furthermore, Defendant does not identify any employee other than Plaintiff who was disciplined for a start rule violation. Accordingly, the Court concludes that Defendant has not established its affirmative defense as a matter of law.

### 3. Damages - Willfulness

Finally, Defendant argues that Plaintiff failed to show that Defendant's decision to terminate her employment was a willful violation of USERRA. In order to recover liquidated damages under USERRA, Plaintiff must show that her "employer's failure to comply with the provisions of this chapter was willful." 38 U.S.C. § 4323(d)(1)(C). Although there is limited authority on what the term "willful" means under USERRA, the Supreme Court has held that a violation of the ADEA "is 'willful' if 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.'" *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985) (citation omitted). Because Plaintiff has not identified an alternative standard for analyzing willfulness, the Court here will look to the standard for establishing willfulness under the ADEA. In order to establish willfulness, "[a] plaintiff does not need to show that the employer's conduct was 'outrageous,' nor does [s]he need to provide direct evidence of the employer's motives." *E.E.O.C. v. Bd. of Regents of Univ. of Wisconsin Sys.*, 288

SA115

F.3d 296, 304 (7th Cir. 2002) (quoting *Mathis v. Phillips Chevrolet, Inc.*, 269 F.3d 771 (7th Cir. 2001)).

Defendant notes that Plaintiff did not ask any questions at trial pertaining to Defendant's knowledge of USERRA with respect to its decision to terminate Plaintiff's employment. However, Plaintiff presented significant evidence showing that Defendant was on notice of the terms of USERRA and did investigate its obligations under USERRA. The Court recognizes that knowledge of the potential application of a statute alone is not sufficient to establish willfulness. See *Trans World Airlines, Inc.*, 469 U.S. at 127 ("We are unpersuaded by respondents' argument that a violation of the Act is 'willful' if the employer simply knew of the potential applicability of the ADEA."). However, Plaintiff's theory of the case is that her military service was a motivating factor in her termination. That theory was credited by the jury. Defendant's decision makers either knew this was a violation of USERRA or showed reckless disregard for the matter of whether its conduct was prohibited by USERRA. Accordingly, the Court denies Defendant's motion for judgment as a matter of law on Plaintiff's USERRA claim.

### C.    Liability under the ADA

"To establish a violation of the ADA, an employee must show '1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation.'" *Winsley v. Cook Cty.*,

563 F.3d 598, 603 (7th Cir. 2009) (quoting *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000)).

       *1.    Qualified Individual*

       "The ADA proscribes discrimination against only 'qualified individual[s] with a disability.'" *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996) (citing 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.4; 29 C.F.R. app. § 1630.9). "No matter the type of discrimination alleged-either disparate treatment or failure to provide a reasonable accommodation—a plaintiff must establish first that [she] was 'a qualified individual with a disability.'" *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997) (quoting *Bombard*, 92 F.3d at 563). An employee must "pass a two-step test" to be "a qualified individual." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). "First, the individual must satisfy 'the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.'" *Id.* (quoting 29 C.F.R. app. § 1630.2(m)). "Second, the individual must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodation.'" *Id.* (quoting 29 C.F.R. app. § 1630.2(m)). "[T]he burden of proof on the issue of capability is not on the employer but on the plaintiff." *Miller v. Ill. Dept. of Corrs.*, 107 F.3d 483, 484 (7th Cir. 1997). To satisfy this burden, Plaintiff had to present evidence that she "was 'willing and able to demonstrate these skills by coming to work on a regular basis.'" *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998).

       The Seventh Circuit has "repeatedly held that an employee who does not come to work cannot perform the essential functions of his job." *Fogle v. Ispat Inland, Inc.*, 32 Fed. App'x 155, 157-58 (7th Cir. 2002); accord *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003);

*Amadio v. Ford Motor Co.*, 238 F.3d 919, 927-28 (7th Cir. 2001); *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899-900 (7th Cir. 2000); *Waggoner v. Olin Corp.*, 169 F.3d 481, 483 (7th Cir. 1999). Consistent with these cases, this Court previously concluded that Plaintiff was not a qualified individual because of her unexcused tardies and absences. [88, at 22-24.] That part of the Court's decision was left undisturbed by the Seventh Circuit. [110, at 14 n. 2.]

The evidence presented at trial was consistent with the forecast of evidence at summary judgment on this point. The Attendance Policy required employees to be "in the building and ready to work at the scheduled start time and continue to work until the scheduled hours of work are completed." [205-15 (Def.'s Ex. 11), at 1.] Plaintiff was not complying with this policy. Plaintiff testified that she would punch in before going to the meditation room. She would stay in the meditation room until the shift start bell rang. It was only then that she would walk back to her car, drive around the side of the building to repark her car, and then reenter the facility. Plaintiff testified that it never occurred to her to leave the meditation room five minutes earlier to give herself enough time to complete these tasks before the start bell rang.

Plaintiff argues that the parties' stipulation that PTSD is a disability under the ADA establishes that Plaintiff—who suffered from PTSD—was a qualified individual. However, whether a person has a disability under the ADA and whether a person is a qualified individual under the ADA are different questions. Under the ADA, a person can have a disability yet not be a qualified individual. *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005) ("[T]he ADA does not shelter disabled individuals from adverse employment actions if the individual, *for reasons unrelated to his disability* (such as a poor work ethic, carelessness, bad attitude, insubordination or unprofessional demeanor), is *not qualified* for the job or is *unable to*

23

*perform* the job's essential functions or fulfill the requirements of the position as prescribed by the employer or "fails to meet his employer's expectations.'" (citations omitted)).

Plaintiff also argues that the evidence presented at trial supports the conclusion that she was a qualified individual under the ADA, citing evidence indicating that—putting aside her attendance issues—Defendant's management was satisfied with Plaintiff's performance. Schroeder indicated that Plaintiff was not terminated for performance issues, for disobedience, or for disrespecting authority; she was terminated only because of her attendance. [Tr. 499-500.] During the time period Temko supervised Plaintiff—from 2005 through 2008—Temko gave Plaintiff grades of "very good" and he meant that as a compliment. [Tr. 182-95.] Jankowski testified that "there were no issues" with Plaintiff's performance while Plaintiff was supervised by Jankowski. [*Id.* at 316.] Jankowski never told Plaintiff that she was not putting in enough work. However, "[a]n evaluation of the quality of [Plaintiff's] performance does not end [the] inquiry. In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis." *Waggoner*, 169 F.3d at 485 (quoting *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994)) (internal quotation marks omitted). Plaintiff was not doing so here.

Plaintiff further contends that it was Defendant's duty to make Plaintiff a qualified employee under the USERRA. Section 4313(a)(3) of the USERRA provides:

> In the case of a person who has a disability incurred in, or aggravated during, such service, and who (after reasonable efforts by the employer to accommodate the disability) is not qualified due to such disability to be employed in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service— (A) in any other position which is equivalent in seniority, status, and pay, the duties of which the person is qualified to perform or would become qualified to perform with reasonable efforts by the employer; or (B) if not employed under subparagraph (A), in a position which is the nearest approximation to a position

24

referred to in subparagraph (A) in terms of seniority, status, and pay consistent with circumstances of such person's case.

Furthermore, Section 4313(a)(4) of the USERRA provides:

In the case of a person who (A) is not qualified to be employed in (i) the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or (ii) in the position of employment in which such person was employed on the date of the commencement of the service in the uniformed services for any reason (other than disability incurred in, or aggravated during, service in the uniformed services), and (B) cannot become qualified with reasonable efforts by the employer, in any other position which is the nearest approximation to a position referred to first in clause (A)(i) and then in clause (A)(ii) which such person is qualified to perform, with full seniority.

According to Plaintiff, under these two provisions, Defendant had a duty to place Plaintiff in another position or train Plaintiff to be qualified for the position she held. However, Plaintiff does not cite to any cases indicating that a violation of these provisions could serve as a basis for establishing the "qualified individual" element of an ADA claim.[6]

Finally, Plaintiff argues that she actually was complying with the Attendance Policy because whether an employee was tardy depended on the when the employee punched in. Because Plaintiff punched in early on November 2 and November 4, 2011, Plaintiff contends she was not tardy. [217, at 3.] However, the Attendance Policy required that employees be "in the building and ready to work at the scheduled start time and continue to work until the scheduled hours of work are completed." [205-15 (Def.'s Ex. 11), at 1.] Plaintiff does not explain how the evidence presented at trial could support the conclusion that she was complying with that requirement. As the Court noted in its previous decision:

---

[6] Plaintiff asserts that Plaintiff's status as a qualified individual was never challenged before trial and that Plaintiff therefore should be permitted to invoke USERRA's reemployment provisions in her post-trial motions. [217, at 4-5.] However, Defendant did raise a challenge to Plaintiff's status as a qualified individual under the ADA on summary judgment. [76, at 5.] In any event, Plaintiff independently could have brought a reemployment claim under USERRA if the facts supported such a cause of action. Plaintiff did not do so and cannot now raise such a claim in her post-trial briefs.

25

> Arroyo relies on this distinction without addressing the undisputed evidence that Volvo determined that she started her shift late on November 4, 2011, *despite having punched in timely*. This is because Arroyo would punch in prior to going to the meditation room (provided to her as an accommodation), stay in the [meditation] room until the shift start bell rang, then leave the room, walk to her car, drive around the side of the building to re-park her car, and then reenter the warehouse. Under any definition of being "in the building and ready to work at the scheduled start time," this would not suffice.

[88, at 23.] This portion of the Court's decision was affirmed by the Seventh Circuit. [110, at 14 n.2.] Furthermore, even though Plaintiff punched in early on November 2 and November 4, 2011, and even though Plaintiff was in the building when the start bell rang, she does not contest that she subsequently left the building. In short, the evidence at trial undisputedly showed that Plaintiff was not a qualified individual at the time of her termination on November 4, 2011. See *Moore-Fotso v. Bd. of Educ. of the City of Chicago*, 211 F. Supp. 3d 1012, 1025-28 (N.D. Ill. 2016) (reasoning that plaintiff failed to show she was a "qualified individual" at the time of her termination based on her numerous absences and tardies). The Court therefore grants Defendant judgment as a matter of law on Plaintiff's ADA discrimination claim.

### 2. Discriminatory Animus

Defendant also argues that it is entitled to judgment as a matter of law on Plaintiff's ADA claim because—according to Defendant—the trial evidence showed that Defendant was not motivated by disability-based animus in terminating Plaintiff's employment. Because the Court concludes that Plaintiff failed to establish that she was a qualified individual with a disability, the Court need not reach the merits of her discrimination claim. *Moore-Fotso*, 211 F. Supp. 3d at 1028 ("Because Plaintiff fails to establish that she is a qualified individual within the meaning of the ADA, the Court need not address the merits of her failure to accommodate claim.").

### 3. Compensatory Damages Under the ADA

26

Defendant also moves for judgment as a matter of law on the issue of compensatory damages under the ADA. The Court instructed the jury that they "may award compensatory damages only for injuries that Plaintiff * * * has proved by a preponderance of the evidence were caused by Defendant Volvo Trucks' wrongful conduct." [156 (Jury Instructions), at 22.] The Court further instructed the jury that the award "must be based on evidence and not speculation or guesswork." However, the jury was instructed that it "should not consider the issue of lost wages and benefits," which the Court independently would calculate. [*Id.*] Thus, the jury was left to consider compensatory damages such as "the physical, mental, and emotional pain and suffering that Plaintiff" had experienced and "the reasonable value of medical care that Plaintiff" reasonably needed and actually received. [*Id.*]

The jury awarded Plaintiff $2.6 million in compensatory damages on her ADA discrimination claim. [161 (Verdict Form), at 2.] However, Defendant moves for judgment as a matter of law on compensatory damages under the ADA, arguing that Plaintiff failed to present any evidence of emotional stress or other compensatory damages *stemming from her termination*. Plaintiff argues that the following evidence supports the jury's award of compensatory damages:

- A December 2010 email sent by Plaintiff regarding her hospitalization.

- The parties' stipulation describing PTDS and advising that Plaintiff was treated for PTSD in December 2010 and was formally diagnosed with PTSD in January 2011.

- Plaintiff's email describing Schroeder's threatening behavior toward Plaintiff.

- Plaintiff's email begging Volvo BP Dennis Scholl to investigate her claim that Schroeder had threatened her and was plotting to terminate her employment.

- An email from Scholl to Plaintiff promising that an investigation would be done.

27

- Testimony by Schroeder that Plaintiff contends establishes that he never was investigated regarding Plaintiff's allegations.

However, because all of this occurred *before Plaintiff was terminated*, this evidence could not serve as a basis for compensatory damages resulting from the termination of Plaintiff's employment—which is the only adverse employment action upon which Plaintiff was allowed to proceed on her ADA.

This issue first surfaced during the trial. After Plaintiff rested on Friday afternoon, Defendant noted that Plaintiff failed to present any evidence of compensatory damages. After considering the evidence presented by Plaintiff, the Court sent the following email to the parties over the weekend:

> I do not think it unreasonable to allow Plaintiff to reopen her case-in-chief to briefly present her own testimony in support of what I think counsel called a routine or "garden-variety" claim of emotional pain and suffering on account of the termination. I don't perceive any substantial prejudice to the Defendant if such brief testimony were allowed. If the argument is that there may have been other causes for the Plaintiff's emotional state at the time of her termination, the Plaintiff's own testimony yesterday provided ample support for Defendant to make that point. In fact, the cross-examination on Friday already picked up on the point.

[155-1, at 15.] Counsel for Defendant strongly objected to this offer and asked to be heard in court first thing when Court resumed the following Monday. [*Id*. at 19.] The issue was rendered moot when counsel for Plaintiff sent the Court and Defendant the following response:

> I also do not believe that plaintiff has to re-open her case at all. I believe that the kinds of compensatory damages for physical pain and suffering and garden variety emotional distress have been sufficiently set forth in Plaintiff's Case in Chief before we rested. I am satisfied that we have sufficient evidence in the record for plaintiff to argue this issue.

[*Id*. at 35.] Although Plaintiff purported to identify evidence of compensatory damages, the evidence identified by Plaintiff all predated Plaintiff's termination. [*Id*. at 45.]

28

In response to the questions posed by the Court during the post-trial phase of the case, Plaintiff's counsel was again given the opportunity to identify what evidence of compensatory damages she presented at trial. At that time, Plaintiff noted that "the financial harm her termination caused dealt with wages" and that "wages were not an issue for the jury." [217, at 10.] Implicitly recognizing that she did not put in evidence of compensatory damages resulting from her termination, Plaintiff also asserts that the jury's compensatory damages award should nonetheless stand because "the jury reasonably could infer" that Plaintiff's termination "led to considerable injury." However, the jury's verdict cannot be based on pure speculation. *Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1176 (7th Cir. 2008) ("We agree with the district court that the jury's damages award must be set aside because it was based on nothing but speculation."). Thus, even if the Court were not granting Defendant judgment as a matter of law on Plaintiff's ADA discrimination claim, the Court would grant Defendant judgment as a matter of law on the issue of compensatory damages.[7]

## IV. Defendant's Motion for a New Trial

### A. Legal Standard

Rule 59(a)(1)(A) authorizes the Court to order a new trial as to some or all issues that were tried to a jury. See Fed. R. Civ. P. 59(a)(1)(A). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). "A new trial should be granted, however, 'only when the record shows that the jury's verdict resulted in a miscarriage of justice

---

[7] The Court notes that—if it were not granting Defendant's motion for judgment as a matter of law on Plaintiff's entire ADA discrimination claim—it would be necessary to revisit the issue of punitive damages, which the Court vacated because of the ADA's statutory damages cap. [177, at 8-9.] Because the Court is granting Defendant judgment as a matter of law on Plaintiff's entire ADA discrimination claim, however, the Court need not do so here.

or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (quoting *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011)).  In determining whether a new trial is warranted, the Court "view[s] the evidence in the light most favorable to the prevailing party, leaving issues of credibility and weight of evidence to the jury." *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 444-45 (7th Cir. 2009).

"The ruling on a motion for a new trial is a matter committed to the district court's discretion." *Galvan v. Norberg*, 678 F.3d 581, 588 (7th Cir. 2012).  The appellate court reviews the district court's decision to grant or deny a new trial for an abuse of discretion, unless the district court's decision is based on a question of law, in which case it is reviewed *de novo*.  See *Wright v. Illinois Dep't of Children and Family Services*, 798 F.3d 513, 527 (7th Cir. 2015).  Still, "[t]he Seventh Circuit has cautioned that while the district court judge 'has a responsibility for the result [of the trial] no less than the jury, he should not set the verdict aside as against the weight of the evidence merely because, if he had acted as trier of the fact, he would have reached a different result; and in that sense he does not act as a 13th juror in approving or disapproving the verdict.'" *U.S. Data Corp. v. RealSource, Inc.*, 2014 WL 3639118, at *4 (N.D. Ill. July 23, 2014) (quoting *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995)).

## B.      Product of Passion and Prejudice

Defendant moves for a new trial based on the jury's damages award on Plaintiff's ADA claim and the jury's finding of willfulness under USERRA.  According to Defendant, these findings of the jury are wholly unsupported by the evidence—and with respect to the damages award, so monstrously excessive—that a new trial on both liability and damages is necessary.  As noted above, a motion for a new trial is governed by Rule 59(a), which directs that "[a] new trial

is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014).

With respect to Defendant's argument regarding willfulness under USERRA, for the reasons discussed above, the Court concludes that jury's finding was supported by the evidence. That being said, the Court agrees that the jury's award of $2.6 million in compensatory damages was not at all supported by the evidence. For the reasons discussed above, the Court is granting Defendant's motion for judgment as a matter of law on Plaintiff's ADA claim. However, the jury's damages award on that claim raises significant concerns about the soundness of the jury's verdict. "In deciding whether a damages award is excessive" such that a new trial or remittitur is appropriate, three factors guide the Court's "analysis: 'whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases.'" *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) (quoting *G.G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011)). The Seventh Circuit has "observed that the 'monstrously excessive' standard and the 'rational connection' standard are really just two ways of describing the same inquiry: whether the jury verdict was irrational." *Id.* (citing *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 713-14 (7th Cir. 2004); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 n. 13 (7th Cir. 1995)). "In deference to the jury's role as the trier of fact, this Court reviews the record as a whole and takes the evidence in the light most favorable to the jury's verdict." *Id.* "In order to determine whether the jury's verdict was irrational, the [Court] must review the trial record as a whole in the light most favorable to the verdict." *Id.* In other words, the issue before the Court is whether the

jury's verdict was "rationally related" to the challenged conduct. *Id*. The Court cannot say so with respect to the jury's damages award on Plaintiff's ADA discrimination claim.

As discussed above, Plaintiff failed to present any evidence on compensatory damages supporting her ADA discrimination claim. Yet the jury awarded Plaintiff $2.6 million in compensatory damages alone.[8] This amount dwarfs the amount of compensatory damages awarded in cases in which the plaintiff actually presented evidence of compensatory damages. See *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 834 (7th Cir. 2013) (discussing compensatory damage awards ranging from $75,000 to $250,000 in more extreme cases). Plaintiff herself only asked that the jury to award her $1 million dollars total. Yet the jury awarded her nearly eight times that amount (and 2.6 times that amount in compensatory damages alone). Given the complete lack of evidence on compensatory damages and the much smaller compensatory damage awards in cases with actual evidence of harm, the Court concludes that the jury's verdict was not rationally related to the evidence presented at trial.

In fact, given both (1) the complete lack of evidence on the issue and (2) the size of the verdict on compensatory damages—having viewed all the evidence presented at trial—the Court concludes that the verdict was irrational. See *Dossett v. First State Bank*, 399 F.3d 940, 945 (8th Cir. 2005) (affirming decision granting a new trial *sua sponte* based on an award of $1.5 million in damages when the plaintiff's attorney only requested $500,000 in damages). The Court recognizes that the Seventh Circuit has expressed skepticism of the proposition that irrationality (or, put another way, passion and prejudice) may be inferred from the size of the award alone. *Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1448 (7th Cir. 1992).

---

[8] Although the Court reduced the $7.8 million award for Plaintiff's discrimination claim because of the statutory damages cap (42 U.S.C. § 1981a(b)(3)), the Court looks to the actual amount awarded by the jury when considering whether an award is either monstrous or irrational because it is that amount the provides the best indication of whether the jury acted with passion and prejudice.

SA127

But here, it is not just the size of the award the supports the inference of prejudice; it is the fact that the award of compensatory damages is not supported by any evidence. This—in conjunction with the size of the award—supports the conclusion that the jury's verdict was improper. "Unquestionably, a new trial, and not remittitur, is required when an award is the result of passion and prejudice, because the prejudice may have infected the verdict itself." *Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1448 (7th Cir. 1992) (citations omitted); see also *Dorin v. Equitable Life Assurance Society*, 382 F.2d 73, 77 (7th Cir. 1967) ("If a verdict is the result of appeals to passion and prejudice, the trial court must unconditionally order a new trial and cannot give the plaintiff an option to accept a lesser amount."); 11 Wright and Miller, FED. PRAC. & PROC. CIV. § 2815 (3d ed.) ("It is not proper to use [remittitur] if the verdict was the result of passion and prejudice, since prejudice may have infected the decision of the jury on liability, as well as on damages. In those instances a complete new trial is required."). However, as discussed above, the Court already is granting Defendant's motion for judgment as a matter of law on Plaintiff's ADA claim.

Still, the Court must determine whether the jury's passion and prejudice affected other aspects of the verdict that still stand. The Court may order a partial new trial only if "it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931). Where a jury's damages award is the product of passion and prejudice and/or is grossly excessive, a new trial should be granted on both liability and damages. *Ustrak v. Fairman*, 781 F.2d 573, 579-80 (7th Cir. 1986) (noting in dicta that "[t]he damages awarded by the jury * * * were so extraordinary as to suggest that not only the jury's assessment of damages but also its assessment of liability may have been tainted by 'passion and prejudice,' thereby requiring that

33

the entire verdict, and not merely the damages part of it, be set aside" (citations omitted)); *Cont'l Cas. Co. v. Howard*, 775 F.2d 876, 883 (7th Cir. 1985) ("When the question of damages 'is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty' granting a partial trial on the issue of damages would amount to a denial of a fair trial.") (quoting *Gasoline Products Co.*, 283 U.S. at 500-01 (1931)); *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 955 (7th Cir. 2018) (indicating that a new trial may be granted on both liability and damages if the jury's damages analysis was based on "passion or prejudice or otherwise disobeyed the district court's instructions"); *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1145 (7th Cir. 1985); *Benson v. Allphin*, 786 F.2d 268, 280 (7th Cir. 1986); see also *Dossett v. First State Bank*, 399 F.3d 940, 946-47 (8th Cir. 2005) ("It is 'generally inappropriate,' however, to order only a partial new trial on the issue of damages when the district court concludes the damages award was motivated by passion and prejudice." (quoting *Sanford v. Crittenden Mem'l Hosp.*, 141 F.3d 882, 885 (8th Cir. 1998))); *Sharkey v. J.P. Morgan Chase & Co.*, 2018 WL 1229831, at *7 (S.D.N.Y. Mar. 5, 2018) ("In the event the jury's verdict was the result of passion or prejudice, the whole matter must be retried, as the prejudice that infected one aspect of the verdict may have affected the remainder of the verdict as well." (citing *Wagenmann v. Adams*, 829 F.2d 196, 216-17 (1st Cir. 1987)).

Here, the question is whether a new trial on Plaintiff's USERRA claim is warranted because of the jury's grossly excessive and irrational verdict on Plaintiff's ADA claim. And, based on the foregoing discussion, the answer to that question is yes.[9]

---

[9] If the Court were not granting judgment as a matter of law on Plaintiff's ADA claim, the Court would order a new trial on Plaintiff's ADA claim on that basis. In that case, the Court would conclude that a new trial on Plaintiff's USERRA claim also is warranted, as it is not clear that the issues to be retried in the ADA claim are so distinct and separable that a trial on the ADA claim alone may be held without injustice. Plaintiff relies on much of the same evidence in support of both claims. Indeed, both claims are predicated on the termination of Plaintiff's employment and Defendant's actions leading up to that event. Where

34

### B.     Manifest Weight of the Evidence

Defendant also argues that the Court should grant its motion for a new trial because the jury's verdict was against the manifest weight of the evidence. "When considering whether the verdict was against the manifest weight of the evidence, 'the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial.'" *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (quoting *Mejia v. Cook Cty., Ill.*, 650 F.3d 631, 633 (7th Cir. 2011)). "Additionally, the evidence must be weighed neutrally, rather than in a light favorable to the non-movant." *Stragapede v. City of Evanston*, 2016 WL 278854, at *10 (N.D. Ill. Jan. 22, 2016), aff'd sub nom. *Stragapede v. City of Evanston, Ill.*, 865 F.3d 861 (7th Cir. 2017), as amended (Aug. 8, 2017). "In conducting its own assessment of the evidence presented, the district court cannot remove a piece of evidence from the calculus merely because the court believes it was not credible and then, with that piece excluded, grant a motion for a new trial because the verdict is now against the weight." *Mejia*, 650 F.3d at 633. The Court is "bound by the same evidence the jury considered in ruling on the motion for new trial." *Whitehead*, 680 F.3d at 928 (citing *Mejia*, 650 F.3d at 633). "[A] court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict." *Marcus & Millichap Inv. Servs. of Chi., Inc. v. Sekulovski*, 639 F.3d 301, 313-14 (7th Cir. 2011) (quotations omitted); see also *Galvan v. Norberg*, 678 F.3d 581, 589 (7th Cir. 2012). "The district court, however, cannot grant a new trial just because it believes the jury got it wrong." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (citation

---

claims are not distinct and separable, a new trial should not be granted as to some claims only. See, *e.g.*, *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordination Pretrial Proceedings*, 2018 WL 3303269, at *10 (N.D. Ill. July 5, 2018) ("[T]he Court does not believe that it can appropriately order a new trial limited to the negligence and strict liability claims while keeping the misrepresentation verdicts intact.").

omitted). "[S]ince the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." *Latino v. Kaizer*, 58 F.3d 310, 317 (7th Cir. 1995) (quoting *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982)) (internal quotation marks omitted). "A new trial should be granted * * * only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Whitehead*, 680 F.3d at 928 (citation and internal quotation marks omitted). The verdict here satisfies that standard.

Assessing the evidence presented at trial, the Court concludes that no rational jury could have rendered the verdict reached by the jury here. This is not a case where the evidence was sharply in conflict. The testimony of Temko and Schroeder indicated that Defendant uniformly enforced its attendance policy against employees who were minutes late. While that policy might be unfair, as it punishes those who are one minute late the same as those who are fifty-nine minutes late, it is not for the Court or the jury for that matter to assess the fairness of the policy. *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) ("The federal courts are not a super-personnel department that second-guesses facially legitimate employer policies. It is not the role of the court to determine whether an employer's expectations were fair, prudent, or reasonable." (internal citations omitted)).

Although only a few employees were terminated based on occurrences for being minutes late, Plaintiff did not identify any examples of employees (other than herself) not receiving occurrences for such minor attendance infractions.[10] The evidence before the jury—including the testimony of Temko and Schroeder—indicated that the policy was enforced uniformly. The Court

---

[10] The Court notes that the jury may have inferred that Defendant excused tardies where a justification was provided (*i.e.*, the employee had car trouble or was stuck in the snow), Plaintiff does not identify any instance in which Defendant excused a tardy where there was no excuse provided.

also notes that Defendant did not identify any examples of other employees who were disciplined for a start time infraction; still, there is nothing in the record to suggest that other employees were not following the Attendance Policy with respect to this issue. Although other employees may have waited in the breakroom for their shift to start after they punched in, they still were in the building in accordance with the Attendance Policy.

The Court may grant a motion for a new trial based on the jury verdict being against the manifest weight of the evidence "even if a motion for judgment as a matter of law must be denied." *Mejia*, 650 F.3d at 634 (citing *Smart Mktg. Grp. v. Publ'ns Int'l Ltd.*, 624 F.3d 824, 832 (7th Cir. 2010)). Although the Court concludes that Defendant is not entitled to judgment as a matter of law on Plaintiff's USERRA claim, the Court also concludes that the jury's verdict with respect to Plaintiff's USERRA claim was against the manifest weight of the evidence. The Court therefore grants Defendant's motion for a new trial on Plaintiff's USERRA claim.

Indeed, Plaintiff herself has a difficult time defending the jury's verdict, relying extensively (although not exclusively) on evidence relating to claims and/or issues not actually before the jury. For example, Plaintiff makes numerous arguments relating to alleged misconduct independent of her termination—the adverse employment action that serves as the basis of Plaintiff's claims. [110, at 17 ("Obviously, Arroyo suffered an adverse action—she lost her job.").] Plaintiff asserts that she was not privy to the many mocking and hostile emails shared among her supervisors and that the "jury had a right to compensate [Plaintiff] due to management's mocking ridicule of Plaintiff and its deliberate indifference to the government published documentation of her rights [that Plaintiff] was bringing to them, thereby further exacerbating her disability." [209, at 9-10.] However, contrary to Plaintiff's assertion, the jury would not act properly by compensating Plaintiff for being mocked by her supervisors unbeknownst to her. Plaintiff also argues that

Defendant violated USERRA by threatening to terminate Plaintiff's employment due to a lack of communication. [209, at 31.] Again, that was not an actionable adverse employment action before the jury. In fact, Plaintiff did not bring a failure to reemploy claim under USERRRA and certainly cannot raise such a claim in response to Defendant's post-trial motions.

### C. Prejudicial Conduct by Plaintiff Relating to Failure to Accommodate and Retaliation Claims Dismissed Prior to Trial.

Plaintiff also makes numerous arguments relating to failure to accommodate and retaliation claims that were disposed of by the Court on summary judgment. For example, Plaintiff asserts that the jury's verdict on Plaintiff's USERRA claim was not against the manifest weight of the evidence because the emails between Defendant's management would allow a reasonable jury to conclude that Defendant "willfully circumvented the law as [Plaintiff] sought to claim her rights under USERRA as an active service member." [209, at 26.] Plaintiff goes on to assert that the actions by Defendant "became even more egregious" when Plaintiff was diagnosed with PTSD and quotes in a parenthetical language from a Supreme Court case regarding retaliation claims. [Id. (quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).] However, there was no retaliation claim before the jury.

This leads to Defendant's final argument for granting a new trial on Plaintiff's USERRA claim—that Plaintiff's counsel engaged in prejudicial conduct warranting a new trial. Specifically, Defendant points to Plaintiff's repeated efforts to inject into the trial evidence relating to her failure to accommodate claim. The Court granted summary judgment on that claim, and that decision was affirmed by the Seventh Circuit. During trial, Plaintiff made numerous statements regarding requests for certain accommodations that were denied by Defendant. For example, During Plaintiff's examination of Temko, counsel for Plaintiff suggested that Defendant should have given someone with PTSD—like Plaintiff—more flexibility. [See Tr. 1084 (asking Temko whether he

would have excused someone with PTSD for being one to two minutes late); Tr. 1103 (asking Temko whether it occurred to him that Plaintiff might have PTSD when he issued a verbal warning to Plaintiff).]  During Plaintiff's examination of Schroeder, Plaintiff's counsel asked Schroeder about Plaintiff's offer to work later to make up for her tardiness.  [Tr. 771.]  Plaintiff also asked Schroeder whether he had authority to cut an employee " a little slack" because she had PTSD. [Tr. at 1001.]  During cross-examination of Plaintiff, the following exchange occurred:

> Q: You would agree with me that there's nothing wrong about an employer asking its employees to be at work on time?
>
> A: Nothing wrong?
>
> Q: Yes.
>
> A: If it violates the law, sure.
>
> Q: Ma'am, are you aware of a law that says an employer can't require their employees to be at work on time?
>
> A Well, gee, if there was an agreed upon accommodation, like flexible work schedule, and then the employer doesn't honor that, yeah, I would believe so.
>
> Q: But that is not the situation here, is it?
>
> A: It is actually.

[Tr. 861.]

The Court sustained some of Defendant's objections to this type of testimony on relevance grounds.  For example, it was not relevant whether it occurred to Temko that Plaintiff had PTSD when he issued her a warning for an attendance infraction.  [Tr. 1103.]  The Court also sustained objections on cumulativeness grounds for questions relating to how Plaintiff was treated differently under the attendance policy.

The Court allowed limited inquiry into Defendant's refusal to exercise its discretion to excuse Plaintiff's attendance infractions.  In allowing some questioning on the issue, the Court

noted that questions about excusing Plaintiff's attendance infractions could relate to Defendant denying accommodations (which would be irrelevant at trial) and they could relate to Defendant exercising its discretion to excuse attendance infractions in a discriminatory manner (which would be relevant). Because the parties indicated that the latter category of questions would be at issue, the Court allowed such questions but reminded the jury throughout the trial that there was no failure to accommodate claim at issue in the case. Still, Plaintiff pressed these questions so much that the Court began to sustain objections to questions on this issue on cumulativeness grounds.

Throughout the trial the Court carefully sought to walk the line between allowing Plaintiff to present evidence supporting Plaintiff's viable claims and barring Plaintiff from presenting evidence relating to claims already determined to be legally insufficient. In aid of that goal, the Court repeatedly provided the jury with curative instructions noting that Plaintiff was not bringing a failure to accommodate claim. In the instructions provided to the jury, the Court also instructed that Plaintiff was not bringing any claim that Defendant "failed to provide accommodations for her PTSD." [156 (Jury Instructions), at 17.] Courts "presume" that juries follow such instructions absent evidence to the contrary. *Sanchez v. City of Chicago*, 700 F.3d 919, 932 (7th Cir. 2012). Furthermore, "[a]s a general rule, errors in admitting evidence that is merely cumulative of properly admitted evidence are harmless." *Jordan v. Binns*, 712 F.3d 1123, 1138 (7th Cir. 2013). "Admission of cumulative evidence does not merit reversal absent a showing of prejudice." *Holmes v. Elgin, Joliet & E. Ry. Co.*, 18 F.3d 1393, 1397 (7th Cir. 1994) (citing *Stutzman v. CRST Inc.*, 997 F.2d 291, 298 (7th Cir. 1993)). To be sure, the Court has already concluded that the jury's verdict did not adhere to the Court's instructions in every respect. Specifically, the jury awarded Plaintiff a sizable compensatory damages verdict—approximately 2.6 times the total damages requested by Plaintiff's counsel—despite the fact that Plaintiff did not present *any*

40

evidence on that issue. Nevertheless, in view of the sustained objections and limiting instructions referenced above, the Court would not order a new trial on the basis of Plaintiff's introduction of testimony and evidence relating to accommodations alone. But for the reasons explained above, other circumstances convince the Court a new trial on Plaintiff's USERRA claim is warranted.

## IV. Conclusion

For the reasons stated above, Defendant's motion for judgment as a matter of law, or, in the alternative, a new trial, or, in the alternative, remittitur and amendment of judgment [192] is granted to the following extent: the Court will enter judgment as a matter of law in favor of Defendant on Plaintiff's ADA discrimination claim and grant a new trial on Plaintiff's USERRA claim. Defendant's remaining requests for relief are denied. Plaintiff's motion to alter judgment [204] is denied in its entirety as moot. This case is set for further status hearing on October 10, 2019 at 9:30 a.m.

Dated: September 30, 2019

Robert M. Dow, Jr.
United States District Judge

41

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.3.3**
**Eastern Division**

Luzmaria Arroyo

                    Plaintiff,

v.                                          Case No.: 1:12−cv−06859
                                            Honorable Robert M. Dow Jr.

Volvo Group North America, LLC

                    Defendant.

---

### NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, February 3, 2022:

      MINUTE entry before the Honorable Robert M. Dow, Jr: Jury trial held. Jury deliberates. Jury reached a verdict. The Jury finds as to Claim I, Liability for Plaintiff USERRA Discrimination Claim For the Defendant, Volvo Group North America, LLC. signed by the Foreperson and 7 jurors, dated 2/3/2022. Jury polled. Judgement is entered for Defendant, Volvo Group North America, LLC and against Plaintiff, Luzmaria Arroyo. Post−trial motions will be due 28 days from today, this deadline cannot be extended. If anyone files a post−trial motion, the Court will set a telephone status shortly thereafter discussing a briefing schedule on the motion. Emailed notice(cdh, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LUZMARIA ARROYO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12-cv-6859 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| VOLVO GROUP NORTH AMERICA | ) | |
| LLC, d/b/a VOLVO PARTS NORTH | ) | |
| AMERICA, | ) | |
| | ) | |
| Defendant. | | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff LuzMaria Arroyo sued Defendant Volvo Group North America, LLC, d/b/a Volvo

Parts North America ("Volvo") for discrimination under the Americans with Disabilities Act, 42

U.S.C. § 12101 *et seq.* ("ADA"), and the Uniformed Services Employment and Reemployment

Rights Act, 38 U.S.C. § 4301 *et seq.* ("USERRA").[1] [51.] On August 23, 2016, a jury returned a

verdict in favor of Plaintiff on both claims, awarding $2.6 million in compensatory damages and

$5.2 million in punitive damages on Plaintiff's ADA claim and finding Defendant liable under the

USERRA.[2] [162.] After trial, Defendant moved the Court for judgment as a matter of law on both

claims and, alternatively, for a new trial. [192.] The Court granted Defendant's motion for

judgment as a matter of law on Plaintiff's ADA claim, holding that no reasonable juror could find

---

[1] Plaintiff also brought claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, as well as a claim under Illinois law for intentional infliction of emotional distress. See [51.] The Court entered summary judgment on these claims, [88], which the Seventh Circuit affirmed on appeal. See [110.]

[2] The jury was asked to assess damages only with respect to Plaintiff's ADA claim. After the jury returned a verdict in favor of Plaintiff on her USERRA claim, the Court awarded equitable relief in the amount of $550,830.32. See [176.] Pursuant to the statutory cap on damages imposed by 42 U.S.C. § 1981a(b)(3), however, the Court reduced Plaintiff's $2.6 million compensatory damages award on her ADA claim to $300,000 and vacated the jury's $5.2 million punitive damages award. [*Id.*]

that Plaintiff was a qualified individual under the ADA at the time of her termination and that Plaintiff had not introduced any evidence to support an award of compensatory damages under the ADA in any event. [227, at 26–29.] Although the Court denied Defendant's motion for judgment as a matter of law on Plaintiff's USERRA claim, it granted Defendant's motion for a new trial. [*Id.* at 34.] The Court reasoned that the jury's $2.6 million compensatory award—a figure that it arrived at in spite of a complete lack of evidence on the issue of ADA compensatory damages— was a product of passion and prejudice that may have infected the verdict in its entirety. [*Id.*] A second trial was then held on Plaintiff's USERRA claim, which ended in a verdict in favor of Defendant. [342.] Before the Court is Plaintiff's Rule 59 motion to alter or amend that judgment, [345], and Plaintiff's motion to file an oversized reply brief in support of that motion. [349.] For the reasons that follow, the Court grants the latter [349] but denies the former [345].

## STATEMENT

This case has wended a long and tortuous path from the day it was filed on August 27, 2012, to the present. After the close of discovery in 2014, this Court granted Defendant's motion for summary judgment on all counts. [88.] Plaintiff appealed. The Seventh Circuit affirmed in part and reversed in part, remanding the case for trial on Plaintiff's USERRA and ADA claims. *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 288 (7th Cir. 2015). On remand, this Court held a jury trial on each of those claims and the jury returned a verdict in favor of Plaintiff on both. [162.]

Regrettably, there was a serious problem with that verdict—the jury awarded Plaintiff $2.6 million in compensatory damages on her ADA claim even though there was no evidence in the trial record that could support such an award. See [227, p. 32.] In fact, there was no evidence of

damages of any kind. Because there was nothing upon which the jury could rationally have based its compensatory damages award, the Court concluded that it was a product of passion and prejudice. Concerned that this passion and prejudice might have infected the verdict in its entirety, including the jury's underlying findings on liability, the Court granted Defendant's motion for a new trial. [227.]

Because the Court also granted Defendant's motion for judgment as a matter of law on Plaintiff's ADA claim, [*id.*], the second trial was limited to Plaintiff's USERRA claim. The second jury found in favor of Defendant. [342.] Plaintiff—understandably disappointed with this result— promptly filed a motion under Federal Rule of Civil Procedure 59(e) to set aside that verdict and reinstate the verdict returned by the first jury years before. [343, 345.]

Although the fifty pages of briefing Plaintiff files in support of her motion defy easy summary, her arguments fall into the following categories:

- Objections to myriad evidentiary and trial rulings the Court made in the course of conducting the second trial in this case, see [345, at 6–16] and [348, at 16–18, 22–24];

- Objections to the Court's determination that it, rather than the jury, would determine damages on Plaintiff's USERRA claim in the event the second jury found Defendant liable, see [345, at 18] and [348, at 18–22];

- Objections to the Court's decision to enter judgment as a matter of law in favor of Defendant on Plaintiff's ADA claim, see [345, at 7, 16] and [348, at 13–16]; and

- Objections to the Court's decision to grant Defendant's motion for a new trial, including the Court's decision to do so without first offering Plaintiff the option of remittitur, see [345, at 20–23] and [348, at 10, 24–25].

Notably, although the lion's share of Plaintiff's arguments challenge the manner in which her second trial was conducted, Plaintiff does not request a new trial. While it is true that Plaintiff

styles her motion as one "for New Trial or To Alter or Amend Judgment," [345, at 1], nowhere does she actually ask the Court to order a new trial. Defendant emphasizes this fact in its opposition brief. See [346, at 1] ("Conspicuously, Plaintiff does **not** request a new trial" (emphasis original)); [*id.* at 4] ("[Plaintiff] could have moved for a new trial pursuant to Rule 59(a). She did not do so and therefore waived the issue."). Tellingly, Plaintiff does not contest this characterization of her motion in her 27-page reply brief, which merely reiterates her desire that the Court "set[] aside the jury verdict entered . . . on February 3, 2022," "reinstat[e] the jury verdict entered . . . on August 23, 2016," and "enter[] judgment on that earlier jury verdict." [348, at 26–27.]

In light of Plaintiff's failure to contest Defendant's claim that she is not seeking a new trial, the Court can only conclude that she has made a purposeful decision to eschew such relief. This finding is significant because any mistakes that this Court may have made in conducting Plaintiff's second trial would at most justify granting a motion for a new trial, not resurrecting the verdict that this Court vacated years ago on entirely unrelated grounds. See [227.] Errors that do not call into question the propriety of this Court's order granting Defendant's motion for a new trial, however plausible, simply cannot justify reinstating the verdict vacated by that undisturbed order.

Because of the fundamental discrepancy between the relief Plaintiff requests and the errors that she alleges justify that relief, most of Plaintiff's objections supply inadequate grounds for granting her motion. To take one example, Plaintiff objects to this Court's decision to enter judgment as a matter of law on her ADA claim after the completion of her first trial. See [345, at 7, 16.] Even assuming Plaintiff is correct that the Court erred in doing so, such a fact would not undermine the Court's independent decision to order a new trial on grounds of passion and prejudice. The two issues are logically distinct. Because the new trial order would remain in

4

effect, the appropriate remedy would be to hold a second trial on Plaintiff's ADA claim, not to reinstate the old verdict.

For this reason, the only argument that might warrant reinstatement of the original verdict in this case—which, again, is the sole relief Plaintiff seeks—would be a challenge to the propriety of the Court's new trial order itself. When a district court vacates an order granting a new trial after the completion of that trial, the effect is to reinstate the earlier verdict, thus restoring the state of affairs immediately preceding the entry of the new trial order. See, *e.g.*, *Gallimore v. Mo. Pac. R. Co.*, 635 F.2d 1165, 1171 (5th Cir. 1981) ("[A] court may vacate its order granting a new trial and reinstate the [earlier] verdict or judgment." (quoting another source)). Such relief is available under Rule 59. See 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 (3d ed. Apr. 2022) ("Rule 59(e) . . . include[s] motions for reconsideration.").[3]

Although Plaintiff's opening and reply briefs do not explicitly pursue this avenue of relief, each dedicates several pages to attacking this Court's order granting a new trial on September 30, 2019. [227.] Plaintiff asserts three primary objections to that decision, arguing that the Court erred (1) because the initial verdict "was not against the clear weight of the evidence," [345, at 20]; (2) because the $5.2 million punitive damages award "was within permissible ratios,"[4] [*Id.*]; and (3) and because the Court granted Defendant's motion "without first offering Arroyo the

---

[3] That district courts possess this power makes eminent sense. Precisely the same relief would follow from a successful appeal, so vacating a manifestly erroneous new trial order under Rule 59 promotes "the just, speedy, and inexpensive determination" of the case by forestalling an unnecessary appeal. Fed. R. Civ. P. 1; *Juneau Square Corp. v. First Wis. Nat. Bank of Milwaukee*, 624 F.2d 798, 806 (7th Cir. 1980) ("[A]fter a new trial and entry of final judgment an appellate court entertaining an appeal from the final judgment may review the new trial order and, where appropriate, reinstate the original verdict.").

[4] Here, Plaintiff presumably refers to constitutional limitations on the size of punitive damages awards relative to the compensatory damages awards that they supplement. See, *e.g.*, *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

opportunity to accept a remittitur." [*Id.* at 22.] The Court will liberally construe these objections as a request that the Court vacate its new trial order and reinstate the original verdict.

Such an argument is subject to the standards that apply to any other Rule 59 motion. "Relief under Rule 59(e) is an 'extraordinary remed[y] reserved for the exceptional case.'" *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 463 (7th Cir. 2021) (quoting *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015)). "To prevail on a motion for reconsideration under Rule 59, the movant must present either newly discovered evidence or establish a manifest error of law or fact." *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). Plaintiff does not point to any newly discovered evidence. Therefore, she must demonstrate that the Court's order granting a new trial was manifestly erroneous either in its factual apprehension of the case or in its application of law to those facts.

Plaintiff fails to make such a showing. To reiterate, the Court granted Defendant's motion for a new trial because the jury awarded Plaintiff $2.6 million in compensatory damages on her ADA claim, notwithstanding Plaintiff's failure to present *any* evidence justifying such an award. Not only was the jury's damages verdict unsupported by evidence, it "dwarf[ed] the amount of compensatory damages awarded in cases in which the plaintiff actually presented evidence of compensatory damages." [227, at 32.] In light of these concerning facts, the Court "conclude[d] that the [damages] verdict was irrational . . . or, put another way, [a product of] passion and prejudice . . . ." [*Id.*]

The question became what to do about this defect in the jury's verdict. The Court considered the possibility of ordering a partial new trial solely on the issue of damages, but ultimately concluded that a new trial was necessary on the jury's underlying finding that Defendant violated the USERRA as well. In so holding, the Court drew on precedent of the Seventh Circuit

6

and other jurisdictions counseling that where an irrational damages verdict calls into question the rationality of the jury's underlying findings of liability, a new trial on both damages and liability is appropriate. [*Id.* at 33–34.]

Plaintiff has not convinced the Court that this decision was erroneous, let alone manifestly so. In particular, Plaintiff has failed to demonstrate that the Court erred in either its factual conclusion that the jury's damages verdict was unsupported by evidence or its ultimate legal conclusion that a new trial on both liability and damages was appropriate.

Plaintiff attempts to paper over her failure to introduce evidence of damages by adverting generally to evidence that she was mistreated by Defendant. See, *e.g.*, [345, at 20] ("Based on the cavalier way Volvo management and supervisors trifled with Arroyo's rights under USERRA and the ADA and mocked and treated her over the years as she went in service of our country, the large monetary verdict in *Arroyo I* should hardly shock the conscience."). But questions of liability and damages are distinct, and evidence supporting the former does not necessarily (and in this case did not) satisfy a Plaintiff's burden of proof on the latter. Because Plaintiff points to no evidence calling into question this Court's factual determination that no evidence in the record supported the first jury's compensatory damages award, her contention that that award "was not against the clear weight of the evidence" fails. [*Id.*]

Plaintiff's remaining, legal objections to the new trial order are similarly unavailing. Plaintiff attempts to defend the verdict, in part, by arguing that the 2:1 ratio between the punitive and compensatory damages awarded by the first jury "was within permissible ratios." [345, p. 20.] But the $5.2 million punitive damages award had nothing to do with the Court's decision to order a new trial. In fact, the Court had vacated that award long before it ordered a new trial, in accordance with the damages cap imposed by 42 U.S.C. § 1981a(b)(3). See [177.] And in its

memorandum opinion and order granting Defendant's motion for a new trial, the Court never intimated, let alone held, that the jury's punitive damages verdict had any bearing on the Court's independent determination that the compensatory damages verdict was unsupported by evidence and, therefore, irrational.

Finally, with respect to Plaintiff's argument that she should have first been offered the option of remittitur, the Court points, once more, to the myriad cases in this Circuit prohibiting courts from remitting an irrationally excessive verdict. See, *e.g.*, *Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1448 (7th Cir. 1993); *Dorin v. Equitable Life Assurance Soc'y*, 382 F.2d 73, 77 (7th Cir. 1967) ("If a verdict is the result of appeals to passion and prejudice, the trial court must unconditionally order a new trial and cannot give the plaintiff an option to accept a lesser amount."). Because the Court found that the jury's $2.6 million compensatory verdict was a product of passion and prejudice, it had no discretion to offer Plaintiff remittitur. Even if it did, the Court would not have done so in light of its further decision to enter judgment as a matter of law on Plaintiff's ADA claim.

For the reasons above, the Court is not convinced that it erred in granting Defendant's motion for a new trial, let alone that that order constitutes manifest error. Therefore, the Court will not vacate its new trial order. And because all of Plaintiff's remaining arguments would, even if meritorious, fail to justify the relief Plaintiff seeks—reinstatement of the initial jury verdict—Plaintiff's motion is denied.

Dated: December 27, 2022

Robert M. Dow, Jr.
United States District Judge

8

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LUZMARIA ARROYO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:12-cv-06859 |
| vs. | ) | |
| | ) | Honorable Robert M. Dow, Jr., |
| VOLVO GROUP NORTH AMERICA, LLC, | ) | Judge Presiding |
| d/b/a VOLVO PARTS NORTH AMERICA, | ) | |
| | ) | Honorable Jeffrey Cole, |
| | ) | Magistrate Judge |
| | ) | |
| Defendant. | ) | JURY DEMANDED |

**NOTICE OF APPEAL**

To:

Mr. William J. McMahon IV
Constangy Brooks Smith, & Prophete, LLP
100 N. Cherry Street
Winston-Salem, North Carolina 27101
bmcmahon@constangy.com

Ms. Laura Balson
Constangy Brooks Smith, & Prophete, LLP
300 S. Wacker Drive
Suite 1950
Chicago, Illinois 60606
lbalson@constangy.com

Notice is hereby given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the orders by Judge Robert M. Dow, Jr. setting aside his previous order of August 23, 2016 after the case was remanded from the Seventh Circuit in No. 14-3618, Decided: October 6, 2015, with instructions and directions concerning its trial which were followed as closely as possible, and the jury rendered a verdict for Plaintiff in the amount of $2,600,000 in compensatory damages and $5,200,000 in punitive damages on her ADA claim and found liability for Arroyo and against Volvo on her USERRA claim. (Doc.#: 162).

Notice is also hereby given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the order entered on July 13, 2017 by Judge Robert M. Dow, Jr. awarding Plaintiff $141,388.53 in back pay, $84,131.92 in front pay, $41,348.61 in other employment-related compensation, $8,546.10 in prejudgment interest, and $275,415.16 in liquidated damages. Pursuant to 42 U.S.C. § 1981a(b)(3), the Court reduced the Jury's $2.6 million compensatory damages award to $300,000

1

and vacated the Jury's $5.2 million punitive damages award. All other forms of equitable relief were denied. Final judgment was entered in favor of Arroyo. (Doc.#: 177).

Notice is also hereby given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the Memorandum Opinion and Order by His Honor, Judge Robert M. Dow, Jr. entering judgment as a matter of law for Defendant Volvo Group North America, LLC, d/b/a Volvo Parts North America, entered in this action on September 30, 2019 on Arroyo's ADA discrimination claim and granting a new trial on Arroyo's USERRA claim only and no longer following the clear mandate from the Seventh Circuit Court of Appeals. (Doc.#192).

Notice is also hereby given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the Order entered by Judge Robert M. Dow, Jr. on September 30, 2019 denying in its entirety Arroyo's motion to alter judgment. (Doc.#: 204).

Notice is also hereby given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the Memorandum Opinion and Order by His Honor, Judge Robert M. Dow, Jr. setting aside the jury verdict in its entirety because the Trial Court suspected passion and prejudice might have infected the jury verdict in its entirety including the jury's underlying findings on liability without any evidence whatsoever to support that suspicion. (Doc.#: 227).

Notice is also hereby given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the Memorandum Opinion and Order by His Honor, Judge Robert M. Dow, Jr. on August 26, 2021 denying Arroyo's two earlier motions to reconsider her request for miscellaneous relief concerning issues to be tried and witnesses to be called at the second trial of the cause. (Doc.#: 300).

Notice is also hereby given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the additional pretrial rulings on scope of permissible evidence at trial and further interpretation of the USERRA statute and other authorities read into the record by His Honor, Judge Robert M. Dow, Jr. on January 25, 2022 before the commencement of the second trial. (Doc.#326).

Notice is also hereby given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the order entered by Judge Robert M. Dow, Jr. on January 26, 2022 excluding from the trial of *Arroyo II* the testimony of Dennis Sholl, National Vice President of Volvo and the testimony of Regina Williams, the Volvo Human Resources Representative who interacted with Arroyo right after the date of her termination. (Doc.#: 328).

Notice is also hereby given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the order entered by Judge Robert M. Dow, Jr. on January 26, 2022 excluding from the trial of *Arroyo II*

excluding evidence, including emails from Keith Schroeder to Dennis Scholl and Regina Williams at the time of and concerning Plaintiff's termination from Volvo where Schroeder references Arroyo going to Colonel Gorski for intervention on the travel issue because it reveals the frustration and malicious intent of Schroeder. (Doc.#: 328).

Notice is also hereby given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the order entered by Judge Robert M. Dow, Jr. on January 26, 2022 excluding from the trial of *Arroyo II* Keith Schroeder's issues with Arroyo as she sought to protect her USERRA rights which is closely linked to her termination as shown by the suspicious timing of Keith Schroeder's complaint at the time of termination of Arroyo's employment. (Doc.#: 328).

Notice is also hereby given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the order entered by Judge Robert M. Dow, Jr. on January 26, 2022 excluding from the trial of *Arroyo II* the emails from Colonel Gorski to Keith Schroeder because they talked about Arroyo's right to have eight hours rest time before and after travel pursuant to her military orders and duties and the frustration and irritation it caused Keith Schroeder, Michael Temko, other supervisors, and other Volvo employees. (Doc.#: 328).

Notice is also hereby given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the order entered by Judge Robert M. Dow, Jr. on January 26, 2022 precluding from the trial of *Arroyo II* any evidence that Arroyo was being treated at the Veterans Administration Hospital for PTSD and the frustration that attendance at the VA for PTSD Group Therapy Sessions caused to Volvo personnel. (Doc.#: 328).

Notice is hereby further given that LuzMaria Arroyo, Plaintiff in the above-captioned case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the Memorandum Opinion and Order by His Honor, Judge Robert M. Dow, Jr. granting judgment to Volvo Group North America, LLC, d/b/a Volvo Parts North America, Defendant entered in this action on the 27th day of December, 2022, denying Plaintiff's Rule 59 Motion for New Trial or to Alter or Amend Judgment, filed on March 2, 2022. (Doc.#: 351).

Respectfully submitted,

/s/ John P. DeRose
John P. DeRose
One of the attorneys for LuzMaria Arroyo
Plaintiff Appellant

SA148

John P. DeRose
Caitlyn F. DeRose
John P. DeRose & Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, IL 60521
(630) 920-1111 office
(630) 920-1170 fax
john@johnderoselaw.com
caitlyn@johnderoselaw.com

SA149

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LUZMARIA ARROYO,                        )
                                        )
                    Plaintiff,          )
                                        )       Case No. 1:12-CV-06859
vs.                                     )
                                        )       Honorable Robert M. Dow, Jr.,
VOLVO GROUP NORTH AMERICA, LLC          )       Judge Presiding.
d/b/a VOLVO PARTS NORTH AMERICA,        )
                                        )
                    Defendant.          )

**CERTIFICATE OF SERVICE
NOTICE OF APPEAL**

To:
Mr. William J. McMahon IV                       Ms. Laura Balson
Constangy Brooks Smith, & Prophete, LLP         Constangy Brooks Smith, & Prophete, LLP
100 N. Cherry Street                            300 S. Wacker Drive
Suite 300                                       Suite 1950
Winston-Salem, North Carolina 27101             Chicago, Illinois 60606
bmcmahon@constangy.com                          lbalson@constangy.com

The undersigned, pursuant to 28 USC 1746, certifies under penalty of perjury under the laws of the United States of America that this Notice of Appeal was served by electronically filing the same with the Clerk of the United States District Court for the Northern District of Illinois on January 24, 2023, and the above-named attorneys of record will receive copies of the same through the Court's electronic filing system of which they are members.

                                        Respectfully submitted,

                                        /S/ John P. DeRose
                                        John P. DeRose
                                        One of the Attorneys for LuzMaria Arroyo
                                        Plaintiff-Appellant

John P. DeRose
Caitlyn F. DeRose
John P. DeRose & Associates
615 N. York Rd.
Hinsdale, IL 60521
(630) 920-1111 office
(630) 920-1170 fax
john@johnderoselaw.com

5

SA150